IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

JOSE RODRIGUEZ,

                    Plaintiff,                    Civil Action No.
                                                  9:13-CV-1106 (DNH/DEP)

          v.

D. ROCK, *et al.*,

                    Defendants.

─────────────────────────────

APPEARANCES:                           OF COUNSEL:

FOR PLAINTIFF:

JOSE RODRIGUEZ, *Pro se*
09-A-3150
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN            CHRISTOPHER W. HALL, ESQ.
New York State Attorney General      Assistant Attorney General
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Jose Rodriguez, a New York State prison inmate, has brought this action against several individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, alleging that defendants violated both his First Amendment right to freely exercise his chosen religion and the RLUIPA when they denied him religious meals during Ramadan.

Now that discovery in the action is closed, defendants have moved for summary judgment, arguing that they were not personally involved in the alleged violations, and further that they are entitled to qualified immunity from suit. For the reasons set forth below, I recommend the motion be granted in part but otherwise denied.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS; and is a member of the Nation of Islam. *See generally* Dkt. No. 1. While he is now confined elsewhere, at the times relevant to the claims in

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

this case, plaintiff was confined in the Upstate Correctional Facility ("Upstate") located in Malone, New York.[2] *Id.* Each of the defendants named in plaintiff's complaint is employed at Upstate, including (1) David Rock, the Superintendent; (2) Michael Lira, the Deputy Superintendent of Programs; (3) Don Haug, the Food Service Administrator; (4) Timothy Debyah, a Block Sergeant; (5) Sean Patterson, a Corrections Officer; and (6) Lawrence LaBarge, also a Corrections Officer. Dkt. No. 1 at 1, 3-4; Dkt. No. 43-2 at 1; Dkt. No. 43-3 at 1; Dkt. No. 43-4 at 1; Dkt. No. 43-5 at 1; Dkt. No. 43-6 at 1; Dkt. No. 43-7 at 1.

A.    Underlying Facts Regarding Claimed Denial of Religious Meals

Plaintiff was transferred from Great Meadow Correctional Facility into Upstate on August 3, 2012, during Ramadan, a religious period observed by members of the Nation of Islam. Dkt. No. 52 at 19-20. When an inmate is transferred to a new facility, a form that details basic information about him, including his religion, date of birth, and identifying marks or tattoos, is forwarded with him to the receiving facility. *Id.* at 23. According to plaintiff, when he was transferred to Upstate, the itinerary form that accompanied him noted that he was a member of the Nation of Islam. *Id.* at 25. Upon his

---

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

arrival at Upstate, plaintiff informed an unidentified sergeant that he was a member of the Nation of Islam, and the sergeant promised that he would be given the proper meals in accordance with his religion. *Id.* at 24-28.

According to plaintiff, during Ramadan, members of the Nation of Islam refrain from eating food and drinking liquids between sunrise and sunset. Dkt. No. 52 at 28. Prisoners participating in Ramadan are given special meals that allow them to eat late at night and early in the morning. *Id.* at 28, 31-32. Specifically, a dinner tray is delivered to each Muslim inmate after sundown, along with a "sahoya bag" that contains food for the prisoner to eat early in the morning before sunrise. *Id.* at 31-32. Corrections officers deliver these meals to the prisoners. Dkt. No. 43-3 at 3.

The parties have offered conflicting accounts regarding the relevant events following plaintiff's transfer into Upstate. At plaintiff's deposition he testified that, upon arriving at Upstate, he was taken to his cell by defendant Patterson and another unidentified corrections officer. Dkt. No. 52 at 34-35. Plaintiff informed defendant Patterson and the unidentified corrections officer of his Ramadan fast and need for Ramadan meals. *Id.* at 36. When plaintiff arrived at his cell, he was strip-searched by defendant LaBarge, at which time plaintiff informed defendant LaBarge of his religious needs. *Id.* at 34, 37-38. Later that night, plaintiff informed defendant Debyah that he had

not received his Ramadan meal; defendant Debyah responded by promising to look into the matter. *Id.* at 38-39. Over the next twelve days, plaintiff spoke to various DOCCS employees, including defendants Patterson, LaBarge, and Debyah, informing them that he was not receiving his Ramadan meals. Dkt. No. 1, 6-41; Dkt. No. 52 at 43-44, 50, 63, 72-73. Plaintiff alleges that he did not eat any food, and drank only tap water, between August 3, 2012 and August 14, 2012. Dkt. No. 52 at 30-31, 72. Plaintiff was served his Ramadan meal and sahoya bag on the evening of August 15, 2012. Dkt. No.1 at 12; Dkt. No. 52 at 72. Ramadan ended on August 17, 2012, with a special meal, which plaintiff also received. Dkt. No. 52 at 90.

While defendants generally agree with plaintiff's recitation regarding the timing of his arrival at Upstate, defendants Patterson, Debyah, and LaBarge do not recall speaking to plaintiff about his religious meals. Dkt. No. 43-2 at 2; Dkt. No. 43-4 at 2-3; Dkt. No. 43-6 at 2. Defendant Patterson states that he was not working on August 3, 2012, when plaintiff arrived at the facility. Dkt. No. 43-6 at 2, 6-8. The only days on which defendant Patterson could have spoken to plaintiff were August 13, 2012 and August 14, 2012, because he did not work on plaintiff's block on any other day during the relevant period. *Id.* at 3. Both defendants Debyah and LaBarge

do not recall having conversations with plaintiff regarding his Ramadan meals on the days between August 3, 2012, and August 14, 2012. Dkt. No. 43-2 at 2; Dkt. No. 43-4 at 2-3.

According to defendant Haug, when a Muslim inmate is transferred to Upstate, his name is placed on a list that notes his religion and the need for religious meals during Ramadan. Dkt. No. 43-3 at 2-3. The list is periodically generated from the prison chaplain's office and is attached to meal delivery carts. *Id.* Defendant Haug asserts that plaintiff's name appeared on the chaplain's list on August 3, 2012 and August 6, 2012, and defendant Haug "assume[d] that [plaintiff] received his Ramadan meals [between August 3, 2012, and August 17, 2012]." *Id.* at 3, 6-7.

### B.    Plaintiff's Complaints to Prison Officials

Plaintiff lodged complaints with various prison officials regarding the alleged failure to provide him with religious meals, both verbally and in the form of grievances and letters. Dkt. No. 52 at 39-85.

#### 1.    Defendant Haug

Plaintiff wrote a letter to defendant Haug regarding his Ramadan meals on August 6, 2012. Dkt. No. 1-3 at 4; Dkt. No. 52 at 44. Plaintiff received a letter dated August 15, 2012, from the prison chaplain stating that, "[p]er the Food Service Administrator," plaintiff's name was on the list

of inmates to receive religious meals. Dkt. No. 1-1 at 1; Dkt. No. 52 at 45. At his deposition, plaintiff testified that his only contact with defendant Haug was the letter he sent on August 6, 2012, and receipt of the letters from the chaplain "per [defendant Haug]." Dkt. No. 52 at 45. Defendant Haug contends that he did not know of plaintiff's grievance until October 26, 2012, long after Ramadan had ended. Dkt. No. 43-3 at 4. Defendant Haug does not recall receiving plaintiff's complaint from August 6, 2012, and does not recall speaking to plaintiff at any time. *Id.* at 3-4.

        2.   <u>Defendant Lira</u>

On August 6, 2012, plaintiff sent a letter to defendant Lira, the Deputy Superintendent of Programs at Upstate, complaining that he had not received his Ramadan meals. Dkt. No. 1-3 at 5; Dkt. No. 52 at 86. Defendant Lira did not respond to plaintiff's letter. Dkt. No. 52 at 87. In his declaration in support of defendants' motion, defendant Lira states that, although he does not recall receiving plaintiff's letter, assuming he had received the letter, he would have forwarded it to the prison chaplain for resolution. Dkt. No. 43-5 at 2.

### 3. Defendant Rock

On August 10, 2012, plaintiff sent a complaint letter and a grievance to defendant Rock regarding his Ramadan meals. Dkt. No. 1-1 at 16; Dkt. No. 1-3 at 6; Dkt. No. 52 at 55, 59. Defendant Rock does not recall receiving either of those written communications. Dkt. No. 43-7 at 3-4. In his declaration, defendant Rock states that, had his office received a complaint letter regarding religious meals, his secretary would have referred the letter to the deputy superintendent of programs, who would likely have contacted the chaplain's office. *Id.* at 3. With respect to the grievance plaintiff allegedly sent, defendant Rock states that, had his office received it, it would have been returned to plaintiff with an instruction to address his issues to the Inmate Grievance Program ("IGP") office in accordance with DOCCS Directive No. 4040. *Id.* at 4.[3]

Plaintiff also sent a letter to defendant Rock on September 10, 2012, asking for assistance in appealing a separate grievance that was also sent on August 10, 2012. Dkt. No. 1-3 at 11; Dkt. No. 43-7 at 4. The letter does

---

[3] Directive No. 4040 requires an inmate to first submit any complaints to the IGP before writing to the prison superintendent. Dkt. No. 43-7 at 2, 11-13. According to defendant Rock, if he receives a grievance from an inmate that has not first been submitted to the IGP, it is his practice to return the grievance with a memorandum directing the inmate to follow procedures set forth in Directive No. 4040. *Id.* at 2. Due to the volume of mail that defendant Rock receives, his secretary opens letters and determines whether they should be directed to other offices or returned to the sender. *Id.* at 3.

not detail the nature of the grievance that plaintiff hoped to appeal. Dkt. No. 1-3 at 11. Because defendant Rock and the IGP office had no record of a grievance filed by plaintiff on August 10, 2012, defendant Rock returned the appeal letter and directed plaintiff to first address concerns to the IGP office. Dkt. No. 43-7 at 4.

### 4. Defendant Debyah

Plaintiff claims to have spoken with defendant Debyah regarding written grievances on August 9, 2012, and August 14, 2012. Dkt. No. 52 at 68, 72. Defendant Debyah does not recall those interactions with plaintiff. Dkt. No. 43-2 at 5.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on September 9, 2013, by the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Following an initial review of plaintiff's submissions pursuant to 28 U.S.C. § 1915(e), District Judge David N. Hurd issued an order on November 26, 2013, granting plaintiff's IFP application and dismissing two of the defendants named in plaintiff's complaint. Dkt. No. 7. Following the completion of discovery, defendants filed the pending motion seeking the entry of summary judgment on November 7, 2014. Dkt. No. 43. Defendants' motion, which plaintiff has opposed, Dkt. No. 46, has been

referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).

III.    DISCUSSION

   A.    Defendant Patterson

As an initial matter, in his response to defendants' motion it appears plaintiff has consented to the dismissal of all claims against defendant Patterson. Dkt. No. 46-2 at 1 ("Plaintiff wishes to have Defendant Sean Patterson DISMISSED from the complaint entirely."). Accordingly, I recommend dismissal of plaintiff's complaint as against defendant Patterson based on plaintiff's stipulation. *See, e.g.*, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 394 (1990) ("Once the defendant has filed a summary judgment motion or answer, the plaintiff may dismiss the action only by stipulation or order of the court[.]" (citing Fed. R. Civ. P. 41)).

   B.    Plaintiff's RLUIPA Claim

Plaintiff has asserted RLUIPA and section 1983 claims against all defendants in their "individual and personal capacit[ies]" and seeks only monetary relief. Dkt. No. 1 at 3-4, 44-5. The RLUIPA,[4] however, does not

---

[4]      In relevant part, the RLUIPA states as follows:

          No government shall impose a substantial burden on the

create a private cause of action against state officers sued in their individual

capacities, nor does it allow for the award of monetary damages against

state officers sued in their official capacities. *Wash. v. Gonyea*, 731 F.3d

143, 144 (2d Cir. 2013) (citing *Sossaman v. Tex.*, 131 S. Ct. 1651, 1656

(2011)); *accord, Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014)

("RLUIPA does not authorize claims for monetary damages against state

officers in either their official or individual capacities."); *Williams v. Leonard*,

No. 11-CV-1158, 2015 WL 3544879, at *1 (N.D.N.Y. June 4, 2015)

(McAvoy, J.) ("[T]o the extent that Plaintiff seeks monetary damages

against the Defendants in their individual or official capacities under the

RLUIPA, such damages are not available.").[5] Because, in this case, plaintiff

does not seek any relief aside from monetary damages, I recommend that

defendant's motion for summary judgment be granted dismissing plaintiff's

---

religious exercise of a person residing in or confined to an
institution. . . unless the government demonstrates that
imposition of the burden on that person—

> (1) is in furtherance of a compelling governmental
> interest; and

> (2) is the least restrictive means of furthering that
> compelling governmental interest.

42 U.S.C. § 2000cc-1(a); *Cutter v. Williams*, 544 U.S. 709, 712 (2005).

[5]    Copies of all unreported decisions cited in this document have been appended for
the convenience of the *pro se* plaintiff.

RLUIPA claim.[6]

### C.    Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine dispute

as to any material facts and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins.*

*Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d

Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law." *Anderson*, 477 U.S. at

248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

A material fact is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*,

477 U.S. at 248.

A party moving for summary judgment bears an initial burden of

---

[6]    Even assuming plaintiff's complaint included a request for declarative or injunctive relief, "[i]n this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir.2006) (citing *Young v. Coughlin,* 866 F.2d 567, 568 n.1 (2d Cir. 1989)); *accord, Johnson v. Rock*, No. 08-CV-1013, 2010 WL 3910153, at *2 (N.D.N.Y. Sept. 30, 2010) (Sharpe, J.). Because plaintiff has been transferred to a different correctional facility since the incidents at issue occurred, any request for declaratory or injunctive relief would be dismissed as moot.

demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a motion for summary judgment, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553.The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

D.    Personal Involvement

Defendants contend that plaintiff's remaining First Amendment claim should be dismissed because no reasonable factfinder could conclude that any of them were personally involved in denying plaintiff his religious meals

between August 3, 2012, and August 15, 2012. Dkt. No. 43-8 at 7.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

With respect to individuals who are sued in their capacities as supervisors, like defendants Lira, Haug, and Rock, it is well-established that they cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.

2003) ("[L]iability . . . cannot rest on *respondeat superior*."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

With these principles in mind, I will analyze the personal involvement of each of the defendants below.

### 1.    Defendant Lira

Plaintiff alleges that he wrote a letter to defendant Lira complaining that he had not received Ramadan meals, but received no response to the letter. Dkt. No. 1-3 at 5; Dkt. No. 52 at 86. Defendant Lira does not recall receiving plaintiff's letter. Dkt. No. 43-5 at 2. Even assuming plaintiff's allegations are true, it is well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find

that the defendant was personally involved in the deprivation alleged. *Smith v. Rosati*, No. 10-CV-1502, 2013 WL 1500422, at *6 (N.D.N.Y. Feb. 20, 2013) (Peebles, M.J.), *adopted by* 2013 WL 1501022 (N.D.N.Y Apr. 10, 2013) (Hurd, J.); *see also Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *16 (N.D.N.Y. Jan. 24, 2013) (Dancks, M.J.), *adopted by* 2013 WL 599893 (N.D.N.Y. 2013) (Mordue, J.) ("[M]ere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged constitutional violations."). For this reason, I recommend the dismissal of all claims asserted against defendant Lira.

### 2. Defendant Haug

Plaintiff also wrote a letter to defendant Haug, dated August 6, 2012, complaining that he was not receiving Ramadan meals. Dkt. No. 1-3 at 4; Dkt. No. 52 at 44-5. In response, plaintiff received a memorandum dated August 15, 2012, from the prison chaplain, Deacon Bashaw, stating, "[p]er the Food Service Administrator, your name is on the list as of this date." Dkt. No. 1-1 at 1. In support of defendants' motion, defendant Haug has submitted a declaration stating that he does not recall receiving plaintiff's letter. Dkt. No 43-3 at 3. Because the record evidence reflects that defendant Haug referred plaintiff's letter to the prison chaplain, I find that

defendant Haug was not sufficiently involved in the alleged denial of plaintiff's religious meals to support a finding of liability. *See Eldridge v. Williams*, No. 10-CV-0423, 2013 WL 4005499, at *5 (S.D.N.Y. July 30, 2013) (citing *Grullon v. City of New Haven*, 720 F.3d 133, 137 (2d Cir. 2013) (concluding that forwarding a plaintiff's complaint to a "subordinate for investigation and response. . . does not establish personal involvement"); *see also Reeder v. Hogan*, No. 09-CV-0520, 2012 WL 4107822, at *7 (N.D.N.Y. July 11, 2012) (Baxter, M.J.), *adopted by* 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012) (Mordue, J.), ("Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a Section 1983 cause of action." (quotation marks omitted)). Accordingly, I recommend that all claims against defendant Haug be dismissed.

### 3. Defendant Rock

Plaintiff sent defendant Rock both a letter and a grievance on August 10, 2012, complaining that he had not received his Ramadan meals.[7] Dkt. No. 1 at 10; Dkt. No. 1-1 at 16-17; Dkt. No. 1-3 at 6; Dkt. No. 52 at 54-55,

---

[7]     Plaintiff also submitted a correspondence to defendant Rock dated September 10, 2012, in which he requests assistance "with appealing [a grievance] to the next level." Dkt. No. 1-3 at 11. Although it is not clear from the record whether defendant Rock responded to this grievance, it is not relevant to the claims in this action because it contains no complaints from plaintiff about not receiving Ramadan meals. *Id.*

59-60. While there is no record that defendant Rock responded to plaintiff's letter, defendant Rock did send a memorandum to plaintiff on September 10, 2012, in response to plaintiff's grievance. Dkt. No. 1-3 at 12; Dkt. No. 43-7 at 3; Dkt. No. 52 at 59. Defendant Rock advised plaintiff he was returning plaintiff's grievance to him because inmates are required to submit any grievance directly to the IGP office. Dkt. No. 1-3 at 12. Courts in this circuit have held that, under these circumstances, a supervisor in defendant Rock's position is not personally involved because, although he responded to plaintiff's grievance, he neither conducted an investigation nor acted on the grievance. *See, e.g., Jones v. Fischer*, No. 10-CV-1331, 2012 WL 1899004, at *11, (N.D.N.Y. May 1, 2012) (Baxter, M.J.), *abrogated on other grounds by Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 748 F.3d 471, 475 (2d Cir. 2014), ("The memorandum from defendant Rock, telling plaintiff he needed to take his grievance through the proper channels is not sufficient to establish personal involvement." (footnote omitted)). Accordingly, I recommend dismissal of all claims asserted against defendant Rock.

### 4.    Defendants LaBarge and Debyah

Plaintiff spoke to defendant Debyah "exactly five times" between August 3, 2012, and August 15, 2012, regarding the failure of prison officials to serve him Ramadan meals. Dkt. No. 52 at 63-65, 68-71, 72. According to plaintiff, defendant Debyah told plaintiff he would check the list that notes inmates' religious needs to see if plaintiff's name had been added. *Id.* at 65. Although the record is not clear on how many occasions plaintiff spoke to defendant LaBarge, plaintiff testified at his deposition that he informed defendant LaBarge daily that he was not receiving his Ramadan meals. *Id.* at 52-53. According to plaintiff, each time he complained directly to defendant LaBarge, he was told that the relevant paperwork did not reflect that plaintiff was a member of the Nation of Islam and entitled to Ramadan meals. *Id.* at 53. In support of defendants' motion, defendants LaBarge and Debyah have submitted declarations, in which they state that they do not recall having any discussions with plaintiff regarding the allegations in his complaint. Dkt. No. 43-2 at 2; Dkt. No. 43-4 at 2-3. In light of the record evidence, resolving all ambiguities and drawing all inferences in a light most favorable to plaintiff, a reasonable factfinder could conclude, if plaintiff's deposition testimony is credited, that defendants LaBarge and Debyah learned of plaintiff's complaints regarding his Ramadan meals and ignored

the issue. I therefore recommend that defendants' motion, to the extent it seeks dismissal of plaintiff's claims against defendants LaBarge and Debyah for lack of personal involvement, be denied.

E.   Qualified Immunity[8]

Defendants also seek dismissal of plaintiff's claims on the basis that they are entitled to qualified immunity from suit. Dkt. No. 43-8 at 10-11. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated*

---

[8]   Because I have recommended dismissal of defendants Patterson, Lira, Haug, and Rock for reasons discussed above in parts III.A. and III.D. in this report, I have analyzed defendants' qualified immunity argument only with respect to defendants Debyah and LaBarge.

*on other grounds by Pearson*, 555 U.S. at 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

When resolving whether an official is shielded by qualified immunity at summary judgment, the court must employ a "two-pronged inquiry." *Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014). The first prong asks "whether the facts, '[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right [.]'" *Tolan*, 134 S.Ct. at 1865 (quoting *Saucier*, 533 U.S. at 201). The second prong asks "whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 134 S.Ct. at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The official will be shielded from liability "if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tolan*, 134 S.Ct. at 1866 (quoting *Hope*, 536 U.S. at 739); *see also Provost*, 262 F.3d at 160 ("In general, public officials are entitled to qualified immunity if (1) their conduct does not

violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights . . . This forgiving standard protects 'all but the plainly incompetent or those who knowing violate the law.'") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In this case, it is well-established that a prisoner has a right to receive meals that are consistent with his religious dietary principles. *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (citing *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir.1975)); *see also Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir.1992) ("The principle [*Kahane*] established was not placed in any reasonable doubt by intervening Supreme Court rulings[.]"). While defendants LaBarge and Debyah deny any recollection of speaking to plaintiff regarding his complaints that he was being denied Ramadan meals, the allegations in his complaint and testimony at his deposition describing the conversations he had with each of the defendants gives rise to a genuine dispute of material fact as to whether defendants LaBarge and Debyah did, in fact, participate in denying plaintiff access to his religious meals. Because this question cannot be resolved on summary judgment, I cannot recommend that the court find the remaining two defendants are entitled to qualified immunity from suit. In the event a reasonable factfinder

credits plaintiff's testimony and version of the events, no reasonable officer in the position of defendants LaBarge and Debyah would believe that their alleged conduct – which essentially amounts to ignoring plaintiff's complaints – did not violate plaintiff's clearly established First Amendment rights. Accordingly, I recommend the court deny defendants' motion to the extent it requests dismissal of the claims asserted against defendants LaBarge and Debyah based on qualified immunity.[9]

IV.    SUMMARY AND RECOMMENDATION

In light of plaintiff's agreement to dismiss his claims against defendant Patterson, I recommend that plaintiff's complaint be dismissed as against that defendant. In addition, because plaintiff only seeks money damages against the defendants in both their individual and official capacities and

---

[9]    In their memorandum of law submitted in support of the pending motion, defendants contend as follows:

> Officer[] . . . LaBarge could not have known if [he was] violating plaintiff's religious rights since [he was] only allowed to deliver meals based on the Ramadan lists generated by the Chaplain's office and posted on the food carts they used to deliver meals. In addition to the lists, Sergeant Debyah reasonably relied on the mess hall to tell him if an inmate was entitled to religious meals.

Dkt. No. 43-8 at 11. I have not considered these contentions because they are not supported by any record evidence and, accordingly, amount only to attorney argument. In addition, even if the court was to consider the contentions, they are not specific to plaintiff in that they generally state that, in the ordinary course of their jobs, defendants LaBarge and Debyah rely on others to determine which inmates are entitled to religious meals. Significantly, they do not contend that, with respect to plaintiff's specific complaints, they consulted with anyone to determine whether plaintiff was entitled to Ramadan meals.

monetary relief against individual defendants is unavailable under the RLUIPA, his claim under that statutory provision is subject to dismissal. Although the record evidence contains genuine disputes of material fact with respect to whether defendants LaBarge and Debyah were personally involved in denying plaintiff his Ramadan meals, no reasonable factfinder could conclude that defendants Lira, Rock, or Haug were personally involved in the alleged deprivations. Finally, in light of the existence of a genuine dispute of material fact as to whether defendants LaBarge and Debyah ignored plaintiff's requests for Ramadan meals, I cannot recommend they be protected by qualified immunity at this procedural juncture.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion (Dkt. No. 43) be GRANTED in part and DENIED in part, as follows:

(1)     Plaintiff's RLUIPA claim asserted against all defendants should be dismissed;

(2)     Plaintiff's claims asserted against defendant Patterson should be dismissed;

(3)     Plaintiff's First Amendment claims asserted against defendants Lira, Haug, and Rock should be dismissed; and

(4)    Plaintiff's First Amendment claims asserted against defendants LaBarge and Debyah should survive defendants' motion and be set down for trial.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:    July 28, 2015
          Syracuse, New York

2015 WL 3544879
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard WILLIAMS, Plaintiff,

v.

Mark LEONARD, Defendants.

No. 9:11–CV–1158.  |  Signed June 4, 2015.

**Attorneys and Law Firms**

Richard Williams, Comstock, NY, pro se.

Melissa A. Latino, New York State Attorney General, Albany, NY, for Defendant.

## DECISION & ORDER

THOMAS J. McAVOY, District Judge.

**\*1**  This *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, was referred to the Hon. Thérèse Wiley Dancks, United States Magistrate Judge, for a ReportRecommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff alleges that the Defendants violated his right to free exercise of religion while incarcerated.

The Report–Recommendation, dated March 19, 2015, recommended that Defendants' motion for summary judgment be granted in part and denied in part.

The parties filed timely objections to the Report–Recommendation. When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiffs' objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Wiley Dancks for the reasons stated in the Report–Recommendation, with one exception. [1] Magistrate Judge Dancks recommends that the Court deny summary judgment on Plaintiffs RLUIPA claim "for injunctive relief and damages regarding the length of Plaintiffs pants" and Plaintiffs RLUIPA claim "for injunctive relief and damages regarding family participation in Eid el-Adha." "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord,* 758 F.3d 215, 224 (2d Cir.2014) (citing *Sossamon v. Texas,* ⎯ U.S. ⎯, ⎯, 131 S.Ct. 1651, 1663, 179 L.Ed.2d 700 (2011)). Thus, to the extent that Plaintiff seeks monetary damages against the Defendants in their individual or official capacities under the RLUIPA, such damages are not available.

It is therefore

**ORDERED** that the parties' objections to the Report–Recommendation of Magistrate Jude Wiley Dancks, dkt.s 40, 41, are hereby OVERRULED in part. The Report–Recommendation, dkt. # 39, is hereby ADOPTED, except that the Court finds that Plaintiff may not obtain damages against the Defendants in their individual and/or official capacities under the RLUIPA. it is therefore ordered that Defendants' motion for summary judgment, dkt. # 33, is hereby GRANTED in part and DENIED in part, as follows:

1. The motion is GRANTED with respect to Plaintiff's Equal Protection Clause claim for injunctive relief regarding family participation in Eid el-Adha;

2. The motion is GRANTED with respect to any claims Plaintiff makes for damages against the Defendants in their individual and/or official capacities under the RLUIPA; and

**\*2**  3. The motion is DENIED in all other respects

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2015 WL 3544879

Footnotes

1    The Court notes that the Report–Recommendation contains one apparent typographical error. In discussing the Defendants' policies concerning hems on pants, the Magistrate Judge noted that the policy had been implemented in 2007 and amended in 2009 and 2013. *See* dkt. # 39 at 26–27. The Magistrate Judge found that the changes to the policy each permitted prisoners to hem their pants higher above their feet in an attempt to accommodate the religious practice at issue here. The Magistrate Judge noted that "[t]his suggests that Defendants were using the least restrictive means to further their interests between 2007 and 2013." *Id.* at 27. Since the Magistrate Judge recommended that the Defendants' motion be denied with respect to the RLUIPA claim, the Court assumes that the Magistrate Judge found that "Defendants were [ *not* ] using the least restrictive means to further their interests between 2007 and 2013." The Magistrate Judge would otherwise have found that Defendants were entitled to summary judgment, and the Magistrate Judge clearly found otherwise. The Court agrees with the Magistrate Judge that questions of fact exist with respect to Plaintiff's claims regarding pant length under the RLUIPA.

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

(Cite as: 1994 WL 23069 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet Keith,
Otisville Medical Department, Defendants.
No. 91 CIV. 8135.

Jan. 24, 1994.
MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an inmate
then in confinement at the Federal Correctional Institution
in Otisville, New York ("Otisville"), filed this action for
injunctive relief and damages based upon alleged
violations of his rights under the United States
Constitution, Amendments I, IV, V, VI, IX, and XIII, and
upon violations of various laws and/or regulations
governing prison administration.[FN1] The Complaint named
as defendants G.L. Hershberger ("Hershberger"), the
United States Attorney General ("Attorney General"),
Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the
Bureau of Prisons ("BOP"), and the Otisville Medical
Department ("OTV Medical Department") (collectively
"Defendants"). Defendants moved for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules of
Civil Procedure, or, in the alternative, for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set out below, Defendants'
Rule 12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Complaint,
pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure, for failure to state a claim upon which relief

can be granted. Rule 12(c) provides:

After the pleadings are closed but within such time as
not to delay the trial, any party may move for judgment
on the pleadings. If, on a motion for judgment on the
pleadings, matters outside the pleadings are presented to
and not excluded by the court, the motion shall be
treated as one for summary judgment and disposed of as
provided in Rule 56, and all parties shall be given
reasonable opportunity to present all material made
pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are
employed for dismissing a complaint for failure to state a
claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a
Rule 12(c) motion to dismiss for failure to state a claim
upon which relief can be granted. See Ad–Hoc Comm. of
the Baruch Black & Hispanic Alumni Ass'n v. Bernard M.
Baruch College, 835 F.2d 980, 982 (2d Cir.1987); see
also Viacom Int'l. Inc. v. Time, Inc., 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R.
Miller, Federal Practice and Procedure ¶ 1367, at 515–16
(1990). Thus, the Court must read the Complaint
generously, drawing all reasonable inferences from the
complainant's allegations. See California Motor Transp.
v. Trucking Unlimited, 404 U.S. 508, 515 (1972).
Moreover, "consideration is limited to the factual
allegations in [the] amended complaint, which are
accepted as true, to documents attached to the complaint
as an exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to documents
either in plaintiff['s] possession or of which plaintiff[ ] had
knowledge and relied on in bringing suit." Brass v.
American Film Technologies, Inc., 987 F.2d 142 (2d
Cir.1993); accord Allen v. Westpoint–Pepperell, Inc., 945
F.2d 40, 44 (2d Cir.1991); Cortec Indus., Inc. v. Sum
Holding L.P., 949 F.2d 42, 47–48 (2d Cir.1991), cert.
denied, 112 S.Ct. 1561 (1992); Frazier v. General Elec.
Co., 930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to state a
claim only if the Court finds beyond a doubt that "plaintiff
can prove no set of facts" to support the claim that
plaintiff is entitled to relief. See Conley v. Gibson, 355
U.S. 41, 45–46 (1957).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

(Cite as: 1994 WL 23069 (S.D.N.Y.))

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

(Cite as: 1994 WL 23069 (S.D.N.Y.))

mentioned by name any of the individual named Defendants. Defs' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna on 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.

Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 1500422
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy SMITH, Plaintiff,
v.
C. ROSATI, et al., Defendants.

Civil Action No. 9:10–CV–1502
(DNH/DEP). | Feb. 20, 2013.

**Attorneys and Law Firms**

Troy Smith, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Troy Smith, a New York State prison inmate, has commenced this action, pursuant to 42 U.S.C. § 1983, against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and several DOCCS employees, alleging deprivation of his civil rights. In general terms, plaintiff's amended complaint alleges that two defendants assaulted him at the instruction of other defendants, that one defendant failed to intervene and protect him from the assault, that two defendants failed to provide him with adequate medical care, that several defendants conspired to conceal the assault, and that he was deprived procedural due process at a disciplinary hearing arising from the event.

Currently pending before the court in connection with the action is defendants' motion for the entry of partial summary judgment. Specifically, defendants seek dismissal of all claims against all defendants with the exception of those asserted against defendants Rosati and St. John, who, plaintiff alleges, assaulted him. For the reasons set forth below, I recommend that defendants' motion be granted except as it relates to the failure to intervene claim asserted against defendant Fraser and the retaliation claim interposed against defendant Goodman.

**I.** *BACKGROUND* [1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Am. Compl. (Dkt. No. 7). Although he is currently confined elsewhere, at all times relevant to this action, Smith was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *Id.* at 1. Two series of events, separately discussed below, give rise to this action.

**A.** *Mattress Incident*

In January 2010, plaintiff attempted to trade in his old mattress to defendant B. Mars, the laundry supervisor at Great Meadow, in return for a new one. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 9. According to plaintiff, defendant Mars improperly ordered plaintiff to pay the full price for the new mattress because she believed that plaintiff had purposely damaged his old one. *Id.* at 9–10. Defendant Mars issued a misbehavior to plaintiff, and plaintiff filed a grievance against defendant Mars with the Inmate Grievance Resolution Committee ("IGRC"), both as a result of the incident. *Id.* at 10. Defendant Craig Goodman, a corrections captain employed by the DOCCS, presided over the disciplinary hearing that resulted from the misbehavior report issued by defendant Mars. *Id.* at 11; Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1. According to plaintiff, at that hearing, defendant Goodman acknowledged that plaintiff's old mattress was damaged as a result of normal wear-and-tear, promised to testify on plaintiff's behalf at the IGRC hearing, and dismissed the misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 11. Plaintiff alleges, however, that defendant Goodman ultimately refused to testify on his behalf at the IGRC hearing, and denied that he told plaintiff his mattress was damaged as a result of normal wear-and-tear. *Id.* at 12. As a result, in January or February 2010, plaintiff filed a grievance with the IGRC alleging that defendant Goodman lied to him. *Id.* at 15, 17.

**\*2** In May 2010, plaintiff tested positive for marijuana use, and was issued a misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 13. Defendant Goodman presided over the ensuing disciplinary hearing and, after finding plaintiff guilty, sentenced him principally to twelve months of disciplinary confinement in the Special Housing Unit ("SHU"). *Id.* at 18, 21. Due to plaintiff's mental health status, however, this sentence was subsequently modified by the facility superintendent to six months in keeplock confinement. *Id.* at

23. On or about June 11, 2010, plaintiff arrived in keeplock at Great Meadow. *Id.*

**B.** *Assault*

On June 18, 2010, defendant Paul Zarnetski, a corrections lieutenant employed by the DOCCS, instructed defendant Craig Rosati, a corrections officer also employed by the DOCCS, to escort plaintiff to his scheduled disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 87; Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶¶ 1, 4. At approximately 12:45 p.m. on the same date, defendant Rosati retrieved plaintiff from his cell for the escort. Am. Compl. (Dkt. No. 7) at 9; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. As the two entered a nearby stairway, an altercation occurred between them, which resulted in both plaintiff and defendant Rosati falling down the stairs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. Plaintiff alleges that defendant Rosati pushed him down the stairs and then jumped on him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31, 35. Defendant Rosati, on the other hand, reported that plaintiff turned toward him in a threatening manner, causing him to use force that consisted of a strike to plaintiff's forehead with a closed fist. Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. It is undisputed, however, that, after plaintiff and defendant Rosati fell down the stairs, defendant Chad St. John, another corrections officer, arrived at the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. Plaintiff alleges that defendant St. John began kicking him while he was still on the ground. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36. Defendants, however, maintain that defendant St. John used force that consisted only of applying mechanical hand restraints. Goodman Decl. (Dkt. No. 79, Attach.13) at 1.

Shortly after the arrival of defendant St. John, defendant C. Fraser, a corrections sergeant at Great Meadow, also arrived on the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 37; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. The parties dispute whether defendant Fraser witnessed a further use of force by defendant Rosati when defendant Rosati pushed plaintiff's face into a wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38; Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9. It is undisputed, however, that defendant Fraser ordered that a video camera be brought to the scene; upon its arrival, a corrections officer began filming plaintiff's escort from the stairway to the Great Meadow hospital. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed).

**\*3** Upon his arrival at the hospital, Smith was examined by defendant David Lindemann, a DOCCS registered nurse. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 40; Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶¶ 1, 4. As a result of his examination and interview of plaintiff, defendant Lindemann noted plaintiff's complaints of a sore left shoulder, pain to his left rib area, and facial area pain, but observed no decrease in plaintiff's range of motion in his shoulder and no visible injuries to his rib area. Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 5; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.8, 9). Defendant Lindemann observed a swollen area on plaintiff's head and a laceration of approximately one and one-half inches in length above plaintiff's left eye, for which he referred plaintiff to defendant Nesmith for stitches. *Id.* Defendant Ted Nesmith, a physicians assistant employed by the DOCCS, closed plaintiff's laceration above his left eye with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80; Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 5.

As a result of the incident, plaintiff was issued a misbehavior report accusing him of engaging in violent conduct, attempted assault on staff, and refusing a direct order. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5) at 2–3. A Tier III disciplinary hearing was subsequently convened by defendant Andrew Harvey, a commissioner's hearing officer, to address the charges. [2] *Id.* at 2. Plaintiff was assigned a corrections counselor, defendant Torres, to help him prepare his defense at the disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–79. At the close of that hearing, plaintiff was found guilty on all three counts, and was sentenced to a six-month period of disciplinary SHU confinement, together with a loss of packages, commissary, and telephone privileges for a similar period. *Id.* at 21.

In the months that followed the incident involving defendants Rosati and St. John, both plaintiff and his mother, Linda Terry, wrote letters to defendant Fischer, the DOCCS Commissioner, complaining of the alleged assault. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 5, 8–12. On September 15, 2010, defendant Lucien LeClaire, the Deputy DOCCS Commissioner, responded by letter, advising plaintiff that defendant Fischer had referred plaintiff's complaint to him, and that he, in turn, had referred the matter to the Office of Special Housing/Inmate Disciplinary Programs. *Id.* at 6. The next day, defendant Albert Prack, the acting director of the Office of Special Housing/Inmate Disciplinary Programs, wrote a letter to plaintiff indicating that his letters to defendant Fischer, which he construed as a request for reconsideration of

his appeal of the disciplinary conviction, was without merit, and advising plaintiff that "[n]o further administrative action will be taken." *Id.* at 7.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 13, 2010, and on February 14, 2011, filed an amended complaint as a matter of right. Dkt. Nos. 1, 7. Those named as defendants in plaintiff's amended complaint include DOCCS Commissioner Brian Fischer; DOCCS Chief Counsel and Deputy Commissioner Anthony J. Annucci; DOCCS Deputy Commissioner Lucien LeClaire, Jr.; DOCCS Inspector General Richard Roy; Deputy Superintendent for Security at Great Meadow Charles Kelly; Deputy Superintendent for Administration at the Great Meadow D. Lindstrand; Corrections Captains Joseph Carey and Craig Goodman; [3] Corrections Sergeants D. Bebee and C. Fraser; Corrections Lieutenants T. Pray and Paul Zarnetski; [4] Commissioner's Hearing Officer Andrew Harvey; Corrections Counselor Torres; Corrections Officers Craig P. Rosati and Chad W. St. John; Physicians Assistant Ted Nesmith; [5] Register Nurse David Lindemann; [6] Laundry Supervisor B. Mars; and Acting Director of the Office of Special Housing/Inmate Disciplinary Programs Albert Prack. [7]

**\*4** Liberally construed, plaintiff's amended complaint asserts eight causes of action, claiming (1) the use of excessive force by defendants Rosati and St. John; (2) conspiracy to conceal the alleged assault by defendants Rosati and St. John against defendants Rosati, St. John, Fraser, Bebee, Kelly, Lindemann, Nesmith, Lindstrand, Goodman, Torres, and Harvey; (3) deliberate indifference to plaintiff's serious medical needs against defendants Lindemann and Nesmith; (4) retaliation against defendants Goodman, Rosati, and St. John; (5) failure to enforce DOCCS regulations against defendants Fischer, Annucci, Roy, and LeClaire; (6) withholding personal property against defendant Mars and Goodman; (7) procedural due process against defendants Harvey, Torres and Prack; and (8) failure to train and supervise against defendants Fischer, Annucci, LeClaire, Roy, Kelly, and Lindstrand. [8] Am. Compl. (Dkt. No. 7) at 19–20. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

By decision and order dated June 23, 2011, following an initial review of plaintiff's amended complaint, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the court *sua sponte* dismissed all of plaintiff's claims against defendants Kelly, Lindstrand, Carey, Bebee, and Pray, without prejudice, as well as plaintiff's equal protection claims against defendants Mars and Goodman, also without prejudice, and otherwise authorized the action to go forward. Dkt. No. 10.

On May 14, 2012, following the close of discovery, defendants moved for the entry of partial summary judgment dismissing the majority of the claims made in plaintiff's amended complaint. Dkt. No. 79. In their motion, defendants argue that (1) defendants Fischer, Annucci, LeClaire, Roy, and Prack are entitled to dismissal based upon the lack of their personal involvement in the alleged constitutional violations; (2) the record fails to support a claim of deliberate medical indifference against defendant Nesmith and Lindemann; (3) the record does not disclose a basis to hold defendant Fraser liable for failure to protect or intervene; (4) plaintiff's claims against defendant Zarnetski are subject to dismissal, based upon his lack of prior knowledge of and involvement in the assault; (5) plaintiff's verbal harassment claim against defendant Goodman is not cognizable under section 1983; (6) plaintiff's procedural due process cause of action against defendant Harvey lacks merit; (7) plaintiff's claim based upon the payment of $65 for a new mattress does not state a cognizable constitutional claim; and (8) in any event, all defendants, except for defendants Rosati and St. John, are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 79, Attach.17). Defendants' motion, to which plaintiff has since responded, Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72(3)(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426

F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

**B.** *Personal Involvement*

In their motion, defendants seek dismissal of all claims against defendants Fischer, Annucci, LeClaire, Roy, and Prack based upon lack of personal involvement. Plaintiff responds by arguing that, through his letters, those individuals were or should have been aware of plaintiff's circumstances, but were deliberately indifferent, and additionally were derelict in the performance of their duties and in supervising subordinates, permitting the alleged constitutional deprivations to occur.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). It is well established that a supervisor cannot be liable for damages under section 1983 solely by

virtue of being a supervisor because there is no *respondeat superior* liability under section 1983. [9] *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). A supervisor, however, may be held responsible for a civil rights violation when it is established that he (1) has directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [10]

**1.** *Defendant Fischer*

 *6 At his deposition, plaintiff testified that he sued DOCCS Comissioner Fischer for two reasons: (1) he wrote defendant Fischer about the alleged assault by defendants Rosati and St. John, and defendant Fischer failed to respond; and (2) as the DOCCS Commissioner, defendant Fischer is responsible for the actions of his subordinate employees. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 55–57. Neither of these reasons provides an adequate basis for suit under section 1983. *See, e.g., Hernandez v. Keane,* 342 F.3d 137, 144 (2d Cir.2003) ("[S]upervisor liability in a [section] 1983 action ... cannot rest on *respondeat superior."* ); *Parks v. Smith,* No. 08–CV–0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y.2011) (McAvoy, J.) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."). [11] Except for this testimony by plaintiff, there is no other record evidence relating to defendant Fischer. As a result, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Fischer was personally involved in any of the allegations giving rise to this action.

**2.** *Defendant Annucci*

At his deposition, plaintiff testified that he sued DOCCS Chief Counsel and Deputy Commissioner Annucci in this action for four reasons: (1) he is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) he failed to investigate the alleged assault on plaintiff; (3) he merely passed the letters from plaintiff and plaintiff's family

down the chain of command; (4) he did not do his job. Plf.'s Dep. Tr. (Dkt. No. 79, Attach 3) at 57–59. Plaintiff's argument that defendant Annucci did not do his job by failing to investigate is based on plaintiff's unsupported assumption that defendant Fischer forwarded plaintiff's letter to defendant Annucci and instructed him to investigate. *See id.* at 58 ("[Defendant Annucci] didn't do what I figured he was told to be done by investigating[.]"). Indeed, there is no record evidence, including any testimony from plaintiff, that plaintiff or any members of his family wrote a letter or complaint directly to defendant Annucci. In any event, even assuming that defendant Annucci received plaintiff's letters, defendant Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks,* 2011 WL 4055415, at \*14 ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."). For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### 3. *Defendant LeClaire*

At his deposition, plaintiff testified that he sued Deputy DOCCS Commissioner LeClaire because defendant LeClaire forwarded plaintiff's letter addressed to defendant Fischer regarding the alleged assault to the Office of Special Housing/ Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 60; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 6. That allegation is insufficient to raise a dispute of material fact as to whether defendant LeClaire is personally involved in any of the allegations giving rise to this action. *See, e.g., Ward v. LeClaire,* No. 07–CV–0026, 2010 WL 1189354, at \*5 (N.D.N.Y. Mar. 24, 2010) (Suddaby, J.) ("[I]t is well settled that referring letters and grievances to staff for investigation is not sufficient to establish personal involvement." (internal quotation marks and alterations omitted)). Because there is no other record evidence that relates to defendant LeClaire, I find that no reasonable factfinder could conclude that he was personally involved in any of the allegations giving rise to this action.

### 4. *Defendant Roy*

**\*7** At his deposition, plaintiff stated that he sued defendant Roy because he has not received a response from the Inspector General's Office, where defendant Roy heads the Internal Affairs Department, regarding plaintiff's grievance. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 61. Plaintiff testified that

he gave a copy of his grievance regarding the alleged assault to an Internal Affairs employee while at Great Meadow, and was later interviewed regarding the incident, but has not yet received a result of the investigation. *Id.* at 61–64. Importantly, plaintiff testified that he has no personal knowledge that defendant Roy, as the head of Internal Affairs, was ever personally aware of the investigation. *Id.* Because there is no *respondeat superior* liability under section 1983, this evidence is not sufficient to support a claim against defendant Roy. *Hernandez,* 342 F.3d at 144. For that reason, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Roy was personally involved in any of the allegations giving rise to this action.

### 5. *Defendant Prack*

At his deposition, plaintiff testified that he sued defendant Prack because Prack cursorily reviewed plaintiff's appeal of his disciplinary conviction in his capacity as the acting director of the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 92; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7. A review of the record evidence reveals that defendant Prack did, in fact, respond to plaintiff's appeal of his disciplinary conviction, and that defendant Prack indicated in that response that plaintiff's appeal was meritless. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7.

Whether review of an inmate's disciplinary conviction by a person in defendant Prack's position is sufficient to establish personal involvement in section 1983 cases is the subject of debate in this circuit. Some courts have determined that the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon.* [12] *See Baez v. Harris,* No. 01–CV–0807, 2007 WL 446015, at \*2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (finding that the response of "the Director of the Special Housing/Inmate Disciplinary Program" to the plaintiff's appeal is "sufficient to withstand summary judgment on the issue of personal involvement"); *Ciaprazi v. Goord,* No. 02–CV–0915, 2005 WL 3531464, at \*16 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.) (recommending that [the director of Office of Special Housing/Inmate Disciplinary Programs] not be dismissed for lack of personal involvement because a "review of [the plaintiff's appeal from a disciplinary conviction] sufficiently establishes his personal involvement based upon [the defendant] being positioned

to discern and remedy the ongoing effects of any such violations"); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint sufficiently alleged personal involvement of the superintendent and DOCCS commissioner to withstand motion to dismiss because the complaint alleged that both defendants had actual or constructive notice of the alleged constitutional violation that occurred at the disciplinary hearing); *Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through ... an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) (holding that, on a motion to dismiss, the allegation that the DOCCS's commissioner "entertained" and "affirmed" the plaintiff's appeal is sufficient to state a claim against the commissioner because "the allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation").

 **\*8** On the other hand, some courts have concluded otherwise, holding that the mere allegation that a defendant reviewed a disciplinary conviction appeal is insufficient to find that defendant personally involved. *See Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y.2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J .) ("The affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation."); *Abdur-Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning [the director of the Special Housing/Inmate Disciplinary Program] ... is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU. That is not enough to establish [his] personal involvement." (internal citation omitted)); *Odom v. Calero,* No. 06–CV–15527, 2008 WL 2735868, at \*7 (S.D.N.Y. Jul. 10, 2008) (holding that the allegation that the director of the Special Housing/Inmate Disciplinary Program was personally involved as a result his denial of the plaintiff's appeal of his disciplinary conviction was not sufficient to trigger the second category establishing personal involvement under *Colon* because, "[o]nce the [disciplinary] hearing was over and [the defendant's] decision was issued, the due process violation was completed"); *Ramsey v. Goord,* No. 05–CV–0047A, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug. 13, 2005) ("[T]he fact that [the DOCCS commissioner and SHU director], as officials in the DOC[C]S 'chain of command,' affirmed [a] determination on appeal is not enough to establish personal involvement of their part.");

*Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant." (internal quotation marks omitted)).

At this time, I am inclined to agree with those courts that have determined that a defendant's review and response to an appeal of a disciplinary conviction is sufficient under *Colon* to find that defendant personally involved. Mindful that on a motion for summary judgment I must view the facts, and draw all inferences, in the light most favorable to the non-movant, I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation, and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation. Additionally, because it appears that plaintiff was still serving the sentence imposed at the disciplinary hearing where his alleged due process violation occurred, I find that any violation that may have occurred was ongoing, and defendant Prack was in a position to remedy that violation, at least in part, at the time plaintiff appealed his conviction. All of this is enough to find that there is a dispute of material fact as to whether defendant Prack was personally involved in the allegations giving rise to plaintiff's due process claim by way of the second of the five potential grounds for supervisor liability under *Colon. Cf. Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) ("We disagree, however, with the district court's denial of leave to amend to add [the director of the Special Housing/Inmate Disciplinary Program], who [was] personally involved in [the plaintiff's] disciplinary proceedings[.]"). [13]

 **\*9** In summary, I recommend that defendants' motion for summary judgment on the basis of personal involvement be granted with respect to defendants Fischer, Annucci, LeClaire, and Roy, but denied as it relates to defendant Prack.

## C. *Deliberate Indifference Claims Against Defendants Nesmith and Lindemann*

Defendants next seek dismissal of plaintiff's Eighth Amendment deliberate indifference claims against defendants Nesmith and Lindemann, arguing that the record lacks any evidence of their deliberate indifference to plaintiff's serious medical needs. In his amended complaint, plaintiff contends that defendants Nesmith and Lindemann

failed to provide him with proper medical treatment for back pain, blurred vision, and hearing loss resulting from alleged assault by defendants Rosati and St. John on June 18, 2010. Am. Compl. (Dkt. No. 7) at 12.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v.. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy

has caused or will likely cause the prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (internal citations omitted).

**\*10** The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain.' " *Salahuddin,* 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837; *see also Leach v. Dutrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Here, after carefully reviewing the record evidence, I find that no dispute of material fact exists as to whether defendants Nesmith and Lindemann were deliberately indifferent to plaintiff's medical needs as a result of the alleged assault by defendants Rosati and St. John. More specifically, although plaintiff testified at his deposition that defendant Nesmith did not follow "his procedure as being a physician" and failed to follow-up with plaintiff, plaintiff also testified that defendant Nesmith cleaned plaintiff's laceration and closed it with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80. Importantly, plaintiff testified that, on the date of the alleged assault, defendant Nesmith did everything that plaintiff requested of him. *Id.* at 80, 81. The record also reflects that defendant Lindemann completed an examination of plaintiff upon his arrival at the Great Meadow hospital, and that he completed a two-page "Use of Force Report" and one-page "Alleged Fight Exam" report during his examination of plaintiff. [14] Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 4; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8); Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 4. I have also reviewed the videotape submitted by defendants that recorded the treatment that defendants Nesmith and Lindemann provided plaintiff following the alleged assault by defendants Rosati and St. John. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed). This recording did not display anything unusual, and, although the recording did not include any sound, it appeared that defendants Lindemann and Nesmith asked plaintiff questions, responded to plaintiff's answers, and provided plaintiff with thorough medical care for his reported injuries. *See generally id.* After carefully reviewing all of this evidence, including plaintiff's testimony, I conclude that no reasonable factfinder could find that the care defendants Nesmith and Lindemann provided plaintiff was inadequate, or that they acted with the requisite deliberate indifference when providing medical treatment to plaintiff.

**\*11** As it relates to plaintiff's allegations that he received inadequate follow-up medical treatment, the record evidence does not support this allegation. Specifically, plaintiff testified that defendant Nesmith removed his stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 83. Additionally, a review of plaintiff's ambulatory health record reveals that plaintiff was subsequently treated by other medical staff members at Great Meadow on several occasions, including on June 20 and 25, 2010; July 1, 6, 20, 23, 27, and 29, 2010; and August 3, 2010. Lindemann Decl. Exhs. (Dkt. No. 79, Attach 11). While some of those visits reference symptoms that

plaintiff now attributes to the alleged assault on June 18, 2010, including a notation that plaintiff was scheduled to see an eye doctor (June 25, 2010), others involved matters unrelated to the alleged assault, including missing dentures (July 20, 2010), bug bites (July 23, 2010) and a request for toenail clippers (July 29, 2010). *Id.* Even considered in the light most favorable to plaintiff, the cumulation of this evidence leads me to find that a reasonable factfinder could not conclude that plaintiff received inadequate follow-up medical care by any of the named-defendants, including defendants Nesmith and Lindemann, or that any of the nameddefendants acted with the requisite deliberate indifference.

In summary, I find that there is no record evidence to support a reasonable factfinder's determination that, objectively, defendants Nesmith and Lindemann provided plaintiff with inadequate treatment for a serious medical need, or that, subjectively, they knew of but disregarded an excessive risk to plaintiff's health or safety. I therefore recommend dismissal of plaintiff's deliberate medical indifference claim against those two defendants.

**D.** *Plaintiff's Claims Against Defendant Fraser*
Defendants next seek dismissal of all claims asserted in plaintiff's amended complaint against defendant Fraser. A careful review of plaintiff's amended complaint reveals that it asserts three causes of action against defendant Fraser, including (1) conspiracy to cover-up the alleged assault on June 18, 2010; (2) the issuance of a false misbehavior report; and (3) failure to intervene. In their motion, defendants only specifically seek dismissal of a perceived excessive force claim, and the issuance of a false misbehavior report claim against defendant Fraser. For the sake of completeness, I will nonetheless address all of the claims asserted against defendant Fraser.

To the extent that plaintiff's amended complaint may be construed as asserting an excessive force claim against defendant Fraser, I recommend dismissal of that claim because there is no record evidence that defendant Fraser used any force against plaintiff. Specifically, a review of both plaintiff's amended complaint and his deposition transcript do not reveal an allegation that defendant Fraser used any force against him. Plaintiff only alleges that defendants Rosati and St. John used force, which is not sufficient to support an excessive force claim against defendant Fraser.

**\*12** The remaining claims asserted against defendant Fraser, except for plaintiff's failure to intervene cause of action,

are also easily discounted. Plaintiff's conspiracy claim fails against defendant Fraser, as well as defendants Rosati, St. John, Harvey and Torres, Am. Compl. (Dkt. No. 7) at 19, because there is no record evidence that these defendants agreed to violate any of plaintiff's constitutional rights. *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). Specifically, plaintiff did not testify at his deposition to the existence of any agreement among those defendants, and the only mention of such an agreement is a conclusory allegation in plaintiff's amended complaint. *See* Am. Compl. (Dkt. No. 7) at 19 ("Defendant[ ]s Fraser, Rosati, St. John, Harvey, and Torres conspired to use Tier III hearing to deflect official misconduct for exercising a protected right[.]"). Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact. *See, e.g., Hilson v. Maltese,* No. 09–CV–1373, 2012 WL 6965105, at *6 n.10 (N.D.N.Y. Dec. 14, 2012) (Baxter, M.J.), *adopted by* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (Mordue, J.) ("Plaintiff's conclusory assertion ... is not sufficient to establish a material issue of fact[.]" (listing cases)).

Plaintiff's claim that defendant Fraser issued a false misbehavior report against him is not cognizable under section 1983. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report.").

The allegations in plaintiff's amended complaint related to defendant Fraser's failure to adhere to DOCCS's regulations or policies, do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N .Y.2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

Plaintiff's failure to intervene claim against defendant Fraser, however, cannot be dismissed at this juncture. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994), *accord,*

*Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *see also Mowry v. Noone,* No. 02–CV–6257, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004) ("Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used."). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *JeanLaurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)).

**\*13** Here, a review of the record evidence reveals the existence of a genuine dispute of material fact as to whether defendant Rosati's continued use of force against plaintiff triggered defendant Fraser's duty to intervene. Although defendants cite plaintiff's deposition testimony for the proposition that "no further assault occurred after Defendant Fraser's arrival on the scene," Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9, the record does not support this fact. Instead, during two separate lines of questioning, plaintiff testified at his deposition that, after defendant Fraser arrived to the scene, defendant Rosati "pushed" or "mushed" plaintiff's face into the wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38, 65. Because this testimony clearly indicates that defendant Fraser was present for this alleged use of force by defendant Rosati, and because the record evidence does not conclusively support a finding that defendant Rosati's additional use of force was unconstitutional, [15] I find that a reasonable factfinder could conclude, based on the record evidence now before the court, that defendant Fraser's duty to intervene was triggered by defendant Rosati's conduct.

In summary, I recommend that all claims against defendant Fraser be dismissed, with the exception of the failure to intervene claim.

### E. *Plaintiff's Claims Against Defendant Zarnetski*

Defendants next seek dismissal of all claims against defendant Zarnetski. Plaintiff's amended complaint alleges that defendant Zarnetski is liable for the force used by defendant Rosati because he should have predicted that, when he instructed defendant Rosati to escort plaintiff to

the disciplinary hearing, defendant Rosati would assault him. Although such an allegation, if properly supported by the record, may give rise to a failure to intervene or conspiracy to use excessive force claim, the evidence in this case does not support either claim.

In his verified amended complaint, plaintiff avers that defendant Zarnetski sent defendant Rosati to escort him to his disciplinary hearing, and on the way to the hearing, defendant Rosati assaulted him. Am. Compl. (Dkt. No. 7) at 17. During his deposition, plaintiff elaborated on this allegation only to the extent of testifying that it is "known" at Great Meadow that defendant Rosati "is a hothead," and, as a result of this common prison knowledge, defendant Zarnetski should have predicted that defendant Rosati would assault plaintiff. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 88–89. Plaintiff also admitted, however, that, in order to attend his disciplinary hearing, he was required to be escorted by a corrections officer. *Id.* at 88. In his affidavit, defendant Zarnetski avers that he "had absolutely no foreknowledge that C.O. Rosati and plaintiff would be involved in a use of force on June 18, 2010." Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶ 4. Because, in the face of defendant Zarnetski's denial, plaintiff's allegations amount to nothing more than his rank speculation that defendant Zarnetski knew or should have known that defendant Rosati would assault plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski had a duty to intervene. *See Henry,* 2011 WL 5975027, at *4 (finding that, to establish liability on the part of a defendant for failure to intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene."). In addition, because none of this evidence raises a genuine dispute of material fact as to whether defendants Zarnetski and Rosati agreed to use force against plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski conspired to violate plaintiff's constitutional rights. *See Pangburn,* 200 F.3d at 72 ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). For all of these reasons, I recommend dismissing all of plaintiff's claims against defendant Zarnetski.

### F. *Plaintiff's Claims Against Defendant Lieutenant Goodman*

**\*14** In his amended complaint, plaintiff alleges that defendant Goodman conspired with defendants Rosati and St. John to effectuate the alleged assault on plaintiff because plaintiff successfully modified a disciplinary sentence imposed by defendant Goodman. Am. Compl. (Dkt. No. 7) at 8. Plaintiff supports this contention with a further allegation that, three days after the alleged assault by defendants Rosati and St. John, defendant Goodman said to plaintiff, " 'That is what you get for getting my sentence modified [.]' " *Id.* at 14. Defendants properly construe these allegations as plaintiff's assertion of a First Amendment retaliation claim, and seek its dismissal. Defendants also seek dismissal of plaintiff's verbal harassment claim asserted against defendant Goodman.

### 1. *First Amendment Retaliation*

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, which is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99–CV–2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Here, it is well settled that plaintiff's appeal of defendant Goodman's disciplinary sentence is constitutionally protected conduct, satisfying the first prong of a retaliation claim. *See, e.g., Santiago v. Holden,* No. 11–CV–0567, 2011 WL 7431068, at *5 (N.D.N.Y. Nov. 29, 2011) (Homer, M.J.), *adopted by* 2012 WL 651871 (N.D.N.Y. Feb. 28, 2012) (Suddaby, J.) ("There is no question that [the plaintiff's] conduct in filing grievances and appeals was conduct protected by the First Amendment."); *Brown v. Bascomb,*

No. 05–CV–1466, 2008 WL 4283367, at *6 (N.D.N.Y. Sept. 16, 2008) (Mordue, C.J.). In addition, being assaulted plainly constitutes an adverse action sufficient to satisfy the second prong of a retaliation claim. *See Cole v. N.Y. S. Dep't of Corrs. Svcs.,* 2012 WL 4491825, at *13 (N.D.N.Y. Aug. 31, 2012) (Dancks, M . J.), *adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.) ("An assault by corrections officers is sufficient to chill a person of ordinary firmness from continuing to engage in his First Amendment activity." (internal quotation marks omitted)). Turning to the third requirement for a retaliation claim, requiring that a plaintiff to establish a casual connection between the protected conduct and adverse action, drawing all inferences in favor of plaintiff, I find that both plaintiff's amended complaint and his deposition testimony, if credited by a factfinder, may serve to support the allegation that defendant Goodman did, in fact, conspire with defendants Rosati and St. John to assault plaintiff. More specifically, if plaintiff's testimony regarding defendant Goodman's statements three days after the assault is credited, a reasonable factfinder could conclude that this statement was an admission by defendant Goodman that he orchestrated, in some way, the assault on plaintiff. However, because defendant Goodman explicitly denied conspiring with defendants Rosati and St. John to assault plaintiff, Goodman Decl. (Dkt. No. 79, Attach.12) at ¶¶ 3, 4, I find that a genuine dispute of fact exists as to whether defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff for having exercised his First Amendment rights. For this reason, I recommend that defendants' motion for summary judgment be denied as it relates to plaintiff's retaliation claim against defendant Goodman.

### 2. *Verbal Harassment*

 **\*15** To the extent that plaintiff's amended complaint may be construed as asserting a verbal harassment claim against defendant Goodman for allegedly stating to plaintiff, " 'That is what you get for getting my sentence modified,' " Am. Compl. (Dkt. No. 7) at 14, that claim is not cognizable under section 1983. *See, e.g., Moncrieffe v. Witbeck,* No. 97–CV–0253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) ("A claim for verbal harassment is not actionable under 42 U.S.C. § 1983."). For this reason, I recommend that plaintiff's verbal harassment claim asserted against Goodman be dismissed. [16]

### G. *Plaintiff's Claims Against Defendants Harvey, Torres, and Prack*

Defendants next seek dismissal of plaintiff's procedural due process claims asserted against defendants Harvey, Torres, and Prack. Defendant Harvey served as the hearing officer who presided at plaintiff's Tier III disciplinary hearing arising from the incident on June 18, 2010. Defendant Torres was assigned to assist Smith in his defense at that disciplinary hearing. Plaintiff's amended complaint also alleges that defendants Harvey and Torres conspired with others to use the Tier III hearing to conceal official misconduct. Additionally, as was briefly noted above, plaintiff's amended complaint asserts a due process claim against defendant Prack.

### 1. *Due Process Claims*

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564–67 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include (1) advanced written notice of the charges, (2) a hearing in which the inmate is provided the opportunity to appear at a disciplinary hearing and present witnesses and evidence, (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken, and, in some circumstances, (4) the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–70; *see also Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner at least "some eviden[tiary]" support. *Superintendent, MA Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985).

Here, as it relates to defendant Harvey, plaintiff's amended complaint alleges that defendant Harvey failed to provide plaintiff with a timely hearing. Am. Compl. (Dkt. No. 7) at 13. To the extent that plaintiff bases this claim on an allegation that defendant Harvey violated a state agency's regulation, that claim fails as a matter of law. *See Bolden,* 810 F.2d at 358 ("State procedural requirements do not establish

federal constitutional rights."); *Barnes,* 628 F.Supp.2d at 411 ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

**\*16** As it relates to defendant Torres, plaintiff's allegation that she failed to call or interview witnesses on his behalf is unsupported by the record evidence. Specifically, plaintiff admitted at his deposition that he has no basis to believe that defendant Torres failed to interview the people identified by plaintiff as potential witnesses to the alleged assault. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–76. In addition, plaintiff admitted that defendant Torres returned to plaintiff with a list of witnesses that would or would not testify on his behalf. *Id.* at 77. Finally, plaintiff admitted that he did, in fact, call as witnesses those people that agreed to testify on his behalf. *Id.* at 78. From this record evidence, I find that no reasonable factfinder could conclude that defendant Torres denied plaintiff due process based on a failure to assist plaintiff in identifying and calling witnesses on his behalf.

As it relates to defendant Prack, plaintiff's amended complaint alleges that defendant Prack "failed to stop the torture in SHU." Am. Compl. (Dkt. No. 7) at 19. The court construes this allegation to suggest that, because defendant Prack denied plaintiff's appeal of his disciplinary conviction, he contributed to whatever procedural due process violations occurred during the disciplinary hearing below. The record evidence, however, does not support this conclusion because, as discussed above, defendant was provided the opportunity to investigate and present witnesses on his behalf, and he was appointed a corrections counselor to assist in the preparation of his defense. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75, 77–78. Moreover, a careful review of the Tier III hearing transcript, submitted by defendants in support of their motion, reveals that plaintiff was provided adequate due process during the disciplinary hearing from which plaintiff appealed to defendant Prack. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5). All of this evidence leads the court to conclude that no reasonable factfinder could find that defendant Prack's determination that plaintiff's appeal contributed to a due process violation.

For all of these reasons, I recommend that plaintiff's procedural due process claim asserted against defendant Harvey, Torres, and Prack be dismissed.

### 2. *Conspiracy Claim*

To the extent it is alleged that defendants Harvey and Torres conspired to conceal the June 18, 2010 assault, such claims are not cognizable under section 1983. *De Ponceau v. Bruner,* No. 09–CV–0605, at \*7 (N.D.N.Y. Feb. 21, 2012) (Peebles, M.J.), *adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012) (Suddaby, J.). In any event, as was discussed above in determining that plaintiff's conspiracy claim asserted against defendant Fraser, there is no record evidence that defendants Harvey and Torres engaged in an agreement to violate any of plaintiff's constitutional rights. For these reasons, I recommend that plaintiff's conspiracy claim asserted against defendants Harvey and Torres be dismissed.

### H. *Plaintiff's Claims Against Defendant Mars*

**\*17** Defendants next seek dismissal of all claims against defendant Mars, including plaintiff's claim that she violated his Fourteenth Amendment rights by making him pay $65 to replace a damaged mattress. The Fourteenth Amendment, however, does not give rise to a claim that a defendant deprived a plaintiff of private property; it only protects a plaintiff's right to due process as a result of a deprivation of private property. *See, e.g., Edwards v. Bezio,* No. 08–CV–0256, 2010 WL 681369, at \*5 (N.D.N.Y. Feb. 24, 2010) (Kahn, J., *adopting report and recommendation by* Treece, M.J.) ("The lynchpin of a due process claim based on a state actor's unauthorized deprivation of private property is the availability of post-deprivation remedies provided by the state, not the deprivation itself .... Plaintiff does not allege that New York State has failed to provide a meaningful post-deprivation remedy, and, in fact, New York provides a venue for challenging such appropriations in the New York State Court of Claims."). For this reason, I recommend that any claim asserted by plaintiff against defendant Mars based on an allegation that she charged him too much money for his new mattress be dismissed.

Defendants also seek dismissal of plaintiff's claim against defendant Mars relating to the issuance of a false misbehavior report. The mere allegation of the issuance of a false misbehavior report against an inmate, however, is not cognizable under section 1983. *See Boddie,* 105 F.3d at 862 ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Moreover, even assuming that defendant Mars did issue a false misbehavior report, whatever wrong arose out of that conduct is rectified by the court's finding that plaintiff received adequate due process at the ensuing disciplinary hearing. *See, e.g.,* Plf .'s Dep. Tr. (Dkt. No. 79, Attach.3) at 12–13. *See Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) (finding that, where

an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them").

Finally, defendants seek dismissal of plaintiff's equal protection claim asserted against defendant Mars based on plaintiff's admission that defendant Mars did not single him out or treat him differently than other inmates based on his race. Plaintiff's equal protection claim against defendant Mars, however, was previously dismissed by the court, and it has not been revived by plaintiff's amended complaint. Dkt. No. 10 at 16.

For all of these reasons, I recommend that all of plaintiff's claims asserted against defendant Mars be dismissed.

### I. *Qualified Immunity*

Because I recommend that one claim against each defendant Fraser and defendant Goodman survive defendants' pending motion for summary judgment, I will only address defendants' defense of qualified immunity as it relates to those two defendants.

**\*18** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson,* 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011). The inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, whether that right is clearly established at the relevant time. *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011); *Nagle v. Marron,* 663 F.3d 100, 114 (2d

Cir.2011); *Doninger,* 642 F.3d at 345 (citing cases). To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft,* 131 S.Ct. at 2083 (internal quotation marks omitted). Until recently, courts were required to analyze qualified immunity by considering the two factors in order. *Doninger,* 642 F.3d at 345 (citing *Saucier,* 533 U.S. at 201). Following the Supreme Court's decision in *Pearson,* however, courts are no longer wedded to the *Saucier* "two step," and instead retain the discretion to decide the order in which the two relevant factors are to be considered. [17] *Id.; see also Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 429 n.9 (2d Cir.2009).

To prevail on a qualified immunity defense, a defendant must establish that "(1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Green v. Montgomery,* 219 F.3d 52, at 59 (2d Cir.2000).

### 1. *Defendant Fraser*

Because the right to be free from excessive force is a clearly established right, the relevant qualified immunity inquiry turns on whether a reasonable officer in defendant Fraser's position would have known that defendant Rosati's conduct amounted to excessive force. See *Green,* 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."). Defendants have already acknowledged that whether defendant Rosati's use of force against plaintiff constitutes excessive force is a question for the jury, and I agree. As a result, I cannot conclude that defendant Fraser is entitled to qualified immunity as it relates to plaintiff's failure to intervene claim.

### 2. *Defendant Goodman*

**\*19** As noted earlier, an inmate's right to appeal a disciplinary sentence is protected by the First Amendment. *Santiago,* 2011 WL 7431068, at *5. Therefore, the relevant inquiry is whether a reasonable officer in defendant Goodman's position would have known that conspiring with other corrections officers to have plaintiff assaulted in retaliation for plaintiff appealing the sentence violated his clearly established First Amendment right. Because that answer is clearly, "yes," I cannot conclude that defendant Goodman is entitled to qualified immunity as it relates to plaintiff's retaliation claim.

In summary, I recommend that defendants' motion for summary judgment be denied as it relates to defendants' qualified immunity defense.

### IV. *SUMMARY AND RECOMMENDATION*

At the center of plaintiff's amended complaint in this action is his claim that he was assaulted by defendants Rosati and St. John, two corrections officers stationed at Great Meadow, during an escort from his cell to a disciplinary hearing. While defendants have moved for summary judgment dismissing many of plaintiff's other claims, they do not challenge that cause of action at this juncture, acknowledging that its resolution will undoubtedly turn upon credibility determinations, which are not properly made on a motion for summary judgment.

After carefully reviewing the record evidence in this case, I recommend that all of plaintiff's claims against all of the remaining defendants be dismissed, with the exception of plaintiff's failure to intervene claim against defendant Fraser, and plaintiff's retaliation claim against defendant Goodman. As it relates to those two remaining claims, I conclude that a reasonable factfinder could determine, if plaintiff's testimony is credited, that defendant Fraser's duty to intervene was triggered, and that defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff. Additionally, at this juncture, the record evidence does not establish a basis to find that defendants Fraser or Goodman are entitled to qualified immunity.

Addressing plaintiff's remaining claims, I find that the record before the court fails to establish a proper basis to conclude that defendants Fischer, Annucci, LeClaire, and Roy were personally involved in any of the allegations giving rise to this action. The record also reflects that no reasonable factfinder could conclude that defendant Nesmith and Lindermann are liable for deliberate medical indifference to plaintiff's serious medical needs. Similarly, plaintiff has stated no claim against defendant Zarnetski associated with the assault or otherwise, nor has he stated a cognizable due process claim against defendants Harvey, Torres or Prack. Finally plaintiff's claims against defendant Mars, related to the requirement that he pay $65 to replace a damaged mattress, and the issuance of a false misbehavior report, lack merit. Based upon the foregoing, it is hereby respectfully,

**\*20** RECOMMENDED that defendants' summary judgment motion (Dkt. No. 79) be GRANTED, in part, as it relates to all of plaintiff's claims against all defendants, with the exception of (1) plaintiff's claims against defendants Rosati and St. John, (2) plaintiff's failure to intervene claim against defendant Fraser, and (3) plaintiff's First Amendment retaliation claim against defendant Goodman.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk is respectfully directed to amend court records to reflect the correct name spellings of defendants Zarnetski, Nesmith, Lindemann, and Prack.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1500422

### Footnotes

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2   The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

3   Plaintiff's amended complaint identifies defendant Goodman as a lieutenant. Am. Compl. (Dkt. No. 7) at 5. In his affidavit submitted in support of defendants' pending motion, however, defendant Goodman states that he is a corrections captain. Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1.

4    Defendant Zarnetski's name has been spelled by plaintiff in various ways, and is listed on the court's records as Zaratski. The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Zarnetski.

5    Defendant Nesmith was sued by plaintiff as "Nesmith (Ted) Fisher, III," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "Nesmith Fisher." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Ted Nesmith.

6    Defendant Lindemann was sued by plaintiff as "D. Lindermann," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "D. Lindermann." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as David Lindemann.

7    The record reflects that defendant Prack's name has been spelled in a variety of ways, and is listed on the court's records as "Albert Prach." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Albert Prack.

8    At several points in his complaint, as amended, plaintiff alleges that defendants violated various regulations regarding such matters as reporting the requirement of prison medical personnel to assess medical conditions, and the requirement that a disciplinary hearing be held within seven days. It is well-established that the violation of a prison regulation is not redressable in a civil rights action brought pursuant to section 1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N.Y.2009) ( "[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). Plaintiff's complaint also references 18 U.S.C. § 1351, a criminal statute addressing fraud and foreign labor contracting, as well as the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350, and providing a private right of action by an alien for a tort committed in violation of international law or a United States treaty. Those sections do not appear to have any applicability to the facts of this case.

9    Here, the defendants implicated in this portion of the pending motion are principally supervisory DOCCS employees.

10   The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* on the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue—specifically in deciding whether *Iqbal* effectively calls into question certain categories of supervisor liability in *Colon. Sash v. United States,* 674 F.Supp.2d 542–44 (S.D.N.Y.2009); *see also Stewart v. Howard,* No. 09–CV0069, 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) (Lowe, M.J.) ("The Supreme Court's decision in [*Iqbal* ] arguably casts in doubt the continued viability of some of the categories set forth in *Colon."* (citing *Sash* )). In this case, absent any controlling authority to the contrary, the court assumes that all of the *Colon* categories still apply.

11   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

12   *See Colon,* 58 F.3d at 873 ("The personal involvement of a supervisory defendant may be shown by evidence that: ... (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[.]").

13   Based on the record evidence now before the court, I find that defendant Prack could have been personally involved only in plaintiff's procedural due process claim. As discussed more completely below, however, I recommend dismissal of that claim. Therefore, the finding that a dispute of material fact exists as to whether defendant Prack was personally involved in the allegations giving rise to this action is largely academic.

14   These reports do not include any complaints of hearing loss or blurred vision—complaints that plaintiff has alleged are ongoing and long-term effects of the alleged assault. *See generally* Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8).

15   In their motion, defendants have expressly represented that they do not move for summary judgment on the excessive force claim asserted against defendants Rosati and St. John because "[t]hat claim ... necessarily involves a credibility determination ... [and] remain[s] for trial." Defs.' Memo of Law (Dkt. No. 79, Attach.17) at 3.

16   In the court's initial order, plaintiff's equal protection cause of action was dismissed against defendants Goodman and Mars. Dkt. No. 10 at 16.

17   Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231 (internal quotation marks omitted).

---

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.   

2013 WL 1501022
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy SMITH, Plaintiff,

v.

C. ROSATI, Correctional Officer, Great Meadow
Correctional Facility; C. St. John, Correctional
Officer, Great Meadow Correctional Facility; Brian
Fischer, Commissioner of Corrections; Anthony
J. Annucci, Chief Counsel, Deputy Commissioner;
Lucien Leclaire, Jr.; Richard Roy, Inpsector General;
C. Fraser, Sgt, Great Meadow Correctional Facility;
Goodman, Lt., Great Meadow Correctional Facility;
Harvey, Commissioner's Hearing Officer; C.O.
Torres, Counselor, Great Meadow Correctional
Facility; Ted Nesmith, Physician Assistant; Nurse
David Lindemann, Registered Nurse, Great Meadow
Correctional Facility; B. Mars, Laundry Supervisor,
Great Meadow Correctional Facility; Paul Zarnetski,
Lt., Great Meadow Correctional Facility; and
Albert Prack, Shu Director, Doccs, Defendants.

No. 9:10–CV–1502 (DNH/
DEP). | April 10, 2013.

**Attorneys and Law Firms**

Troy Smith, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Michael G. McCartin, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this civil rights action pursuant to
42 U.S.C. § 1983. On February 20, 2013, the Honorable
David E. Peebles, United States Magistrate Judge, advised, by
Report–Recommendation that defendants' motion for partial
summary judgment be granted in part and denied in part.
Defendant Fraser timely filed objections to the Report–
Recommendation.

Based upon a de novo review, the Report–Recommendation
is accepted. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for partial summary judgment is
GRANTED in part and DENIED in part; and

2. All claims against all defendants are DISMISSED with
the exception of those asserted against defendants Rosati and
St. John; [1] the failure to intervene claim against defendant
Fraser; and the First Amendment retaliation claim against
defendant Goodman.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1501022

Footnotes

1        Defendants did not move for dismissal of the excessive force claim asserted against defendants Rosati and St. John.

End of Document                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Jan. 24, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, was initially
referred to Magistrate Judge George H. Lowe for Report
and Recommendation by the Honorable Norman A.
Mordue, United States District Judge, pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon
Magistrate Judge Lowe's retirement on February 9, 2012,
the case was reassigned to me. Plaintiff Phillip
Jean–Laurent ("Jean–Laurent") has brought this action
against Defendants Correctional Officers Patrick Lane
("Lane"), Allen Briggs ("Briggs"), and Seth Tyndall
("Tyndall"); Correctional Sergeants Matthew Beard
("Beard") and David Pawlin ("Pawlin") (sued incorrectly
as "Sgt. Pauline"); Correctional Lieutenant Norman Jones
("Jones"); Deputy Superintendent Security Brian
McAuliffe ("McAuliffe"); Superintendents Warren

Barkley ("Barkley") and William Hulihan ("Hulihan");
Appeal Review Officer Norman Bezio ("Bezio"); Deputy
Commissioner Christopher Lindquist ("Lindquist") (sued
incorrectly as "Dep. Comm. Linquist"); Dr. Charles
Moehs ("Moehs") (sued incorrectly as "Dr. Mays"); John
Does # 1 and # 2; Dr. John Doe; and Jane Doe. (Dkt. Nos.
1, ¶¶ 9–16, and 6–17.FN1)

> FN1. Page numbers in citations to filed
> documents refer to the page numbers assigned by
> the Court's electronic filing system rather than to
> the page number in the original document.

Defendants, with the exception of the four Doe
Defendants who have not yet been identified and served,
now move to dismiss Plaintiff's Complaint for failure to
state a claim under Federal Rule of Civil Procedure
12(b)(6).FN2 (Dkt. No. 23.) For the reasons set forth
below, the Court recommends that Defendants' motion be
**GRANTED** in part and **DENIED** in part.

> FN2. Because the Doe Defendants have been
> excluded from the motion, this Report and
> Recommendation does not address the legal
> sufficiency of the claims asserted against them in
> the Complaint.

### I. BACKGROUNDFN3

> FN3. The background facts set forth herein are
> taken from Plaintiff's Complaint.

**A. Facts Concerning Plaintiff's Claims Arising Out of
his Storage of Draft Bags and the Destruction of His
Legal Documents**

Plaintiff is a former prisoner of the New York State
Department of Correctional and Community Supervision
("DOCCS"). (Dkt. No. 1, ¶ 8.) In January of 2008,
Plaintiff was transferred from Elmira Correctional Facility
("Elmira") to Cape Vincent Correctional Facility ("Cape
Vincent"). *Id.* at ¶ 17. Eight draft bags containing
Plaintiff's personal property were sent from Elmira to
Cape Vincent at the time of the transfer. *Id.* Plaintiff's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

personal belongings did not all fit into the storage lockers provided for his use at Cape Vincent, so he stored personal legal documents and materials and books in two draft bags placed neatly under his bunk. *Id.* at ¶ 18.

Defendant Lane, who was the steady housing unit officer at the time, advised Plaintiff that he could not store belongings in draft bags and would have to purchase storage containers from the commissary for his excess belongings. *Id.* at ¶ 19. When Plaintiff informed Lane that he had no funds to purchase the containers because of his transfer and assured him that he would purchase the containers when his funds arrived from Elmira, Lane agreed to allow him to use the draft bags until he was able to comply with the storage policy. *Id.* at ¶ 20. The funds transferred from Elmira were collected by Cape Vincent, so Lane allowed Plaintiff to use the draft bags for another two weeks. *Id .* at ¶ 21. Lane agreed to continued use of the bags when funds Plaintiff subsequently received from home were also collected by Cape Vincent. *Id.*

**\*2** Lane subsequently learned that Plaintiff was litigating an action against correctional officers and issued Plaintiff a misbehavior report for possessing the two draft bags in his living quarters the same day. *Id.* at ¶ 22. Defendant Pawlin, who was the hearing officer on the claimed rule violations, directed Plaintiff to discard several hundred pages of legal materials and documents essential to pending litigations. *Id.*

After the hearing, Plaintiff learned of a state-wide policy directive that he believed permitted him to retain two draft bags to store personal belongings in his cell.[FN4] *Id.* at ¶ 23. When he informed Defendant Lane of the directive, Lane "outburst his disregards for the policy directive." *Id.* Plaintiff sought redress through the administrative grievance procedure. When Lane learned of Plaintiff's grievance, he contacted Defendant Beard, a Corrections Sergeant at Cape Vincent, and during phone conversations with Beard, Lane repeatedly referenced departmental directives, facility policy manuals, and the inmate's misbehavior handbook. *Id.* at ¶ 24. Lane directed Plaintiff to turn over the draft bags and moments later Defendants Beard and Lane, along with other corrections officers, manacled Plaintiff and took him to the Special Housing Unit ("SITU"). *Id.* Plaintiff's Complaint does not state the length of time during which he remained in the SITU.

FN4. Plaintiff is presumably referring to Section III of DOCCS Directive # 4917 which provides in part:

Personal property possessed by an inmate assigned to double cell housing shall be limited to the amount of property that will fit in three standard draft bags (including legal materials). Inmates will be responsible for proper storage of property and the neat and orderly appearance of their cells.

A. *Storage of Property.* An inmate assigned to double occupancy cell housing will be allowed to possess in his or her cell two draft bags provided by the Department for storage of property. Any property beyond what can be stored in the individual locker may be stored in these bags.

Defendants Briggs and Tyndall subsequently packed Plaintiff's belongings, and while doing so, deliberately emptied a container of melted ice into a bag filled with legal documents, destroying several items and a significant portion of legal materials and documents essential to Plaintiff's appeal in an unidentified case pending in the Second Circuit Court of Appeals. *Id.* at ¶ 25. According to Plaintiff, the Second Circuit had granted him an enlargement of time to file a petition for a hearing or rehearing *en banc.* Because the documents were destroyed, Plaintiff was unable to file the petition within the enlargement period. *Id.*

Plaintiff thereafter had a disciplinary hearing on possession of the two draft bags and allegedly fabricated rule violations.[FN5] *Id.* at ¶ 26. Defendant Jones, the hearing officer, found Plaintiff not guilty of the fabricated rule violations. However, he found Plaintiff guilty of possessing the two draft bags, despite what Plaintiff believes to have been a clear departmental directive evidencing that no rule violation had occurred. *Id.* Plaintiff was punitively sanctioned for the draft bag violation. *Id.*

FN5. Plaintiff has not identified the nature of the

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

allegedly fabricated rule violations in his Complaint. (*See* Dkt. No. 1.) Although Plaintiff's Complaint does not specifically identify the person(s) responsible for filing the misbehavior report that led to the hearing, it can be inferred from other allegations that Defendants Lane and Beard were behind the report.

**B. Plaintiff's Claims of Cruel and Inhuman Treatment and Deliberate Indifference to his Serious Medical Needs Against Defendants Pawlin, Moehs, McAuliffe, and Bezio**

Prior to Plaintiff's SHU confinement, he had been scheduled for oral surgery and medical treatment for chronic low back pain. *Id.* at ¶ 27. Plaintiff was not allowed to keep his appointments because he was punitively confined in the SHU and was left to endure "unbearable toothaches, extreme eating and hygienical discomfort, as well as excruciating lower back pain during and after his SHU confinement." *Id.* Once Plaintiff was released from SHU confinement, he was required to start anew the lengthy and time consuming procedure of scheduling dental and medical appointments. *Id.* According to Plaintiff, Defendants McAuliffe and Barkley were cognizant of the routine practice of denying prisoners confined in the SHU reasonable and adequate dental and medical care and/or knowingly implemented or allowed the practice. *Id.*

**\*3** When Plaintiff was released from the SITU, he was required to carry his belongings, including at least eight draft bags weighing eighty or more pounds, to an assigned housing unit over four-hundred yards away in snowy frigid weather and was not allowed to use an available pushcart or have another inmate assist him, despite informing Defendant John Doe # 1 of his medical condition and level of pain. *Id.* at ¶ 28. Plaintiff strained his lower back as a result and endured tremendous pain for at least two weeks. *Id.* According to Plaintiff, Defendant Pawlin thereafter subjected Plaintiff to a pattern of harassing inter-facility movements that required Plaintiff to move his belongings to different housing units. *Id.*

Plaintiff was punitively confined in the SITU in April of 2008 as a result of sanctions imposed by Defendant Jones.[FN6] *Id.* at ¶ 29. Plaintiff was not permitted to keep his rescheduled dental and medical appointments because of

the confinement. *Id.* at ¶ 29. When he left the SITU after serving several weeks, Plaintiff was, for a second time, required to carry all of his personal belongings without assistance or a pushcart despite informing Defendant John Doe # 2 of his medical condition and pain. *Id.* Plaintiff hurt his back transporting his belongings. *Id.* When he reported to sick call, Defendant Jane Doe told him that she was not going to do anything for him, and she would not give him a medical excuse from carrying the rest of his personal belongings to his housing unit. *Id.*

> FN6. It is not entirely clear from the Complaint whether Plaintiff was confined in the SITU by Defendant Jones as a result of Jones' finding that Plaintiff was guilty of possessing two draft bags or for some other reason. *See* Dkt. No. 1 at ¶ 26.

Approximately four months later, after filing a grievance and personally seeking redress from DOCCS' Chief Medical Officer, Plaintiff was examined by Dr. Rosner and finally had one of two troubling wisdom teeth extracted and received a few physical therapy sessions, *Id.* at ¶ 30. Upon completion of the initial therapy sessions, the therapist concluded that the course of treatment had been effective and that Plaintiff was in need of further therapy. *Id.* at ¶ 31. The therapist also recommended that Plaintiff be given a TENS unit for self-administered therapy. *Id.* However, at a follow-up appointment with Defendant Moehs, who had replaced Dr. Rosner as Plaintiff's health care provider, Moehs informed Plaintiff that he would not continue with the recommended course of treatment or provide the TENS unit and told Plaintiff to live with the pain. *Id.*

**C. Plaintiff's Claim that he was Denied a Fair and Impartial Hearing by Defendant McAuliffe**

In preparation for an August 2008 disciplinary hearing, Plaintiff attempted to obtain documentary evidence he believed was relevant and necessary to his defense. *Id.* at ¶ 32. Plaintiff's request was denied by Defendant McAuliffe, who presided over the disciplinary hearing and allegedly made false representations to Plaintiff to induce him to enter into an involuntary and unintelligent plea agreement. *Id.* McAuliffe is alleged to have unfairly and unilaterally penalized Plaintiff for an altercation with another prisoner and sanctioned Plaintiff

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

to punitive segregation for six months at Mid–State Correctional Facility ("Mid–State"), with a concomitant loss of privileges and recommended loss of good time, which extended Plaintiff's term of imprisonment to the maximum. *Id.* at ¶ 33. The other prisoner was not sanctioned at all. *Id.*

**\*4** Plaintiff appealed McAuliffe's determination to Defendant Bezio on the grounds that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he had been denied due process and equal protection of the law as supported by documentary evidence. *Id.* at ¶ 34. Defendant Bezio affirmed McAuliffe's determination. *Id.*

### D. Alleged Indifference to Plaintiff's Serious Medical and Dental Needs While in the SHU at Mid–State

During the period of his confinement in the SHU at Mid–State, Plaintiff continued to experience excruciating back pain and toothaches. *Id.* He requested and was denied treatment by Defendant Dr. John Doe based upon Moehs' medical entry, without any physical examination. *Id.* Plaintiff received dental care to the extent of having dental x-rays taken after grieving the matter to Defendant Hulihan. *Id.* However, his painful wisdom tooth was not extracted. *Id.* Despite making articulate, detailed complaints of being deprived necessary and adequate medical and dental care to Defendants Barkley, Hulihan, and Lindquist, Plaintiff's complaint was denied as unsubstantiated and no significant steps were taken to ensure that Plaintiff received necessary and adequate medical and dental care prior to his transfer from Mid–State to Downstate Correctional Facility. *Id.*

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on February 17, 2011. (Dkt. No. 1.) Plaintiff's application to proceed *in forma pauperis* was granted by Judge Mordue in a June 1, 2011 Decision and Order (Dkt. No. 2) in which the District Court dismissed Plaintiff's claim for destruction of property against Defendants Briggs and Tyndall, with prejudice, and his equal protection claim against Defendants McAuliffe and Bezio, without prejudice, under 28 U.S.C. § 1915(e). Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case any time if the court determines that ... (B) the action ... (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). *Id.* at pp. 6–8. Judge Mordue otherwise accepted the Plaintiff's complaint for filing, specifically noting that in doing so, the District Court was expressing no opinion as to whether Plaintiff's remaining claims could withstand a properly made motion to dismiss or for summary judgment. *Id.* at p. 9. The District Court also ordered Plaintiff to take reasonable steps to ascertain the identities of the "John Doe" and "Jane Doe" defendants and cautioned him that failure to serve the unnamed defendants in a timely manner may result in the action being dismissed against them. *Id.* at pp. 8–9.

## III. ANALYSIS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

**\*5** A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of a complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678. (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

(internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).[FN7]

> FN7. Defendants have submitted DOCS Directive # 4913, entitled "Inmate Personal Property Limits" in support of their motion to dismiss. (Dkt. No. 23–2 at pp. 2–9.) Plaintiff has also relied upon the Directive in his opposition

papers as support for his argument that state-wide policy allowed him to store his excess personal belongings in the two draft bags under his bunk. (Dkt. No. 27 at p. 12.) Since the Directive is integral to the Plaintiff's Complaint, the Court can consider it on Defendants' Rule 12(b)(6) motion without converting the motion to one for summary judgment. However, because the Directive, on its face, can be construed to offer some support for both Plaintiff and Defendants' position, it is of little value in determining the motion before the Court.

> The Declaration of Sandra Prusak, also submitted in support of Defendants' motion to dismiss, references a disciplinary packet that was supposed to be attached to the Declaration. (Dkt. No. 23–3 at p. 2.) Inasmuch as the Disciplinary Packet is not attached to the Declaration as filed, the Court need not consider whether it, or Prusak's reference to its contents, can be considered on a Rule 12(b)(6) motion.

**\*6** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants

Defendants have moved for dismissal of Plaintiff's official capacity claims for money damages under 42 U.S.C. ¶ 1983. (Dkt. No. 1 at ¶¶ 9–10, 12–16.; Dkt. No. 23–1 at pp. 19–20.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

effectively arms of the state ( *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the moving Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, I recommend that the Plaintiff's § 1983 claims brought against the moving Defendants in their official capacities be dismissed without leave to amend.

**C. Claim Against Defendants Briggs and Tyndall for Denial of Access to Court on a Matter Before the Second Circuit Court of Appeals**

Plaintiff claims that documents essential to an appeal he had pending in the Second Circuit Court of Appeals were destroyed when Defendants Briggs and Tyndall deliberately emptied a container of melted ice into Plaintiff's bag. As a result, Plaintiff was unable to file a petition for a hearing or rehearing *en banc* in the case before the filing deadline. (Dkt. No. 1 at ¶ 25.) Plaintiff has not identified the action, nor has he described the nature of the action or the appeal on which he was seeking an *en banc* hearing or rehearing.

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to court under § 1983, Plaintiff must assert non-conclusory allegations demonstrating that Defendants Briggs and Tyndall's alleged conduct in destroying his legal documents was deliberate and malicious. *See Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011)

(Baxter, M.J.). Plaintiff's Complaint, liberally construed, satisfies that requirement.

**\*7** However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348–349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Arar v. Ashcroft,* 532 F.3d 157, 188–89 (2d Cir.2008), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 3409, 177 L.Ed.2d 349 (2010) (following *Christopher* in requiring that the complaint include a description of the "nonfrivolous," "arguable" claim that the plaintiff has lost). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

Plaintiff has provided no information whatsoever concerning the matter in the Second Circuit and has thus failed to state a claim for denial of his First Amendment right of access to court against Defendants Briggs and Tyndall. [FN8] For that reason, I recommend that Plaintiff's claim for denial of access to court against Defendants Briggs and Tyndall be dismissed. Inasmuch as it is possible that Plaintiff may be able to remedy the defect in his Complaint by including specific information regarding his underlying claim, I also recommend that he be granted leave to amend.

> FN8. The fact that Plaintiff was seeking a hearing or rehearing *en banc* raises the inference that he had been unsuccessful on an appeal to the Second Circuit.

**D. Retaliation Claims Against Defendants Lane, Pawlin, Beard, Briggs, Tyndall, and Moehs**

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1.

**\*8** To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary

record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Co-op. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

1. *Retaliation Claim Against Defendant Lane*

According to Plaintiff, Defendant Lane, who had been allowing him to keep two draft bags of personal items under his bunk, issued a misbehavior report against Plaintiff for possessing the two bags right after learning that Plaintiff was litigating a civil action against correctional officers. (Dkt. No. 1 at ¶¶ 20–22.) When Lane learned later that Plaintiff had filed a grievance in reliance upon a state-wide directive Plaintiff believed allowed him to possess two draft bags for temporary storage of his personal belongings [FN9], Lane ordered Plaintiff to turn over the draft bags and had him manacled and taken to SITU. *Id.* at ¶¶ 23–24.

FN9. *See* Dkt. No. 23–2 at p. 7.

Plaintiff claims that he was charged with a violation for possessing the two draft bags and other fabricated rule violations. (Dkt. No. 1 at ¶ 26.) The Court has inferred that Lane was involved in Plaintiff being charged with allegedly fabricated rule violations for which he was found not guilty following a disciplinary hearing. Plaintiff was found guilty of possessing the two draft bags and punitively sanctioned. *Id.*

The filing of lawsuits and administrative grievances is constitutionally protected activity for retaliation purposes. *See Colon,* 58 F.3d at 872 ("Prisoners ... have a constitutional right of access to the courts and to petition the government for redress of grievances, and prison officials may not retaliate against prisoners for exercise of that right."); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right of prisoners to file administrative grievances is a constitutionally protected activity for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

retaliation purposes). Plaintiff's retaliation claim against Lane can be construed to include retaliation for his lawsuit and the grievance he filed, both constitutionally protected activity. Therefore, the Complaint satisfies the first prong of a retaliation claim for pleading purposes.

**\*9** Liberally construing Plaintiff's Complaint, it appears that Plaintiff has set forth a facially plausible claim of adverse action satisfying the second prong. Plaintiff contends that the "motivating factor" behind Lane's initial rule violation charge against him with regard to the draft bags was finding out about Plaintiff's lawsuit. (Dkt. No. 27 at p. 4.) The filing of the charge led to Plaintiff being ordered to discard documents and legal materials by hearing officer Pawlin. *Id.* Destruction of a prisoner's legal papers and personal property has been found substantial enough to qualify as an adverse action for retaliation purposes. *See Smith v. City of New York,* No. 03 Civ. 7576(NRB), 2005 WL 1026551, \*3, 2005 U.S. Dist. LEXIS 7903, at \*10 (S.D.N.Y. May 3, 2005) (Buchwald, J.) Because Plaintiff did have the two draft bags under his bunk, Lane's initial rule violation charge was arguably not a false misbehavior report. However, since Plaintiff claims that the bags were under the bunk with Lane's consent at the time he charged Plaintiff with the rule violation, the violation charge can be viewed as an adverse action for pleading purposes.

Placing Plaintiff in the SHU and filing false misbehavior claims against him after learning that he had filed a grievance based upon the directive also constitute adverse action sufficient to satisfy the second prong of a retaliation claim. *See Hamilton v. Fisher,* No. 9:10–CV1066(MAD/RFT), 2012 WL 987374, at \*14, 2012 U.S. Dist. LEXIS 39116, at \*41 (N.D.N.Y. Feb.29, 2012) (Treece, M.J.) (alleged transfer to SHU in retaliation for complaints could be considered adverse action); *Smith v. Hash,* No. 904–CV–0074 LEK/DRH, 2006 WL 2806464, at \*6, 2006 U.S. Dist. LEXIS 70362 (N.D.N.Y. Sept.28, 2006) (Kahn D.J., Homer, M.J.) (same); *Kotler v. Daby,* No. 10–CV–136 (TJM/DRH), 2011 WL 915312, \*5, 2011 U.S. Dist. LEXIS 26173, at \*14 (N.D.N.Y. Feb.10, 2011) (Homer, M.J.) (both filing false misbehavior report and sending plaintiff to SHU for filing grievances and lawsuits constitute adverse actions); *Mateo v. Fischer,* 682 F.Supp.2d 423, 433

(S.D.N.Y.2010) (filing false misbehavior report against plaintiff constituted an adverse action for purposes of retaliation claim).

Plaintiff's Complaint also satisfies the third prong of the retaliation analysis—a causal connection between Plaintiff's lawsuit and grievance and the adverse action by Lane. Although Lane was not himself the subject of Plaintiff's lawsuit, the temporal proximity between Lane's learning of the lawsuit against other correctional officers and charging Plaintiff with a rule violation makes a facially plausible showing of causation. Further, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SITU and having an allegedly false misbehavior report filed against him supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. In addition, Plaintiff was found not guilty with respect to the allegedly false misbehavior reports. *Id.*

**\*10** For the foregoing reasons, I recommend that Defendant Lane's motion to dismiss Plaintiff's retaliation claim against him be denied.

### 2. *Retaliation Claim Against Defendant Pawlin*

Plaintiff has also asserted a retaliation claim against Defendant Pawlin, the hearing officer who directed him to discard documents and legal materials. (Dkt. No. 27, at p. 4.) Plaintiff's Complaint does not adequately state a claim for retaliation against Defendant Pawlin. Plaintiff has not alleged that Pawlin was aware of the lawsuit Plaintiff had filed against correctional officers, nor is there any allegation that Pawlin was a defendant in that lawsuit. As a result, Plaintiff has failed to allege plausibly that the lawsuit was causally connected to Pawlin's allegedly adverse action. *See Wilson v. Kelly,* No. 9:11–cv–00030 (MAD/RFT), 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 121293, at \*24 (Aug. 27, 2012) (D'Agostino, D.J., Treece, M.J.) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity). Therefore, I recommend that Plaintiff's retaliation claim against Defendant Pawlin be dismissed with leave to amend.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

### 3. *Retaliation Claim Against Defendant Beard*

The Complaint does not allege that Defendant Beard was aware of the lawsuit that Plaintiff had filed against correctional officers. However, Plaintiff has alleged that when Defendant Lane learned that Plaintiff had filed a grievance with regard to storage of the draft bags in his cell, he began phoning Defendant Beard "and reporting to him the situation." (Dkt. No. 1 at ¶ 23.) The Court can reasonably infer from that allegation that Beard was aware that the grievance had been filed when he subsequently joined Lane in escorting the manacled Plaintiff out of his housing unit and taking him to SHU. *Id.* at ¶ 24. Placing Plaintiff in SHU constitutes an adverse action for purposes of the retaliation analysis. *See Hamilton,* 2012 WL 987374, at *14, 2012 U.S. Dist. LEXIS 39116, at *14 (putting Plaintiff in SHU for filing a grievance constitutes an adverse action). Furthermore, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SHU supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. Therefore, I recommend that Defendant Beard's motion to dismiss the Plaintiff's retaliation claim against him be denied.

### 4. *Retaliation Claim Against Defendants Briggs and Tyndall*

Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis. *See Smith v. City of New York,* 2005 WL 1026551, *3, 2005 U.S. Dist. LEXIS 7903, at *10 (destruction of prisoner's legal papers and personal property qualifies as an adverse action for retaliation purposes). However, Plaintiff has not alleged that either Briggs or Tyndall was involved in or even aware of Plaintiff's lawsuit or grievance at the time they are alleged to have emptied a container of melted ice into a bag filled with legal documents. Therefore, the Complaint does not make a facially plausible showing of causation against Briggs and Tyndall, and for that reason I recommend that Plaintiff's retaliation claim against those defendants be dismissed. Because Plaintiff may be able to correct the deficiency in an amended complaint, I recommend that he be granted leave to amend.

### 5. *Retaliation Claim Against Defendant Moehs*

**\*11** The only factual allegations in Plaintiff's Complaint regarding Defendant Moehs are that he replaced Dr. Rosner as Plaintiff's health care provider, informed Plaintiff that he would not continue with the recommended course of treatment necessary to improve Plaintiff's medical condition or provide him with the recommended TENS unit, and told Plaintiff to live with the pain. (Dkt. No. 1 at ¶ 31.) In his opposition to Defendants' motion to dismiss, Plaintiff has asked the Court to infer that Defendant Moehs substituted himself for Dr. Rosner in order to disapprove the recommended course of treatment because Plaintiff had complained to the Chief Medical Officer about not receiving adequate medical care. (Dkt. No. 27 at p. 5.)

The Court finds that the allegations in Plaintiff's Complaint do not permit the inference Plaintiff has asked it to make. *See Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (retaliation claim must be "supported by specific and detailed factual allegations" and "not stated in wholly conclusory terms.") (citation and internal quotation marks omitted).

Plaintiff has failed to allege that Moehs had any knowledge of his complaint to the Chief Medical Officer when he denied Plaintiff the treatment recommended by the therapist, thus failing to satisfy the causal relationship prong of the retaliation analysis. *See Wilson,* 2012 WL 3704996, at *9, 2012 U.S. Dist. LEXIS 12193, at *24. Plaintiff filed the grievance and made complaints to the Chief Medical Officer prior to his examination by Dr. Rosner and to the initial therapy sessions. *See Id.* at ¶¶ 30–31. There are no allegations in the Complaint suggesting that Moehs was the subject of the grievance or complaints or that he would otherwise have any reason to retaliate against Plaintiff by denying him necessary medical care.

In light of Plaintiff's failure to make a facially plausible showing of causal connection, I recommend that his retaliation claim against Defendant Moehs be dismissed. However, because Plaintiff's grievance and complaints to the Chief Medical Officer constitute constitutionally protected activity, and the denial of necessary medical treatment in retaliation for the filing of a grievance or making a complaint is sufficient to satisfy the adverse action requirement of the retaliation claim

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

analysis, I recommend that Plaintiff be granted leave to amend should he be able to plead specific facts supporting causation.[FN10]

> FN10. *See Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *10–11, 2003 U.S. Dist. LEXIS 16442, at ——33–34 (S.D.N.Y. Sept.18, 2003) (McKenna, J) (allegation that prison doctor revoked plaintiff's necessary medical treatment because he filed a grievance is sufficient for second prong of retaliation claim analysis).

**E. Claims of Cruel and Inhuman Treatment and/or Medical Indifference Against Defendants Pawlin, Moehs, McAuliffe, Barkley, Hulihan, and Lindquist**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted).

**\*12** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement. Under the objective requirement, "the deprivation alleged must be objectively sufficiently serious [;] ... a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (citations and internal quotation marks omitted). Under the subjective requirement, a plaintiff must demonstrate that a prison official acted with deliberate indifference to an inmate's health or safety. *Id.* In *Farmer,* the Supreme court found it "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk." *Id.* at 837.

In fulfilling their duty to "provide humane conditions of confinement," prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care. "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer, 511 U.S. at 837; Chance, 143 F.3d at 702–03.* The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer, 511 U.S. at 825; Ross v. Giambruno, 112 F.3d 505 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle, 429 U.S. at 105–6.*

**\*13** Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith, 316 F.3d at 185.* Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

### 1. Claim of Cruel and Inhuman Treatment By Defendant Pawlin

Plaintiff has alleged that he suffered from lower back strain after being required to carry his personal belongings from SHU to his assigned housing unit. (Dkt. No. 1 at ¶ 28.) According to Plaintiff, Defendant Pawlin thereafter subjected him "to a pattern of harassing inter-facility movements ... which required him to move his belongings to different housing units." (Dkt. No. 1 at ¶ 28.) "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837.* Even if requiring Plaintiff to move his personal belongings to different housing units when he was suffering from lower back strain could pass as an "unnecessary and wanton infliction of pain ... incompatible with the evolving standards of decency that mark the progress of a maturing

society," *Estelle, 429 U.S. at 102,* Plaintiff has not alleged facts showing that Pawlin was aware of Plaintiff's back strain at the time he directed the moves, that Plaintiff complained to Pawlin about any impact the moves had on his back, or that Plaintiff suffered any further harm to his back as a result of the moves to different housing units. Therefore, Plaintiff has failed to plead a facially plausible claim of deliberate indifference to Plaintiff's health or safety, and the Court recommends that Plaintiff's Eighth Amendment claim against Defendant Pawlin for cruel and inhuman treatment be dismissed, and that Plaintiff be given leave to amend.

### 2. Claim of Medical Indifference Against Defendant Moehs

Plaintiff claims that the physical therapist who had worked with him had recommended that Plaintiff be given additional physical therapy sessions and a TENS unit for his lower back pain, and that Defendant Moehs refused to authorize both when he took over as Plaintiff's physician. (Dkt. No. 1 at ¶ 31.) An inmate's "mere disagreement over the proper treatment does not create a constitutional claim ... [s]o long as the treatment given is adequate." *Chance, 143 F.3d at 703.* Construing Plaintiff's complaint liberally, as is required in light of his *pro se* status, and accepting the allegations as true, Plaintiff claims that Moehs not only rejected the treatment recommended by the therapist, but that he declined to provide any treatment at all to address Plaintiff's excruciating back pain, telling him instead to learn to live with the pain. (Dkt. No. 1 at ¶ 31.)

**\*14** Plaintiff has described himself as having "excruciating lower back pain" over an extended period of time. (Dkt. No. 1 at ¶¶ 27, 35–36.) Severe back pain, especially if it lasts for an extended period of time, as Plaintiff claims, can constitute a "serious medical need" under the Eighth Amendment, there by satisfying the first element of a medical indifference claim.[FN11] *See Guarneri v. Hazzard, No. 9:06–CV–0985, 2008 WL 552872, at \*6, 2008 U.S. Dist. LEXIS 14809 (Feb. 27, 2008)* (Mordue, C.J., Homer, M.J.) (citing *Nelson v. Rodas, No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, at \*14, 2002 U.S. Dist. LEXIS 17359, at \*50 (S.D.N.Y. Sept. 17, 2002)* (Peck, M.J.) (collecting cases)). Given Plaintiff's alleged level of back pain and the length of time over which it lasted, Moehs' refusal to allow him to follow through with the recommended therapy and allow Plaintiff a TENS unit,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

compounded by his alleged failure to prescribe any treatment whatsoever to address Plaintiff's back condition and pain, constitutes a facially sufficient claim of deliberate indifference for purposes of Plaintiff's 12(b)(6) motion. [FN12] Therefore, the Court recommends which Defendant Moehs' motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against him be denied.

> FN11. Dental conditions left untreated for a significant period of time can also constitute a serious medical need under the Eighth Amendment. *See, e.g., Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (tooth cavity which will degenerate with increasingly serious implications if neglected over sufficient time presents a serious medical need); *Chance,* 143 F.3d at 702 (untreated dental problems resulting in chronic tooth pain for six months resulting in tooth degeneration constitute serious medical needs); *see also Fields v. Gander,* 734 F.2d 1313, 1314–15 (8th Cir.1984) (claim based on plaintiff's inability to eat properly due to dental problems).

> FN12. If it turns out that Defendant Moehs did provide Plaintiff with some course of treatment for his back, albeit not the treatment recommended by the therapist or the treatment Plaintiff would have chosen for himself, and did not merely tell Plaintiff to live with the pain as alleged, Plaintiff's medical indifference claim is unlikely to survive a motion for summary judgment.

3. *Claim of Medical Indifference Against Defendants McAuliffe and Bezio Regarding Medical and Dental Care to Inmates in SHU*

Plaintiff has alleged that on two separate occasions when he in SHU he was not allowed to attend scheduled dental and medical appointments because of a routine practice denying inmates in SHU reasonable adequate dental and medical care. (Dkt. No. 1 at ¶¶ 27 and 29.) The basis for Plaintiff's Eighth Amendment medical indifference claim against Defendants McAuliffe and Bezio is that they "were cognizant of this routine practice, and/or have knowingly implemented or allowed the implementation of the practice of denying prisoners confined in the SHU reasonable adequate dental and medical care." *Id.* at ¶ 27. The dental appointment Plaintiff missed was for "troubling wisdom teeth," which were painful and one of which was ultimately extracted after Plaintiff filed a grievance. *Id.* at ¶ 30. The medical appointment was for Plaintiff's chronic lower back problem that left him with excruciating pain. *Id.* at ¶ 27.

In a § 1983 action against a defendant in his or her individual capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. at 166. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" ); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) ("*[R]espondeat superior* liability does not lie against corrections officers in Section 1983 actions; holding a position in a hierarchical chain of command is insufficient by itself to support personal involvement").

**\*15** However, the Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal,[FN13] (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[FN14]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

FN13. There are no allegations in the Complaint that McAuliffe and Bezio had direct knowledge that Plaintiff had a serious medical need while he was in SHU and nonetheless refused to allow him to keep his dentist and medical appointments. *See Farmer,* 511 U.S. at 825, 837 (deliberate indifference requires defendant's awareness of facts from which he or she could draw an inference that plaintiff had a serious medical need, that inference was actually made, and that defendant consciously and intentionally disregarded or ignored the need).

FN14. The Supreme Court's decision in *Ashcroft,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

Under *Colon,* if McAuliffe and Bezio, acting in a supervisory capacity, either created a policy resulting in violation of an inmate's Eighth Amendment rights, or allowed the continuation of such a policy, they could be subject to liability under 42 U.S.C. § 1983. In this case, however, under even the most liberal reading of Plaintiff's Complaint, he has not alleged any facts to support such a claim. The Complaint is devoid of any factual enhancement of his conclusory assertion that McAuliffe and Bezio were aware of the allegedly routine practice, were involved in implementing it, or that they had authority to stop the practice of denying SHU prisoners "reasonable adequate dental and medical care" and allowed it to continue. *Id.* at ¶ 30. *See Iqbal,* 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement [do] not suffice" to state a claim) (internal quotation marks omitted). Therefore, the Court recommends that Defendants McAuliffe and Bezio's motion to dismiss Plaintiff's Eight Amendment medical indifference claim against them be granted with leave granted Plaintiff to amend.

4. *Claim of Indifference to Serious Medical Needs Against Defendants Barkley, Hulihan, and Lindquist*

Plaintiff identifies Defendants Barkley and Hulihan as superintendents of correctional facilities and Defendant Lindquist as a grievance appeal officer. (Dkt. No. 1 at ¶¶ 14 and 16.) Plaintiff has alleged that while he was in SHU at Mid–State, he continued to experience excruciating back pains and a painful wisdom tooth and requested and was denied treatment by Defendant Dr. John Doe based upon Defendant Moehs' medical notation entry. *Id.* at ¶ 35. According to Plaintiff, the only dental or medical care he received while in SHU at Mid–State was dental x-rays. *Id.* Plaintiff has alleged in conclusory fashion that he made detailed and articulate complaints to Defendants Barkley, Hulihan, and Lindquist about being deprived of necessary and adequate medical and dental care at Mid–State, that the complaints were denied as unsubstantiated, and that no significant steps were taken to ensure that care was given during the time period he was at Mid–State prior to his transfer to Downstate. (Dkt. No. 1 at ¶ 36.)

**\*16** Supervisory personnel may be held liable under § 1983 for "fail[ure] to remedy a violation after learning of it through a report or appeal." *Colon,* 58 F.3d at 873. However, mere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged constitutional violations. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (claim that official ignored prisoner's letter of protest not enough to hold official liable); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at \*12, 2002 U.S. Dist. LEXIS 7067, at \*43 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose *respondeat superior* liability.").

"On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at \*13,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement."); *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint.").

Allegations of awareness on the part of a correctional facility superintendent of an ongoing failure by prison officials to provide a plaintiff with medical treatment for injuries, coupled with failure to remedy the wrong after learning of it through a grievance procedure have been found to be sufficient to survive a Rule 12(b)(6) motion. *See Cicio v. Graham,* No. 9:08–CV–534, 2009 WL 537534, at *7, 2009 U.S. Dist. LEXIS 16675 (N.D.N.Y. Mar.3, 2009) (Mordue, C.J.) (Peebles, M.J.). However, the naked assertion in Plaintiff's Complaint that he complained to Defendants Barkley, Hulihan, and Lindquist that he was being deprived of reasonable and adequate dental care, and that his complaints were found unsubstantiated is simply too lacking in factual detail to show that Plaintiff is entitled to relief. *See Iqbal,* 556 U.S. at 678 (Rule 8(a)(2) "demands more than an unadorned, the defendant-harmed-me accusation.") Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints. Therefore, I recommend that Defendants Barkley, Hulihan, and Lindquist's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against them be granted and that Plaintiff be granted leave to amend.

**G. Claims for Denial of Due Process Against Defendants Lane, Beard, Jones, McAuliffe, and Bezio**

**\*17** To make out a Section 1983 claim for denial of Fourteenth Amendment due process rights, a plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (internal quotation marks omitted). As to the first prong, an inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandlin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As to the second prong, the minimal due process requirements include: "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on ...." *Wolff v. McDonald,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

*1. Due Process Claim Arising Out of Misbehavior Reports Involving Plaintiff's Draft Bags*

Plaintiff has asserted a claim for denial of his due process rights under the Fourteenth Amendment against Defendants Lane, Beard, McAuliffe[FN15] and Jones arising out of the institution, execution, and enforcement of a disciplinary proceeding against him based upon fabricated allegations and in violation of the state-wide directive allowing inmates to store two draft bags of personal possessions in their cells on a temporary basis. (Dkt. No. 1 at ¶¶ 47–48.) Construing Plaintiff's Complaint liberally, Defendants Lane and Beard are accused of filing fabricated charges and a draft bag possession charge against him. Defendant Jones was the hearing officer on the charges and ruled in favor of Plaintiff on the allegedly fabricated charges but found him guilty on the draft bags possession charge in violation of the state-wide directive. *Id.* at ¶ 28.

> FN15. Although Plaintiff has asserted a due process claim against Defendant McAuliffe in connection with the misbehavior report filed by Lane and Beard that resulted in the imposition of punitive sanctions by Defendant Jones, there are no factual allegations in the Complaint connecting Defendant McAuliffe to that claim.

The Court's initial inquiry is whether Plaintiff has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

pleaded facts supporting a facially plausible claim that a liberty interest was infringed by the false charges and hearing determination since Plaintiff had no right to due process unless a liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). In his Complaint, Plaintiff has alleged he was punitively confined to SITU by Jones.[FN16] (Dkt. No. 1 at ¶ 29.) Plaintiff claims that he was in SITU for a few weeks. *Id.* While he was unable to attend dental and medical appointments while he was in SITU, Plaintiff has described it as a routine practice rather than an atypical occurrence. *Id.* at ¶ 27. *See Palmer,* 364 F.3d at 64 (both duration and conditions are considered in determining whether SHU confinement rises to the level of "atypical and severe hardship"). The alleged violation of the state-wide DOCCS storage directive by Defendants Lane, Beard, and Jones help Plaintiff because failure to follow a DOCCS directive does not give rise to a Section 1983 claim. *See Cabassa v. Gummerson,* No. 9:01–CV–1039, 2008 WL 4416411, *6, n. 24, 2008 U.S. Dist. LEXIS 72975, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, D.J.) (violation of a DOCCS directive does not give plaintiff a claim under 42 U.S.C. ¶ 1983).

> **FN16.** The Court has inferred that the SHU sanction was imposed by Jones as a result of the guilty determination on the draft bag possession charge.

**\*18** Because the Plaintiff has failed to allege a liberty interest, it is not necessary to reach the issue of whether he was provided sufficient process in the hearing on the allegedly fabricated charges.[FN17] Therefore, the Court recommends that Defendants Lane, Beard, and Jones' motion to dismiss Plaintiff's Fourteenth Amendment due process claim be granted with leave to Plaintiff to amend.

> **FN17.** The Court has recommended that Defendants Lane and Beard's motion to dismiss Plaintiff's retaliation claim arising out of the allegedly false misbehavior report be denied. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (filing of a false misbehavior report may be actionable when made in retaliation for the exercise of constitutional rights).

### 2. *Due Process Claim Against McAuliffe and Bezio Arising Out of Plaintiff's Alleged Denial of a Fair and Impartial Hearing*

Plaintiff has also asserted a due process claim against Defendants McAuliffe and Bezio in connection with his disciplinary hearing in front of McAuliffe. Plaintiff's due process claim against McAuliffe arises out of his denial of Plaintiff's request for access to documentary evidence needed to defend himself in a disciplinary hearing, his deliberate and purposeful misrepresentation to Plaintiff, and his denial of a fair and impartial disciplinary hearing. His claim against Bezio arises out of Bezio's affirmance of McAuliffe's determination of guilt. (Dkt. No. 1 *at* ¶ 49.) Plaintiff was placed in SHU for six months, with a concomitant loss of all privileges and good time credit, which extended his sentence to the maximum, as a result of the guilty finding. *Id.* at ¶ 33.

The Supreme Court ruled in *Sandlin* that the Constitution did not require that restrictive confinement be preceded by a hearing providing procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The Second Circuit considers the duration of SHU confinement as well as the severity of the conditions. *See Palmer,* 364 F.3d at 65. Although no bright-line rule establishes a period of SHU confinement beyond which a due process right is implicated, *id.* at 64, the Second Circuit has held that a 101 day confinement does not alone meet the *Sandlin* standard of atypicality. *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004), *cert. denied,* 543 U.S. 1187, 125 S.Ct. 1398, 161 L.Ed.2d 190 (2005) (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). A liberty interest has, on the other hand, been found to be infringed by a confinement of 305 days. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

SHU confinement of less than 101 days can constitute atypical and significant hardships if the conditions were more severe than normal SHU conditions or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65 (citing *Ortiz,* 323 F.3d at 195 & n. 1 and *Colon,* 215 F.3d at 232 & n. 1) In *Palmer,* the Second Circuit explained "[w]here the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest has been infringed]." 364 F.3d at 64–65.

**\*19** Plaintiff's allegations of a 180 day confinement in SITU with no medical care for an excruciatingly painful back and painful wisdom tooth is sufficient to satisfy the atypical conditions requirement for a liberty interest for pleading purposes. Plaintiff has also asserted facts adequate to satisfy the pleading requirements for a denial of due process in his disciplinary hearing. "Chief among the due process minima outlined in *Wolff* [is] the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." *Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Plaintiff has alleged that McAuliffe twice denied his request for documents relevant to his defense.

Prisoners also have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). Plaintiff claims that McAuliffe made false representations to him to induce him to enter into an involuntary plea. While Plaintiff's due process claim against McAuliffe may not survive a motion for summary judgment, the allegations in the Complaint are adequate to assert a facially plausible claim of denial of due process.

Plaintiff has also alleged facts adequate to state a claim against Defendant Bezio for denial of due process in affirming the hearing determination. According to Plaintiff, in his appeal, he informed Bezio that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he was denied due process and equal protection. (Dkt. No. 1 at ¶ 34.) It appears from the Complaint that Bezio affirmed the hearing determination while Plaintiff was still in SHU, and that as a result of the affirmance, Plaintiff ended up serving the full 180 day SITU confinement and the maximum of his original sentence. *Id.* Personal involvement of a supervisory official may be shown by evidence that after learning of the violation of a prisoner's

rights through an appeal, he failed to remedy the wrong. *Colon,* 58 F.3d at 873.

The consequences of McAuliffe's alleged violation of Plaintiff's due process rights—Plaintiff's confinement in SHU and loss of good time—were ongoing at the time Bezio affirmed the hearing determination. *Id.* at 34. Bezio therefore had the opportunity to remedy the violation at least to some degree and failed to do so, thereby leaving him potentially subject to personal liability. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where superintendent denied appeal from hearing that allegedly violated plaintiff's rights); *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 WL 1842294, at \*8, 2011 U.S. Dist. LEXIS 51917, at \*25–26 (S.D.N.Y. May 9, 2011) (Swain, D.J.) (denying motion to dismiss claim against official who heard appeal from disciplinary hearing); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (denying appeal officer's motion to dismiss because prisoner alleged he had been denied the opportunity to call a witness at disciplinary hearing); *Moore v. Scully,* No. 90 Civ 3817(MEL), 1993 WL 22129, at \*3, 1993 U.S. Dist. LEXIS 841, at \*10–11 (S.D.N.Y. Jan. 26, 1993) Laker, D.J.) (denying summary judgment where superintendent denied affirmed disciplinary hearing result where plaintiff alleged that hearing denied due process).

**\*20** Based upon the foregoing, the Court recommends that Defendant Bezio's motion to dismiss Plaintiff's Fourteenth Amendment due process claim be denied.

**H. Plaintiff's Pendent State Claims**

Plaintiff has asserted three distinct claims for relief under New York State law against Defendants for acts or omissions within the scope of their employment. (Dkt. No. 1 at ¶¶ 51–55.) They are: (1) *respondeat superior* claims against Defendants Lindquist, Barkley, and Hulihan for negligence in performing their administrative duty to supervise their subordinates' work performance as it related to Plaintiff's care and treatment, *Id.* at ¶ 51; (2) claims against Defendants Lane, Beard, Jones, McAuliffe, and Bezio for wrongful confinement and deprivation of Plaintiff's liberty interest by denying him the right to offer relevant documentary evidence for the preparation and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

presentation of his defense in a disciplinary proceeding in violation of New York State Rules and Regulations and DOCCS policy directives, *Id.* at ¶¶ 52–53; and (3) negligence and malfeasance in providing Plaintiff medical and dental care. Defendants argue that Plaintiff's state law claims should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 23–1 at pp. 20–22.) Defendants are correct. Section 24 provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 62, 527 N.E.2d 1194 (1988). The statutory bar is intended to permit correction officers to perform the task of maintaining safety and security in correctional facilities "undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*21** In 2009, the United States Supreme Court held Correction Law § 24 unconstitutional to the extent it

precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Correction Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at \*21, 2012 U.S. Dist. LEXIS 39232, at \*60 (N.D.N.Y. Feb.28, 2012) (Homer, M.J.); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at \*4–5, 2010 U.S. Dist. LEXIS 104641, at \*15–16 (N.D.N.Y. Sept.30, 2010) (Scullin, S.D.J.); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at \*16, 2010 U.S. Dist. LEXIS 124737, at \*47–48 (N.D.N.Y. Sept.29, 2010) (Lowe, M.J.); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at \*18, 2010 U.S. Dist. LEXIS 10799, at \*61 (N.D.N.Y. Feb.8, 2010) (Kahn, D.J., Peebles, M.J.). For the reasons set forth in those decisions, I recommend that Defendants' motion to dismiss Plaintiff's pendent state law claims in this case be granted, without leave to amend.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 23) be **GRANTED IN PART AND DENIED IN PART.** Specifically, the Court recommends that Defendants' motion be **GRANTED** as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against the moving Defendants in their official capacities, without leave to amend;

2. Dismissal of all of Plaintiff's state law claims against Defendants Lindquist, Barkley, Hulihan, Lane, Beard, Jones, Moehs, McAuliffe, and Bezio (Dkt. No. 1, Counts XV–XIX), without leave to amend; and

3. Dismissal of the following claims, with leave to amend: (a) First Amendment claim against Defendants Briggs and Tyndall for denial of access to courts; (b) First Amendment retaliation claims against Defendants Pawlin,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

Briggs, Tyndall, and Moehs; (c) Eighth Amendment claim of cruel and inhuman treatment against Defendant Pawlin; (d) Eighth Amendment claim for indifference to serious medical needs against McAuliffe, Bezio, Barkley, Hulihan, and Lindquist; and (e) Fourteenth Amendment denial of due process claims against Defendants Lane, Beard, and Jones; and it is further

**RECOMMENDED** that Defendants' motion be ***DENIED*** as to the following: (a) Plaintiff's claim for retaliation against Defendants Lane and Beard; (b) Plaintiff's Eighth Amendment medical indifference claim against Defendant Moehs; and (c) Plaintiff's Fourteenth Amendment violation of due process claim against Defendants McAuliffe and Bezio; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Complaint that relate to the claims on which dismissal is denied and those which relate to the Doe Defendants.

**\*22** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 600213 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 599893 (N.D.N.Y.)

(Cite as: 2013 WL 599893 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Feb. 15, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### *ORDER*

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a
Report–Recommendation by Magistrate Judge Therese
Wiley Dancks, duly filed on the 24th day of January 2013.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's ReportRecommendation,
and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in
its entirety.

2. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned
to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 599893 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 4005499
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tammi ELDRIDGE et al., Plaintiffs,
v.
Superintendent E. WILLIAMS et al., Defendants.

No. 10 Civ. 0423(LTS).　|　July 30, 2013.

### MEMORANDUM OPINION AND ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** *Pro se* plaintiffs Tammi Eldridge, Joyce Powell, Jazmin Shelton, and Sharon Mabry ("Plaintiffs"), all of whom are current or former inmates of Bedford Hills Correctional Facility ("BHCF"), bring this action, pursuant to 42 U.S.C. § 1983, against eight current or former New York State Department of Corrections and Community Supervision ("DOCCS") employees—Superintendent E. Williams, Deputy M. Capra, Deputy J. Hayden, Deputy M. Brynes, Deputy L. Zwillinger, Captain J. Fitzgerald, Captain L. Hammond, and Corrections Officer K. Davoren (collectively, "Defendants")—in their individual capacities. [1] Plaintiffs allege that Defendants were deliberately indifferent to serious health risks that were inflicted on Plaintiffs through exposure to unreasonably high levels of environmental tobacco smoke ("ETS") due to inadequate enforcement of BHCF's indoor smoking ban. Plaintiffs assert that Defendants' deliberate indifference to violations of the ban violated their right under the Eighth Amendment to the Constitution of the United States to be free from cruel and unusual punishment. Plaintiffs also allege that Defendants violated New York state law through inadequate enforcement of the New York State Clean Indoor Air Act and the DOCCS Indoor Smoke–Free Policy. Plaintiffs purport to sue on behalf of themselves and all others similarly situated. All of the Plaintiffs seek compensatory and punitive damages, and Eldridge, Powell, and Shelton seek declaratory and injunctive relief as well. [2]

Currently pending before the Court is Defendants' motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the complaint. The Court has jurisdiction of Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331

and 1367. The Court has reviewed carefully all of the parties' submissions. For the following reasons, the Court grants the motion in its entirety.

### BACKGROUND

The following facts are drawn from the parties' submissions and are undisputed unless otherwise indicated. [3] Plaintiffs Tammi Eldridge and Joyce Powell are current inmates at Bedford Hills Correctional Facility, and Plaintiffs Jazmin Shelton and Sharon Mabry were inmates there until June 2011 and June 2010, respectively. (Def. 56.1 St. ¶¶ 2–5; Pl. 56.1 St. ¶ 2.) Although Plaintiffs allege that most of BHCF's inmates smoke and generally do so throughout the facility, they allege that they suffered unreasonably high exposure to ETS in two areas of the facility's housing unit in particular: their individual cells, in which they allege that they were continuously exposed to smoke through the ventilation system, and the shower areas. (Def. 56.1 St. ¶¶ 27–28, 41–42, 53, 81; Pl. 56.1 St. ¶¶ 3, 15, 24, 41, 57.) The units in which Plaintiffs are or were (before their release) housed consist of single-cell units with windows that can be opened, doors that are solid except for openings along the perimeters, and air vents. (Def. 56.1 St. ¶¶ 15, 110; Pl. 56.1 St. ¶¶ 3, 61.) Defendants deny that smoke constantly enters through vents in the cells. Instead, Defendants assert that the ventilation system should filter out such smoke before it enters another cell, that smoke detectors should be triggered by in-cell smoking and that, to the extent that inmates take measures to conceal their in-cell smoking from detection by the smoke detector (such as by smoking at a window or over a flushing toilet), the measures would tend to reduce or eliminate the migration of ETS to other cells. (Def. 56.1 St. ¶¶ 106–08.) Plaintiffs contend that smoke detectors generally have not been sensitive enough for smoking to activate them. (Pl. 56.1 St. ¶ 59.)

**\*2** Since 2001, the Department of Corrections and Community Supervision ("DOCCS") has had in effect an internal policy banning indoor smoking in correctional facilities. (*Id.* ¶ 16.) Violations of this policy are required to be treated as disciplinary infractions, leading prison officials to issue misbehavior reports initiating disciplinary proceedings. Penalties for such violations range in severity based on the offense, with Tier I disciplinary proceedings involving the least severe infractions and punishments, and Tier III involving the most severe. (*Id.* ¶ 103.) Tier II and Tier III proceedings regarding smoking policy violations [4] declined

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

from 63 charges (50 guilty findings) in 2008 to 21 charges (17 guilty findings) in 2012. (*Id.* ¶ 105.) Smoking in outdoor areas is not banned, and inmates are allowed to possess tobacco products and lighters in their cells. (Kap.Decl.¶ 29.)

Other approaches that prison officials have used to enforce the indoor smoking ban include giving oral warnings, instead of issuing misbehavior reports, to inmates not known to have a history of violating the ban. (*Id.* ¶¶ 103–04.) Defendants also assert that they have the option of curtailing inmate privileges for an entire housing unit to address smoking violations when officers have found that identifying and punishing specific violators is otherwise impossible, but note that this form of punishment has rarely been necessary. (*Id.* ¶ 111.) Inmates' complaints about specific individuals and smoke detectors may further aid enforcement efforts. (*Id.* ¶ 108.)

In 2007, Plaintiff Powell made a written complaint to former Superintendent Ada Perez, complaining that her unit had been "locked down" in response to unauthorized smoking, asserting that she should not have been punished for others' infractions, and requesting redesignation to a non-smoking unit. (Fitz.Decl.¶ 8.) The letter was forwarded to Defendant Fitzgerald, who responded that the facility takes indoor smoking seriously and that a shutdown of common areas "has to be done to encourage all inmates to follow the rules." (*Id.*)

Plaintiffs made multiple complaints about ETS and inadequate enforcement of the indoor smoking ban in the summer of 2009. (Def. 56.1 St. ¶¶ 29, 43, 54, 65, 86.) In July 2009, Eldridge filed an inmate grievance about the response of Defendant Corrections Officer Davoren to an asthma attack that Eldridge had suffered and requested that prison officials enforce the indoor smoking ban in order to ensure a smoke-free environment. (Schul. Decl., Exh. A at 10.) Prison officials consolidated Eldridge's grievance with the other Plaintiffs' grievances that followed. (Def. 56.1 St. ¶ 97.) Plaintiffs generally complained of ETS exposure in the housing unit occurring in the shower area, as well as in their cells through the ventilation system such that they have even had to "tape" and "cover" up their vents to reduce exposure. (Schul. Decl., Exh. A at 26–28, 33–35, 50.) After an investigation by Sergeant Peperone, which concluded that while there was smoking, it "was not enough to be a problem," and that "the only way to stop secondhand smoke is to not allow tobacco at all," Defendant Superintendent Williams ultimately declined to institute new measures to enforce the indoor smoking ban as requested by Plaintiffs. (Def. 56.1 St. ¶¶ 98–99 .)

**\*3** In addition, Plaintiffs allege that they suffer from medical conditions that have been caused or exacerbated by ETS exposure. Eldridge has suffered the most serious of the conditions as she has a history of asthma attacks and has had multiple inpatient stays in the infirmary. (Def. 56.1 St. ¶¶ 49, 61, 67; Pl. 56.1 St. ¶ 21.) The other Plaintiffs have had less serious medical episodes and have not required hospitalizations, although Mabry has been provided with emergency treatment for asthma. (Pl. 56.1 St. ¶¶ 34–35.) Mabry and Powell's asthma conditions have been usually characterized as "mild intermittent," the least severe of four possible assessment levels of asthma. (Def. 56.1 St. ¶¶ 38, 73–74; Pl. 56.1 St. ¶¶ 14, 34–35.) Eldridge, Mabry, and Powell attribute their asthmatic conditions, and/or the exacerbation of those conditions, allergies, nasal and eye discomfort, and headaches, to ETS exposure. (Def. 56.1 St. ¶¶ 23–24, 36, 49, 72; Pl. 56.1 St. ¶¶ 9, 14, 21, 33–35.) No diagnostic link between ETS and these conditions is recorded in the medical documentation that has been proffered in this motion practice, although the records reflect that Plaintiffs complained to medical personnel that their conditions had been triggered or exacerbated by ETS. (Def. 56.1 St. ¶¶ 25, 37, 73, 75; Pl. 56.1 St. ¶¶ 9, 14, 21, 36.) Furthermore, Mabry has testified that her respiratory illness has only had a "slight" impact on her daily activities, and there is no evidence that Mabry has developed a more serious medical condition since she left BHCF in June 2010. (Def. 56.1 St. ¶¶ 75–76; Pl. 56.1 St. ¶¶ 36–37.) Shelton does not suffer from asthma, but claims that the ETS to which she was exposed exacerbated pre-existing allergies, causing problems such as difficulty in breathing and chest pains. (Def. 56.1 St. ¶¶ 23–25; Pl. 56.1 St. ¶ 9.) In May 2012, nearly a year after she left BHCF, Shelton testified that she has no physical health issues and has not been taking any prescribed medications. (Def. 56.1 St. ¶ 34; Pl. 56.1 St. ¶ 13.)

### DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Anderson,* 477 U.S. at 256. A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

In deciding a summary judgment motion, the Court must consider all of the admissible evidence, including affidavits, depositions, answers to interrogatories, and admissions on file, and "resolve all ambiguities and draw all factual inferences in favor of the nonmovant." *See Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, the Court must generally afford "special solicitude" to pro se litigants. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*4** Nevertheless, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which the party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322. The nonmoving party cannot defeat summary judgment "merely upon a 'metaphysical doubt' concerning the facts or on the basis of conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### *Section 1983* Claim

For Plaintiffs to prevail on a claim under 42 U.S.C. § 1983 against state prison officials in their individual capacities, two elements must be met: (1) the defendants must be acting under the color of state law, and (2) their actions must have deprived the plaintiffs of a right guaranteed by the Constitution or the laws of the United States. *Bryant,* 923 F.2d at 983–84. There is no dispute here about the first element—Defendants were state employees acting in their official capacities, and thus acting under color of state law. The second element subsumes inquiries as to whether Defendants were personally involved in the alleged constitutional violation and the elements required to establish that the alleged violation occurred. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)); *see also, Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983"). Here, Plaintiffs claim that Defendants violated their rights under the Eighth Amendment to the Constitution through "deliberate indifference to a substantial risk of serious harm," that is, medical risks associated with exposure to ETS.

The Court will first consider whether the Plaintiffs have alleged facts sufficient to demonstrate that each of the Defendants was personally involved in the alleged deprivation of constitutional rights.

### *Personal Involvement*

To establish supervisory liability under Section 1983, Plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Under *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), a supervisory defendant can be found to be personally involved in a Section 1983 violation by showing any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[5]

**\*5** A defendant's personal receipt of a complaint or letter and subjective awareness of the alleged unconstitutional conditions may be one factor that helps establish personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) ("[i]f ... the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved"). However, even if a complaint or letter is directly addressed to the defendant and the defendant becomes subjectively aware of the alleged problem, if the defendant "lacks the authority to remedy or 'take action with respect to any constitutional violation,' " personal involvement "cannot be found." *Kregler v. City of New York,* 821 F.Supp.2d 651, 658 (S.D.N.Y.2011) (quoting *Kuolkina v.*

*City of New York,* 559 F.Supp.2d 300, 317 (S.D.N.Y.2008));
*see, e.g., Denis v. N.Y. S. Dept. of Correctional Services,*
No. 05 Civ. 4495, 2006 WL 217926, at *21 (S.D.N.Y. Jan.
30, 2006), *report and recommendation adopted* by, 2006
WL 406313 (S.D.N.Y. Feb.22, 2006) (granting summary
judgment for the Chief Medical Officer of the correctional
facilities due to lack of personal involvement because, while
he may have received a complaint, he did not participate in
the formulation, approval, implementation, or enforcement
of the facilities' smoking policy and thus did not participate
in the alleged deprivation). Moreover, if a supervisor merely
received information of unconstitutional acts but reasonably
acted upon it such as by "forward[ing] [a complaint] to [a]
subordinate for investigation and response," that does not
establish personal involvement under Colon. *Grullon,* 720
F.3d 133, 2013 WL 3023442, at *5 (quoting *Sealey v. Giltner,*
116 F.3d 47, 51 (2d Cir.1997)).

### Defendants Zwillinger, Hayden, and Capra

Defendants Zwillinger, the Deputy Superintendent for
Administration, and Hayden, the Deputy Superintendent for
Programming, both received copies of Plaintiffs' complaints
about ETS exposure addressed either to others or directly
to them. Defendants have testified, however, that remedying
complaints about the enforcement of the smoking prohibition
in the housing units is not within their authority. (Def.
56.1 St. ¶¶ 44, 59, 91, 101.) Zwillinger and Hayden
have authority only over administrative matters and the
program buildings, respectively. (*Id.*) Plaintiff Mabry also
claims to have raised her request that security place female
"rover" corrections officers in the shower area directly with
Defendant Zwillinger, but he similarly does not have the
authority to address security matters. (*Id.* ¶ 91.) Although
Plaintiffs assert that "it is within each one of [these
defendants'] supervisory capabilities to implement policies
to stop or minimize the violation," they do not cite any evidence
in the record to support their claim. (Pl. 56.1 St. ¶ 53.) Because
Defendants Zwillinger and Hayden lacked the authority to
remedy the alleged ETS problem and they acted reasonably
upon receipt of information alleging unconstitutional acts,
they do not have the requisite personal involvement for
Section 1983 liability. *See Denis,* 2006 WL 217926, at *21;
*see also Sealey,* 116 F.3d at 51.

**\*6** Deputy Superintendent for Security Capra supervised
Defendants Captain Fitzgerald and Captain Hammond. The
extent of his involvement appears limited to receiving of
copies of complaints addressed to others, which, without
more, is, again, not enough to establish personal involvement.

(Pl. 56.1 St. ¶ 16.) *See Sealey,* 116 F.3d at 51. Section 1983
liability cannot be established by *respondeat superior* alone.
*See Iqbal,* 556 U.S. at 676. Accordingly, the Court concludes
that Defendants Zwillinger, Hayden, and Capra are entitled to
summary judgment due to lack of personal involvement.

### Defendant Byrnes

Defendant Byrnes, the Deputy Superintendent for Health,
also received copies of Plaintiffs' complaints about
inadequate enforcement of the indoor smoking ban and
referred the matter to other prison officials. However,
although Plaintiffs assert otherwise, like Zwillinger and
Hayden, Byrnes lacked the authority to enforce the indoor
smoking ban in the housing units. (Def. 56.1 St. ¶¶ 68, 101;
Pl. 56.1 St. ¶ 53.)

Defendants acknowledge, however, that Byrnes did have
the authority to remedy the alleged wrong with respect to
Eldridge, who had written a letter to Byrnes asserting that
doctors "threatened" to place her in the Regional Medical
Unit (RMU) because of her asthmatic condition, in order to
provide her with a smoke-free environment. (Def. 56.1 St. ¶
67.) Byrnes responded to Eldridge's letter but allegedly failed
to subsequently ensure that Eldridge would be able to live in
a smoke-free environment. (*Id.*) The Court finds that there is
sufficient evidence to establish Byrnes' personal involvement
with regards to Eldridge's claims.

### Defendants Davoren, Williams, Fitzgerald, and Hammond

Defendants do not dispute that the remaining Defendants
—Davoren, who worked as a corrections officer in the
housing unit, Williams, who was superintendent until 2009,
and Captains Fitzgerald and Hammond, who worked in
security—were personally involved in the enforcement of the
DOCCS smoking policy in the housing units.

### Deliberate Indifference Claims Against the Remaining Defendants: Byrnes, Davoren, Williams, Fitzgerald and Hammond

Plaintiffs allege that these Defendants deprived them of their
Eighth Amendment right to be free from cruel and unusual
punishment by being deliberately indifferent in inadequately
enforcing the indoor smoking ban, thereby exposing them
to unreasonably high amounts of ETS. To show that a
prison official has violated the Eighth Amendment through
deliberate indifference, a plaintiff must demonstrate that:
(1) the conditions of confinement objectively posed a

"substantial risk of serious harm," and (2) the defendant was subjectively aware of and unreasonably disregarded this health or safety risk. *Helling v. McKinney,* 509 U.S. 25, 33–35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Farmer v. Brennan,* 511 U.S. 825, 839, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

### Objective Prong: Substantial Risk of Serious Harm

Plaintiffs may satisfy the objective prong of a deliberate indifference claim by demonstrating that ETS exposure is causing them to suffer, or is exacerbating their suffering from, "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (internal quotation marks and citation omitted); see also *Denis,* 2006 WL 217926, at *13; *Koel v. Bernstein,* No. 10 Civ. 3808, 2011 WL 2436817, at *20 (S.D.N.Y. Jun.17, 2011), *report* and *recommendation adopted* by, 2011 WL 4390007 (S.D.N.Y. Sep.21, 2011).

**\*7** The Supreme Court has recognized that, even without a demonstration of contemporaneous harm, an inmate may satisfy the objective prong by offering proof that she herself "is being exposed to unreasonably high levels of ETS" that "pose an unreasonable risk of serious damage to [her] future health." *Helling,* 509 U.S. at 35. While the *Helling* Court did not specify a threshold level or degree of immediacy of such an unreasonable risk, its illustrations involving "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," the viability of a complaint about "demonstrably unsafe drinking water without waiting for an attack of dysentery," and the impropriety of "deliberate indifferen[ce] to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms" suggest that the risk, type, and likely immediacy of harm must be serious and non-speculative. *Id.,* at 33. The Court further made it clear that a determination of whether the challenged

> conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that

it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.,* at 36. Noting that the complaining prisoner, who had originally been double-bunked with a five-pack-a-day smoker, had been transferred to a prison that had recently instituted a policy restricting smoking in certain program areas, the Court in *Helling* observed that "it is possible that the new policy will be administered in a way that will minimize the risk to [the complainant] and make it impossible for him to prove that he will be exposed to unreasonable risk with respect to his future health." *Id.; see also Lee v. Taylor,* 327 F. App'x 253, 254 (2d Cir.2009) ("[A] plaintiff 'states a cause of action under the Eighth Amendment by alleging that prison officials have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health' "); *Shepherd v. Hogan,* 181 F. App'x 93, 95 (2d Cir.2006) (noting that while the plaintiff "also alleged that he had experienced a number of medical problems as a result of his ETS exposure ... this allegation was not necessary for him to prevail [because a] future risk can suffice to constitute a substantial risk of serious harm, even if an inmate experiences no present symptoms").

To prevail on their claim of deliberate indifference to unreasonable future risk associated with ETS exposure, Plaintiffs must demonstrate that their exposure poses a risk that "is not one that today's society chooses to tolerate." *Zaire v. Artuz,* No. 99 Civ. 9817, 2003 WL 230868, at *4 (S.D.N.Y. Feb.3, 2003) (quoting *Helling,* 509 U.S. at 35–36). Because "the Constitution does not mandate comfortable prisons," some exposure to ETS does not necessarily violate the Constitution. *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (holding that housing two inmates in a single cell did not violate the Constitution); *Scott v. Dist. of Columbia,* 139 F.3d 940, 942 (D.C.Cir.1998) ("*Helling* did not read the Eighth Amendment as mandating smokefree prisons").

**\*8** Courts have generally found ETS exposure to be unreasonably high mainly when the plaintiff shares a cell with an inmate who is a frequent or chain smoker, or when the plaintiff is housed in a cell surrounded by such smokers. *See, e.g., Helling,* 509 U.S. at 35–36 (living with a cellmate who smokes five packs of cigarettes a day may satisfy the objective prong); *see also Davis,* 316 F.3d at 100 (plaintiff's experience

in having a cellmate who smoked and being housed in areas where he was surrounded by smokers, such that "the smell of smoke fills the air and enter[s] my cell in a manner as though I was myself smoking," may satisfy the objective prong). The Second Circuit has also upheld the sufficiency of a claim of ETS exposure as an unreasonable risk to future health when a plaintiff was housed in close quarters with a chain smoker for more than a month, even if the plaintiff often left his cell during the day. *Shepherd,* 181 F. App'x at 95.

On the other hand, courts in this Circuit have generally found ETS exposure to be insufficiently high when the exposure was limited to common areas outside of immediate living quarters, such as recreational areas where a plaintiff is only temporarily and/or voluntarily exposed to ETS. *See Zaire,* 2003 WL 230868, at *5 (ETS was not unreasonably high where the plaintiff was exposed to it only in common areas like the gymnasium and he visited it only three times a week while his cell was smoke-free); *see also Gill v. Bracey,* No. 99 Civ. 10429, 2001 WL 34045758, at *2, *4 (S.D.N.Y. Jul.17, 2001) (ETS was not unreasonably high where the plaintiff was exposed to the ETS for four and a half hours a day while in the law library and in line at the medical dispensary and he was not exposed to ETS in his cell).

Here, if Plaintiffs' allegations are accepted as true, perceptible ETS exposure occurred primarily in the shower area and in Plaintiffs' cells through the ventilation system, and to a lesser extent, through the spaces around the cell doors. (Def. 56.1 St. ¶¶ 27–28, 41–42, 53, 81; Pl. 56.1 St. ¶¶ 3, 15, 24, 41, 57.) The Plaintiffs have alluded to a 2007 Surgeon General's report that finds it impossible to identify a safe level of ETS and have referenced academic articles regarding ETS exposure risks, but have not proffered any scientific evidence to indicate that the level of ETS to which they have been exposed is unreasonable under the *Helling* standard in the context of general health risks. The recent decision in *Islam v. Connolly* is instructive. No. 07 Civ. 3225, 2011 WL 723568, at *6 (S.D.N.Y. Feb.16, 2011). There, the court held that the plaintiff's exposure to ETS in the bathroom, which he visited twelve times daily for four or five minutes each time, was not unreasonably high. *Id.* Here, going to the shower area exposed Plaintiffs to ETS briefly, once a day. Plaintiffs also had some control over when they showered and, according to Defendants' uncontroverted proffer, the ability to ask the officers on duty to clear the shower room of smokers if anyone was smoking. (Def. 56.1 St. ¶ 121.) Under these factual circumstances, Plaintiffs' allegations regarding the presence of smokers in the shower room and lingering

smells on their hair, bodies, and clothing, are insufficient to frame a genuine issue of fact as to whether the failure to enforce completely the indoor smoking ban presented an objectively unreasonable risk to Plaintiffs' health within the meaning of *Helling,* much less that the situation was one to which *anyone's* involuntary exposure would "violate[ ] contemporary standards of decency." *See Helling,* 509 U.S. at 36.

**\*9** There is little case law in the Second Circuit on allegations involving cigarette smoke entering an inmate's cell through a ventilation system. *Enigwe v. Zenke,* No. 03 Civ. 854, 2007 WL 2713849, at *4 (E.D.N.Y. Sept. 14, 2007) was one case in the Second Circuit where the plaintiff alleged not only that his cellmate chain-smoked, but also that cigarette smoke entered his cell through the ventilation system for two months. The district court held that the plaintiff did not meet the objective prong in showing a substantial risk of serious harm. The plaintiff, though, had contradicted his own allegations, admitting that he never saw anyone smoke inside the housing unit or in his cell and that he could not recall whether he ever actually saw smoke coming from any vents. *Id.,* at *4–5.

Here, Plaintiffs have been or were incarcerated at Bedford Hills and allege daily exposure to ETS in their cells for years. (Def. 56 .1 St. ¶¶ 2–5, 27, 60; Pl. 56.1 St. ¶¶ 15, 57.) For example, Eldridge alleges that her cell has been "engulfed in smoke," and that she has awakened "out of her sleep to a smoke induced [sic] room, making her gasp for air, ... wheeze and [have] pain in her chest." (Compl. at 7.) Likewise, Shelton alleges that smoke has entered her cell such that she "has been unable to sleep due to the smoking she is forced to inhale." (*Id.* at 27; Def. 56.1 St. ¶ 27.) Shelton furthermore estimated that roughly forty out of sixty inmates in her housing unit smoked, but she has not indicated how often they smoked indoors or how much of that smoke traveled into her cell through the ventilation system. (*Id.* at 27.) Plaintiffs also cite observations by another inmate, Audra Harris, who complained that she "smell[ed] smoke," and by Corrections Officer Alvarez, who "witnessed makeshift ashtrays," as evidence of widespread smoking in the housing units. (Schul. Decl., Exh. A at 18, 34.)

Defendants contend that ETS exposure cannot be that high because the ventilation system "should" filter the smoke out of the air before it enters a cell and, as Eldridge testified, the prison installed a new ventilation system in 2009. (Def. 56.1 St. ¶ 108; Eldridge Dep. at 47.) Defendants further argue that, if indoor smoking was as prevalent as

Plaintiffs claim, the smoke detectors would set off alarms and prompt investigations frequently, noting that Plaintiffs have identified only one incident where an alarm sounded due to smoking. (Def. 56.1 St. ¶ 108.) Plaintiffs contend, though, that the smoke detectors are not sensitive enough to be activated by most smoking violations. (Pl. 56.1 St. ¶ 59.) Other evidence suggesting that ETS is not such a significant problem include the fact that no inmate has filed a grievance about ETS exposure since Plaintiffs last filed a grievance in 2009, and the American Correctional Association audits of BHCF in 2009 and 2012 did not mention any problems with ETS exposure. (Def. 56.1 St. ¶¶ 115–16.)

 **\*10** Overall, even assuming Plaintiffs' evidence to be true, the constant smell of smoke, some smoke entering cells through the vents, and occasional instances of Plaintiffs' cells being "engulfed" in ETS do not amount to the level of unconstitutional ETS exposure that is comparable to living with a cellmate who is a frequent or chain smoker. Furthermore, there is no constitutional right to be free from merely the smell of cigarette smoke and the Plaintiffs cite no evidence that exposure to the smell of cigarette smoke poses a substantial risk of serious harm to future health. Accordingly, the Court finds that the evidence of general ETS exposure in Plaintiffs' cells through the ventilation system is insufficient to meet the objective prong of an Eighth Amendment claim.

The Court also considers whether Plaintiffs' specific medical injury claims sufficiently allege a serious medical condition that has been caused or aggravated by the influx of ETS into their cells. Factors relevant to determining the seriousness of a medical condition include whether: (1) "a reasonable doctor or patient would find [it] important and worthy of comment," (2) it "significantly affects an individual's daily activities," and (3) it causes "chronic and substantial pain." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Severe asthmatic conditions may be found sufficiently serious to meet the objective element, but courts have rejected medical conditions as insufficiently serious where asthma was relatively mild, was not life-threatening, and did not require hospitalization, notwithstanding use of prescription medication and inhalers. *See Oliver v. Deen,* 77 F.3d 156, 158–60 (7th Cir.1996); *see also Colon v. Drew,* 335 F. App'x 86 (2d Cir.2009).

Plaintiff Eldridge has a relatively severe asthmatic condition and alleges that, due to ETS exposure, she has had a history of asthma attacks requiring inpatient stays in the infirmary and

has been awakened out of her sleep, "gasping for air." (Def. 56.1 St. ¶¶ 49, 61, 67; Compl. at 10.) Defendants contend that her conduct suggests that her injuries are not that serious and that a smoke-free environment would be unnecessary to ensure that she is protected against unreasonable risks arising from ETS exposure. In particular, they contend that since April 2012, she has voluntarily worked in the asbestos removal program, for which she declared herself to be in good health, was medically cleared, and has had to take precautions to protect against the hazards of asbestos exposure. (*Id.* ¶¶ 51, 113–14.) Eldridge minimizes the importance of her volunteering for the asbestos removal program, though, contending that the program provides adequate protection and, as a result, does not exacerbate her asthma as ETS exposure does. Overall, notwithstanding her participation in the asbestos removal program, Eldridge's medical records indicate hospitalizations and difficulty sleeping due to ETS exposure, which present a genuine issue of material fact for trial as to whether Eldridge has suffered from sufficiently serious injuries to meet the objective prong. (*Id.* ¶¶ 49, 61, 67; Compl. at 10.)

 **\*11** In contrast, Plaintiffs Powell, Mabry, and Shelton, like the plaintiff in *Oliver,* have had less serious medical incidents that have not required hospitalizations. 77 F.3d at 158–60. Their claimed injuries include asthmatic conditions usually assessed as "mild intermittent," or the least severe type of asthma, and/or symptoms such as headaches, irritated and watery eyes, and breathing problems. (Def. 56.1 St. ¶¶ 23–25, 38, 74.) Mabry also has testified that her medical condition has only had a "slight" impact on her daily activities. (Def. 56.1 St. ¶¶ 75–76; Pl. 56.1 St. ¶¶ 36–37.) Shelton furthermore has testified that, as of May 2012, nearly a year after she left BHCF, she has not had any physical health issues and has not been taking any prescribed medications. (Def. 56.1 St. ¶ 34; Pl. 56.1 St. ¶ 13.) These medical conditions, although clearly ones that have caused Plaintiffs discomfort and worry, do not rise to the level of seriousness as required to violate the Eighth Amendment. *See, e.g .,* *Gill v. Bracey,* 99 Civ. 10429, 2001 WL 34045758, at \*4 (S.D.N.Y. July 17, 2001) (not sufficiently serious injury where plaintiff suffered from a treatable infection and respiratory problem such as asthmatic bronchitis); *Johnson v. Goord,* No. 01 Civ. 9587, 2005 WL 2811776, at \*5–6 (S.D.N.Y. Oct.27, 2005) (not sufficiently serious injury where plaintiff suffered from "temporary discomfort" and was occasionally treated for respiratory conditions); *Blyden v. Bartlett,* No. 95 Civ. 1071, 1997 WL 584308, at \*2 (W.D.N.Y. Sept.9, 1997) (not sufficiently serious injury where plaintiff suffered only from

headaches, irritability, and nausea and no medical records substantiated causation of or aggravation of allergies due to ETS exposure).

Accordingly, there is a genuine issue of material fact with respect to whether Plaintiff Eldridge has suffered sufficiently serious medical injuries that have been caused or aggravated by exposure to ETS, which precludes granting summary judgment against her. However, the Court grants summary judgment against Plaintiffs Powell, Mabry, and Shelton and dismisses all their claims against Defendants from this case for lack of a sufficiently serious risk of medical harm.

### Subjective Prong: Deliberate Indifference

Deliberate indifference is a "state of mind that is the equivalent of criminal recklessness." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). For their conduct to amount to an Eighth Amendment violation, Defendants must have knowingly and unreasonably disregarded an intolerable or excessive risk of harm to Plaintiffs. *Farmer,* 511 U.S. 825, 839, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (adopting a subjective test for deliberate indifference and holding that plaintiff prisoner did not necessarily have to provide advance notice of a concern for his safety to the defendants). The alleged unconstitutional conduct must constitute "more than ordinary lack of due care for the prisoner's interests or safety," but the law does not require that the conduct be intended to cause harm. *Id.,* at 835.

 *12 Where a defendant has subjective knowledge of alleged unconstitutional conditions after reading a complaint but has taken reasonable steps to remedy the problem, a claim will fail for lack of deliberate indifference. *See Grullon* at *6–7 (citing *Sealey,* 116 F.3d at 50–51)). Also, mere imperfect enforcement of an indoor smoking ban in a prison, as long as reasonable enforcement efforts are made, does not amount to deliberate indifference. *See e.g., Scott,* 139 F.3d at 944.

Because Plaintiffs Powell, Mabry, and Shelton's claims have been dismissed for failure to demonstrate that there is an objectively substantial risk of serious harm, the Court will consider evidence of deliberate indifference only with respect to Plaintiff Eldridge's specific medical needs.

### Defendant Byrnes

The basis for Plaintiff Eldridge's claim against Defendant Byrnes is a letter Eldridge wrote to Byrnes asserting that doctors "threatened" to place her in the Regional Medical Unit (RMU) because of her asthmatic condition in order to provide her with a smokefree environment. (Def. 56.1 St. ¶ 67.) Defendants contend that Byrnes acted reasonably by replying that Eldridge could choose to accept or decline that placement offer, and that Eldridge willingly accepted ETS exposure in the housing unit by declining to be transferred to the RMU. (*Id.*) However, Eldridge claims that the RMU is not actually smoke-free because inmates still smuggle in tobacco and smoke inside the facility. (Eldridge Aff. Jul. 9, 2013.) Nonetheless, there is no evidence in the record that Byrnes was aware of a problem with smoking in the RMU, especially as Eldridge's letter did not raise the issue, and thus there was no reason for Byrnes to believe that a transfer to the RMU would not have addressed Eldridge's medical needs. (Schul. Decl., Exh. A at 15–16.) Because the evidence is insufficient to establish that Byrnes was deliberately indifferent, the Court grants summary judgment and dismisses Eldridge's claim against Byrnes.

### Defendant Davoren

Plaintiffs allege that Corrections Officer Davoren was deliberately indifferent in inadequately enforcing the indoor smoking ban whenever she worked in the housing unit, emphasizing in particular one incident involving Eldridge. (Def. 56.1 St. ¶ 64; Pl. 56.1 St. ¶ 28.) Eldridge claims that, on July 21, 2009, the ETS in her cell caused her to be unable to breathe and woke her up. (Def. 56.1 St. ¶ 60.) At the time, Davoren had gone to verbally admonish a neighboring inmate who had smoked and activated the smoke detector. (*Id.;* Pl. 56.1 St. ¶ 26.) Plaintiffs claim that Davoren's failure to issue a misbehavior report to that violator demonstrates her deliberate indifference.

Davoren did, however, respond to the smoke alarm by investigating and telling the inmate to stop smoking. (Def. 56.1 St. ¶ 60; Pl. 56.1 St. ¶ 28.) There is no evidence that Davoren knew of the smoking before the alarm went off. More importantly, there is no evidence that Davoren, before the incident occurred, was subjectively aware of but still chose to disregard Eldridge's asthma and other medical conditions that allegedly made her more susceptible to harm when exposed to ETS. To the contrary, Davoren immediately called for medical assistance upon finding out about Eldridge's difficulty with breathing. (Def. 56.1 St. ¶¶ 61–62.)

 *13 Given the undisputed facts proffered by the Defendants, the Court concludes there is not sufficient evidence for a

rational fact finder to conclude that Davoren was deliberately indifferent. The Court therefore grants summary judgment as to Defendant Davoren and dismisses from this case all claims against her.

### Defendants Williams, Fitzgerald, and Hammond

As for the remaining Defendants' response to Plaintiff Eldridge's specific medical needs, there is no dispute that Williams, Fitzgerald, and Hammond have personal knowledge of Eldridge's serious asthmatic condition. (Def. 56.1 St. ¶ 71.) Eldridge admits, however, that BHCF medical personnel had offered her placement in the RMU to provide her with a smoke-free environment. (*Id.* ¶ 67.) Although Eldridge asserts she declined the offer due to the RMU not actually being smoke-free because inmates still smuggle in tobacco and smoke there, there is no evidence that prison officials were aware of a problem with smoking in the RMU. (Eldridge Aff. Jul. 9, 2013.) It would be reasonable to believe that the option of transferring to the RMU would adequately address Eldridge's medical needs.

In addition, Defendants have provided evidence that there have been continued efforts to enforce the indoor smoking ban generally. Defendants assert that complaints are investigated and violators either are issued misbehavior reports initiating formal disciplinary proceedings (typically for inmates who are "repeat" or "egregious" violators of the smoking ban), or are given oral warnings (usually for inmates who are not known to have a history of smoking violations). (Def. 56.1 St. ¶¶ 103–05.) Disciplinary proceedings for smoking violations declined from 63 charges (50 guilty findings) in 2008 to 21 charges (17 guilty findings) in 2012, for a population of roughly 750 inmates. (Def. 56.1 St. ¶¶ 14, 105.) Defendants argue that this decrease in the number of disciplinary proceedings over the years reflects fewer smoking violations. While the Court finds that enforcement of the indoor smoking ban clearly has not been perfect, imperfect enforcement efforts do not amount to deliberate indifference to ETS exposure. *See, e.g., Scott,* 139 F.3d at 944.

Defendants furthermore contend that their specific interactions with Eldridge do not demonstrate deliberate indifference. Williams reviewed and decided Plaintiffs' consolidated grievance—including Eldridge's—which complained of ETS exposure and inadequate enforcement of the indoor smoking ban in general. (*Id.* ¶ 97.) In her formal response to the grievance, Williams indicated that the facility had a ban on indoor smoking that would continue to be enforced, but declined to introduce new enforcement measures that the Plaintiffs requested, including designated smoke breaks. (*Id.* ¶ 99.) Defendants argue that Williams reasonably relied on Sergeant Peperone's investigation to address the grievance, which found that "some inmates were smoking, but not enough to be a problem." (*Id.* ¶ 98.) As a supervisor, Williams may rely on findings by her subordinate, Sergeant Peperone, if "those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *Poe v. Leonard,* 282 F.3d 123, 144 (2d Cir.2002). It would be administratively impractical for a supervisor to have to independently investigate everything. *Id.* There does not appear to have been reason for Williams to have disregarded Sergeant Peperone's findings. The Court finds that Williams' denial of a grievance based on a subordinate's investigation does not amount to deliberate indifference.

**\*14** Defendants Hammond and Fitzgerald met with Plaintiffs Eldridge and Mabry to discuss and investigate their ETS exposure concerns. Hammond allegedly responded that, if Eldridge and Mabry declined to provide names of inmates violating the smoking ban, he could not do anything to address the problem of smoking violations in the RMU. (Def. 56.1 St. ¶ 46.) Fitzgerald allegedly responded, "Are you kidding ... I can't stop [inmates] from having sex in the jail so how do you think I'm going to stop them from smoking[?]" (*Id.* ¶ 92; Pl. 56.1 St. ¶ 47; Schul. Decl., Exh. A at 33.) Although Plaintiffs assert that these statements demonstrated deliberate indifference, Defendants contend that they were reasonable responses that simply recognized the difficulty of achieving full compliance with the indoor smoking ban. The Court finds that these statements are insufficient evidence for a rational fact finder to conclude that Hammond and Fitzgerald were deliberately indifferent to Eldridge's serious medical needs.

Because Eldridge was offered placement in a smoke-free environment, her complaints were appropriately investigated and responded to, and there have been general efforts to enforce the indoor smoking ban even though they may have been imperfect, the Court grants summary judgment for the remaining Defendants, Williams, Fitzgerald, and Hammond, and dismisses all claims against them for lack of evidence of deliberate indifference.

### Qualified Immunity

Even if there were a triable question as to whether Defendants Byrnes, Davoren, Williams, Fitzgerald, and Hammond were deliberately indifferent to Eldridge's serious medical needs,

Plaintiffs' claims against them may be dismissed on qualified immunity grounds. Defendants are entitled to qualified immunity if (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate such law. *Warren v. Keane, 196 F.3d 330, 332 (2d Cir.1999)* (citing *Salim v. Proulx, 93 F.3d 86, 89 (2d Cir.1996)*). *Helling* "clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health." *Keane* at 333. However, the Court finds that it was objectively reasonable for the Byrnes, Davoren, Williams, Fitzgerald, and Hammond to believe that their actions did not violate the law. Again, undisputed evidence indicates that once Davoren found out about Eldridge's serious medical needs, she acted reasonably by immediately calling for assistance. Williams, Fitzgerald, and Hammond appropriately investigated and addressed Eldridge's complaints of inadequate enforcement of the indoor smoking ban. Finally, Byrnes reasonably responded to Eldridge's letter by informing her that she could accept or reject the offer of placement in the smoke-free RMU. There is no evidence that any of the Defendants were aware of a smoking problem in the RMU that would have made the RMU inadequate for addressing Eldridge's serious medical needs. Accordingly, the Court finds that claims against Defendants Byrnes, Davoren, Williams, Fitzgerald, and Hammond may be dismissed on qualified immunity grounds as well.

### State Law Claims

**\*15** Plaintiffs argue that the New York Correction Law Section 24, which provides immunity for corrections officers against any state law claims, violates the Supremacy Clause of the Constitution of the United States. The statute provides that "[n]o civil action shall be brought in any court of the state ... against any officer or employee of the [Department of Corrections and Community Supervision], ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee." New York Correction Law § 24 (McKinney 2011). However, because the law provides immunity only from state law claims and it does not purport to restrict any federal laws, the Supremacy Clause does not affect its validity. Accordingly, pursuant to New York Correction Law Section 24, the Court dismisses all of Plaintiffs' state law claims.

### CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion for summary judgment in its entirety.[6] Because the Court dismisses all claims, it does not consider arguments with respect to Plaintiffs' class action claims and Plaintiff Shelton's claims for declaratory and injunctive relief against Defendants.

This Memorandum Opinion and Order resolves docket entry number 70. The Clerk of Court is hereby directed to enter judgment dismissing all of the named Plaintiffs' claims and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States, 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).*

SO ORDERED.

### All Citations

Slip Copy, 2013 WL 4005499

### Footnotes

1    Plaintiffs' claims against Defendants in their official capacities were previously dismissed by the Court. (*See* docket entry no. 39.)

2    Plaintiff Mabry's claims for declaratory and injunctive relief were previously dismissed by the Court. (*See* docket entry no. 39.)

3    Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

4    Statistics for Tier I disciplinary proceedings are not tracked. (Def. 56.1 St. ¶ 105.)

**5**    While the Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), may have narrowed the viability of some of the *Colon* predicates for supervisory liability, the Court need not determine to what extent the *Colon* predicates survive here as none of the potentially narrowed predicates are at issue. *See, e.g., Grullon v. City of New Haven,* Docket No. 11–3184, 2013 WL 3023464, at *4 (2d Cir. Jun.19, 2013) (the "requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" "may have [been] heightened").

**6**    The Court has also thoroughly reviewed Plaintiffs' unauthorized surreply and concludes that it does not materially impact the Court's findings.

---

**End of Document**                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4107822
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raszell REEDER, Plaintiff,
v.
M. HOGAN, et al, Defendants.

No. 9:09−CV−520 (NAM/ATB). | July 11, 2012.

**Attorneys and Law Firms**

Raszell Reeder, pro se.

Justin C. Levin, Assistant Attorney General.

*REPORT AND RECOMMENDATION*

ANDREW T. BAXTER, United States Magistrate Judge.

**I. Background**
 *1 Plaintiff commenced this action pro se, seeking damages for injuries resulting from various incidents occurring between 2007 and 2008. (Dkt. No. 1). Liberally construed, plaintiff's original complaint set forth several First and Eighth Amendment claims, including excessive force, denial of medical care, failure to receive proper Ramadan meals, and challenges to his conditions of confinement. *Id.* Plaintiff filed an amended complaint on January 4, 2010 (First Amended Complaint). (Dkt. No. 84). Plaintiff's First Amended Complaint identified defendants originally named as John Doe and Jane Doe, but was identical to his original complaint in all other respects. *Id.*

On November 16, 2009, defendants filed a motion to dismiss the First Amended [1] Complaint pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 69). On September 29, 2010, then-Chief District Judge Mordue granted defendants' motion in part and denied it in part. (Dkt. No. 122). On October 8, 2010, this action was referred to Magistrate Judge Victor E. Bianchini for settlement proceedings, pursuant to the Pro Se Prisoner Settlement Program, and the case was stayed in all other respects until the proceedings were completed. (Dkt. No. 124).

On November 1, 2010, plaintiff filed a motion to amend, together with a Second Amended Complaint. (Dkt. No. 129).

In light of the stay, the Court did not address the motion. On January 31, 2011, the stay was lifted. (Dkt. No. 133). Before this Court could address plaintiff's November 1, 2010 motion, plaintiff filed another motion to amend on May 4, 2011, together with a Third Amended Complaint. (Dkt. No. 141). In an order dated June 22, 2011, this court denied plaintiff's motion to amend filed on May 4, 2011, but granted, in part, the November 1, 2010 motion. (Dkt. No. 145). The operative pleadings are plaintiff's First Amended Complaint, filed January 4, 2010, without the claims that were dismissed as a result of Judge Mordue's September 29, 2010 Order, read together with plaintiff's Second Amended Complaint. Defendants filed a motion for summary judgment on December 27, 2011. (Dkt. No. 150). Plaintiff filed a response on January 9, 2012. (Dkt. No. 154).

**II. Remaining Claims**
Four categories of claims remain for consideration:

 1. Free Exercise of Religion:

   Plaintiff claims that he was denied his Ramadan meals. This claim remains only against defendant Archambault. (First Am. Compl. ¶¶ 29, 37).

 2. Medical Care:

 a) Plaintiff alleges that he was denied proper medical care when he was sent to Clinton Correctional Facility, but was never placed in the appropriate mental health program. This claim remains against defendants Hogan, Fischer, Bosco, Waldron, Roy, Artus, LaValley, and Racette. (First Am. Compl. ¶ 19).

 b) Plaintiff alleges that defendants Fitzgerald and Farnan [2] denied him proper medical care after he was allegedly assaulted on August 24 and 25 of 2008. [3] (First Am. Compl. ¶¶ 27, 43).

 *2 3. Excessive Force:

   Plaintiff claims that he was the victim of excessive force used against him on August 24 and 25 of 2008. Although it still does not appear that plaintiff knows who assaulted him on August 24, he states that defendants Hogan, Bosco, and Waldron are responsible for this assault. Plaintiff claims that one unnamed sergeane [4] and two unnamed corrections officers assaulted him on August 25, and claims that

defendants Uhler and Allen are responsible. Plaintiff also alleges that defendants Marcil and an unknown observation officer used mace against plaintiff on August 25. (First Am. Compl. ¶¶ 20, 21, 22, 41, 42; Pl.'s Dep. 56, 97–98, 104–08).

4. Conditions of Confinement:

    a) Plaintiff alleges that he was denied toiletries, including soap and toilet paper between January 5, 2009 and January 28, 2009. He claims that defendants Ludwig, Artus, Lavalle, Savage, and Racette are responsible. (First Am. Compl. ¶¶ 30, 47).

    b) Plaintiff claims that he was denied food at different times during this period and alleges that defendants Mosley, Besaw, Artus, Lavalle, Poupoure, Tetreault, Boulrice, [5] and Finnel are responsible for this deprivation. (First Am. Compl. ¶¶ 34, 50).

    c) Plaintiff claims that defendant Artus is responsible for failing to repair the loud banging coming from pipes near his cell. (Second Am. Compl. ¶¶ 4–6).

### III. *Facts and Contentions*

Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate") in 2007 and then was transferred to Elmira Correctional Facility ("Elmira") in 2008, where he participated in a group therapy program. (First Am. Compl. ¶¶ 13–15). After about four weeks, plaintiff was transferred from Elmira to Great Meadow Correctional Facility ("Great Meadow") where he participated in a different mental health program. (First Am. Compl. ¶¶ 15–16). Plaintiff claims that he has been "deprived [of his] mental health treatment because of constant movement to different facility programs." (First Am. Compl. ¶ 18).

While plaintiff was at Great Meadow, defendant Howard allegedly "got [plaintiff] relocated" to the "last cell and with feces in it" and told other correctional officers that when plaintiff was at Upstate, plaintiff had attacked defendant Howard's friend. (First Am. Compl. ¶¶ 16, 36, 39, 52). Plaintiff had interacted with defendant Howard at Upstate and Downstate Correctional Facilities. (First Am. Compl. ¶ 52). Plaintiff indicates that while he was a part of the Great Meadow B.H.U. [6] program, plaintiff was "given a new criminal charge," but gives no explanation as to the surrounding facts or its relevance. (First Am. Compl. ¶ 16).

Plaintiff complained to defendant Hicks at Great Meadow that he was "never suppose[d] to be transfer[r]ed out of Elmira," but "she still did nothing except sent me to Clinton Correctional Facility [group therapy] program" later in 2008. (First Am. Compl. ¶ 17). At Clinton, plaintiff "experienced constant assaults [and] wasn't fed for two daily meals[, and w]hile at O.B.S. [plaintiff] was extremely cold and in strong pain." (First Am. Compl. ¶ 28). Plaintiff alleges that he was "denied my religious practive [sic] to eat ramadan meals" for the entire month when ramadan is celebrated. [7] (First Am. Compl. ¶ 29, 46).

**\*3** On August 24, 2008, plaintiff "committed a[n] aggr[a]vated assault charge," and was placed in "full restraints and assaulted in the back of [his] cell" at Clinton by unnamed defendants. (First Am. Compl. ¶¶ 20, 40; Pl.'s Dep. 56). The aggravated assault charge resulted because plaintiff threw urine and feces on a nurse and corrections officer. (Pl.'s Dep. 57). After being placed in restraints, plaintiff alleges that excessive force was used when he was made to lie on the floor. (Pl.'s Dep. 69). After the incident, defendant nurse Fitzgerald evaluated plaintiff from about five feet away, and from behind a plexiglass shield, which plaintiff alleges was "unclean" and "gives unclear vision." (First Am. Compl. ¶ 26; *see also* Pl.'s Dep. 66, 118–23). Plaintiff allegedly received no treatment for the resulting bruises, swelling, or the "excruciating pain [he] was constantly feeling." (First Am. Compl. ¶¶ 26–27; Pl.'s Dep. 124–26).

Plaintiff was moved to the observation area of the mental health clinic, and the next day, plaintiff alleges that he was sleeping, and unknown corrections officers entered his cell and began punching and kicking plaintiff. (First Am. Compl. ¶ 21, 40; *see also* Pl.'s Dep. 65, 89–93). Sergeant Rendle [8] and two unknown corrections officers returned a few minutes later and began "punching [plaintiff], kicking [plaintiff], and kneeing [plaintiff] ." (First Am. Compl. ¶ 22, 40; Pl.'s Dep. 75). Another officer stood at the door, holding it open. *Id.* After assaulting plaintiff for another three minutes, they "ran out the cell door." *Id.* Plaintiff alleges that the unidentified corrections officer who held the door also refused to feed plaintiff breakfast and lunch. *Id.*

Plaintiff alleges that later that same day, defendants Uhler, Allen, Marcil, and other corrections officers wanted plaintiff to come out of his cell, but he "disagreed with coming out," because "they did not come with [a] camera." (First Am. Compl. ¶ 24, 41). A "distraction unit" was called, bringing a camera, so plaintiff "agreed to come out," but

defendants Uhler, Allen, Marcil and others still used mace "repeatedly." *Id.* Plaintiff was placed in full restraints, but the officers failed to lock the cuffs, which caused plaintiff "excruciating pain," and a corrections officer held plaintiff's "arm in an unprofessional [sic] way only intended to cause [plaintiff] extra excruciating pain and he used a[n] untrained hold to apply pressure on my arms and wrist." (First Am. Compl. ¶ 24, 42; Pl.'s Dep. 109–11). Plaintiff received an eye examination by defendant nurse Farnan in the SHU "holding pen," but plaintiff received nothing for his bruises, "excruciating pain [he] was constantly feeling," or "swollenness [sic] from my head, face, chest, stomach, left leg, right leg and testicles." (First Am. Compl. ¶ 27, 43; Pl.'s Resp. to Defs.' Mem. of Law in Supp. of Mot. to Dismiss the Am. First Am. Compl. as to Defs. Farnan and Fitzgerald ¶ 1; Pl.'s Dep. 115–16, 127–29).

 **\*4** On January 5, 2009, plaintiff states that he was "forced to retaliate against a Sgt. and two correction officers for constant harrassment [sic] and constant retaliation ... and because the administration at Clinton refuse[s] to proffessionally [sic] protect me." (First Am. Compl. ¶ 28). The officers then submitted allegedly false reports stating that the personal property inside plaintiff's cell was also contaminated and needed to be destroyed. (First Am. Compl. ¶ 51). Plaintiff's property was placed in a bag and destroyed due to a report indicating that it was "contaminated." (First Am. Compl. ¶ 35). Plaintiff claims that only "one pair of state pants and short sleeve shirt, one pair of state sox, [sic] one pair of state undershirt and undershorts was contaminated and that was outside my cell at the back of the cell outside cell entrance." (First Am. Compl. ¶ 51).

The state property that was destroyed was valued at $152.64, and plaintiff's property, "five Vibe magazines, 1 bible, 7 personal letters, [and] 1 pair of slippers" were valued at $36.25. (First Am. Compl. ¶ 35). The loss of his slippers prevented plaintiff from showering. (First Am. Compl. ¶ 35). After plaintiff attempted to assault the officers on January 5, 2009, he claims he was placed "back in S.H.U. 2 cell" that only had a mattress with "huge holes and it was torn in many places." (First Am. Compl. ¶ 30). Plaintiff alleges he was deprived of writing utensils, paper, grievance forms, envelopes, sheets, blankets, washcloths, soap, a pillow or pillowcase, towels, toilet paper, a toothbrush, toothpaste, and a sweatshirt. (First Am. Compl. ¶ 30). Plaintiff claims that it took until January 23, 2009, for him "to receive most items back." (First Am. Compl. ¶ 30).

For ten days following the January 5, 2009 incident, plaintiff claims he went without food and then only received one meal a day for four more days. (First Am. Compl. ¶ 34, 50). Plaintiff refused to eat during the final four days because "they spit in it or put dirt in it." (First Am. Compl. ¶ 34). Plaintiff was "denied toilet paper for six days while they offer[ed] to feed me." (First Am. Compl. ¶ 47). Plaintiff also felt cold because of a broken window that was not fixed until January 28, 2009. (First Am. Compl. ¶ 30, 47). Plaintiff spoke to defendants Artus and LaValley [9] on January 13, 2009, but "neither did nothing," telling plaintiff that "it's a security concern." (First Am. Compl. ¶ 34, 38, 47). Plaintiff claims that "grievance investigations are not done proffessionally [sic]" or not investigated at all, and defendant Brousseau "neglects her responsibility" as I.G.P. Supervisor by "not using her powers ... to enforce her authority against Clinton Correctional Facility Administration." (First Am. Compl. ¶ 38).

Plaintiff was not included in the group therapy program at Clinton in 2009, which plaintiff alleges is because "the grievance system never conduct proffessional [sic] investigations it has constant incomp[e]tents." (First Am. Compl. ¶ 19). Plaintiff asserts that his exclusion from the Clinton group therapy program "has nothing to do with the criminal charge at Great Meadow." *Id.*

 **\*5** Plaintiff also complains of the "loudness of the very loose pipes banging against each other and against the wall," which causes plaintiff an "extreme amount of uneasiness," loss of concentration, and gives him migraine headaches. (First Am. Compl. ¶ 31, 48). Plaintiff alleges that his "mental health is constantly worst [sic] and noone [sic] is helping me I have no other choice but to keep throwing feces and looking a[t] the people that walk bye [sic] that's [sic] responsible for not fixing these constant attacks when they were warned repeatedly. My brain be [sic] getting angry." (Pl.'s Resp. to Defs.' Mot. to Dismiss Compl. p. 11). [10]

Defendants argue that plaintiff has failed to exhaust his administrative remedies as to his claims based on excessive force, deliberate indifference to a serious medical need, and denial of food. They argue that he cannot establish a claim based on the Eighth Amendment, that he cannot establish a claim based on the First Amendment, and that defendants are protected by qualified immunity. The court will analyze plaintiff's claims in turn as they were listed above. [11] For the reasons below, the court recommends granting defendants

summary judgement in part and denying defendants summary judgment in part.

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); Fed.R.Civ.P. 56(c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

## III. *Personal Involvement*

**\*6** Plaintiff has alleged claims against many defendants in supervisory roles. Defendants allege that many claims should be denied due to a lack of personal involvement.

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed

the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

The failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N .Y.2006). Mere notice of alleged wrongdoing is insufficient to establish a supervisor's or administrator' [s] personal involvement. *Gibson v. Comm'r of Mental Health,* No. 04 Civ. 4350, 2008 WL 4276208, at \*8, 2008 U.S. Dist. LEXIS 70080, at \*27 (S.D.N.Y. Sept. 17, 2008). While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... '[p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.' " *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (quoting *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002).

The court will analyze defendants' arguments based on a lack of personal involvement in the relevant sections, which are separated according to plaintiff's alleged constitutional claims.

## IV. *First Amendment Claims*

### A. Free Exercise

Plaintiff claims that his rights under the First Amendment were violated when he was deprived of "Ramadan meals." (First Am. Compl. ¶¶ 29, 46). The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the

constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y.Oct.17, 2007). The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

**\*7** Plaintiff claims that he was denied meals during Ramadan, a holy month in Islam when observant Muslims fast between sun up and sun down. *See generally Ford v. McGinnis,* 352 F.3d 582, 585 (2d Cir.2003) (discussing the general aspects of Ramadan and some of the accommodations made by DOCCS). Plaintiff claims he gave a grievance about his lack of Ramadan meals to Sergeant Archambault, the "grievance sergeant," but his grievance did not reach the grievance office or the Muslim chaplain. (First Am. Compl. ¶ 29, Pl.'s Resp. to Defs.' Mot. to Dismiss p. 10). Plaintiff was later told by the Imam that he "wasn't on the mess hall list for Ramadan or the Ramadan list in [the Imam's] office," despite the fact that plaintiff "[has] Islam on the facility computer at Clinton. *Id.*

Plaintiff does not allege that defendant Archambault denied him any meals, but only states that he lied about receiving plaintiff's grievances, which is consonant with plaintiff's description of defendant Archambault as the "Grievance Sergeant" of the SHU. (First Am. Compl. ¶ 29). However, plaintiff testified that defendant Archambault told plaintiff that Archambault had delivered the grievance, and plaintiff's claims had been investigated. (Pl.'s Dep. 142–43). Plaintiff also testified that he failed to file another grievance because defendant Archambault told plaintiff that the grievance had been processed, and that plaintiff should begin receiving Ramadan meals. (Pl.'s Dep. 144). Plaintiff testified that he did not know who denied him his Ramadan meals. (Pl.'s Dep. 140).

Defendant Archambault affirmed that his duties as Grievance Sergeant did not include providing meals during Ramadan or otherwise. (Archambault Decl. ¶ 7). Defendant Archambault's duties included speaking personally with inmates housed in the SHU regarding their grievances, providing them with the necessary forms to file grievances, and discussing the grievance process with them. (Archambault Decl. ¶ 8). Defendant Archambault affirmed that he "never allowed inmates to hand me Inmate Grievance Complaints for filing with the Grievance Office," and if an inmate were to try and give him a grievance, he "would not accept the grievance and [he] would advise the inmate to sent it to the Grievance Office through facility mail." (Archambault Decl. ¶¶ 8, 10).

"Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a Section 1983 cause of action." *Liner v. Goord,* 310 F.Supp.2d 550, 555 (W.D.N.Y.2004). *See, e.g., Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (summary judgment affirmed where commissioner referred plaintiff's letter to the prison superintendent); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) (granting summary judgment to DOCS commissioner based on lack of personal involvement); *Farid v. Goord,* 200 F.Supp.2d 220 (W.D.N.Y.2002) (dismissing action against DOCS commissioner and prison superintendent for lack of personal involvement where plaintiff merely sent petition to them and each referred the petition down the chain of command for investigation.)

**\*8** Similar to where a supervisor forwards an inmate's complaint to the appropriate destination for resolution, defendant Archambault's responsibility as Grievance Sergeant was to explain the grievance process, provide forms, and direct inmates how to use the process. Even if defendant Archambault was aware that plaintiff was not receiving Ramadan meals, he was not in a position to remedy the situation. As the Grievance Sergeant, his responsibility was to refer plaintiff to the grievance program, providing explanations and forms if necessary, and had nothing to do with plaintiff's meals. [12]

The court declines to find personal involvement by defendant Archambault related to a grievance he would not have taken from plaintiff and would have been in no position to correct even if he did take the grievance from plaintiff. Summary judgment should be granted as to defendant Archambault

regarding plaintiff's alleged violation of the Free Exercise Clause and plaintiff's First Amendment claim should be dismissed.

### V. *Eighth Amendment Claims*

#### A. Medical Indifference

Plaintiff claims that defendants Hogan, Fischer, Bosco, Waldron, Roy, Artus, LaValley, and Racette deprived him of mental health treatment when he was transferred to Clinton and was not placed in the appropriate mental health program. He also asserts that defendant nurses Fitzgerald and Farnan were deliberately indifferent to his medical needs because they did not examine or treat him appropriately.

#### 1. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

#### a. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will

likely cause the plaintiff. *Id .* (citing *Helling v. McKinney,* 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185).

#### b. Subjective Element

 **\*9** The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.*

(citations omitted). An inmate does not have the right to treatment of his choice. *Dean v.. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle v. Gamble,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

### 2. Application

#### a. Purported Deprivation of Mental Health Treatment

**\*10** Plaintiff claims that defendants Hogan, Fischer, Bosco, Waldron, Roy, Artus, LaValley, and Racette "deprived" plaintiff of his mental health treatment "because of constant movement to different facility programs." (First Am. Compl. ¶ 18–19). It is well-settled that an inmate has no right to incarceration in any particular facility. *See Wilkinson v. Austin,* 545 U.S. 209, 221–222 (2005) (citing *Meachum v. Fano,* 427 U.S. 215, 225) (1976). In *Wilkinson,* the court stated that confinement in any one of a state's institutions is within the normal range of custody which the conviction has authorized that state to impose. *Id.* at 222. In regards to which mental health program plaintiff preferred, mere disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d at 31. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d at 215. The fact that plaintiff might have preferred an alternative treatment, or believes that he did not get the medical attention he desired, does not rise to the level of a constitutional violation. *Id.*

Plaintiff was in the mental health unit at Upstate in 2007, was sent to Elmira to participate in a mental health program for four weeks in 2008, and then sent to the Great Meadow B.H.U later that same year. (First Am. Compl. ¶¶ 13–17; Pl.'s Dep. 32). At Great Meadow, plaintiff complained to the B.H.U. Supervisor, defendant Hicks, that he was "not suppose[d] to be in the B.H.U. program and ... [plaintiff] was never suppose[d] to be transfer[r]ed out of [the] Elmira G.T.P. program." (First Am. Compl. ¶ 17). Plaintiff was then transferred to Clinton later in 2008. (First Am. Compl. ¶ 19; Pl.'s Dep. 32). It is evident that plaintiff was getting mental health treatment at the different facilities in which he was housed. Plaintiff may prefer the program at Elmira, but being transferred out of that facility and that particular program does not rise to the level of a constitutional violation.

Plaintiff appears to allege that defendants Fischer, Hogan, Roy, Artus, LaValley, and Racette are responsible for the alleged deprivation of plaintiff's mental health treatment due to their supervisory status. Defendant Fischer is the Commissioner of the New York State Department of Corrections and Community Supervision. (Fischer Decl. ¶ 1). Commissioner Fischer affirmed that he does not personally read the thousands of letters addressed to him each year by inmates. (Fischer Decl. ¶¶ 15–16). Correspondence is forwarded to the appropriate division or bureau for further action, if necessary. (Fischer Decl. ¶ 16). Correspondence may be brought to Commissioner Fischer's personal attention, if necessary, but that did not happen with plaintiff's letters. (Fischer Decl. ¶ 18, 21).

**\*11** Defendant Hogan is the Commissioner of the New York State Office of Mental Health. (Hogan Decl. ¶ 1). Commissioner Hogan affirmed that he has never assessed plaintiff's mental health needs, he has no involvement in the determination of whether to move an inmate from one correctional facility to another, and is not responsible for the direct supervision of Office of Mental Health employed at correctional facilities. (Hogan Decl. ¶¶ 8–11).

Defendant Roy was the Deputy Commissioner and Inspector General of New York State Department of Correctional Services (now New York State Department of Corrections and Community Supervision) until his retirement in September 2010. (Roy Decl. ¶ 1). Defendant Roy affirmed that he was never personally involved in any matters included by plaintiff in his complaint, and that staff members of the New York State Office of Mental Health at correctional facilities assess the mental health needs of inmates by assigning a mental health service level and transferring inmates to facilities offering services that meet inmates' designated mental health level. (Roy Decl. ¶¶ 6–8).

Defendant Artus was the Superintendent at Clinton from July 2003 through April 2010. (Artus Decl. ¶ 4). Superintendent Artus's responsibilities included making weekly rounds, including to the SHU, and he remembers speaking to plaintiff on occasion. (Artus Decl. ¶¶ 6–7). Superintendent Artus does not recall ever speaking to plaintiff about the claims he makes in this case, but affirmed that he would have delegated any written complaints from plaintiff to a deputy superintendent for resolution. (Artus Decl. ¶ 7–9).

Defendant LaValley was the First Deputy Superintendent at Clinton from February 2008 through September 2009. (LaValley Decl. ¶ 4). As First Deputy Superintendent, defendant LaValley ensured inmates received appropriate mental health care and therapy programs at Clinton based on their assessed need, as determined by mental health staff. (LaValley Decl. ¶ 8). When plaintiff arrived at Clinton in June 2008, mental health staff designated him as Level 3, which did not qualify him to participate in Clinton's Group Therapy Program. (LaValley Decl. ¶ 10–11). Plaintiff was subsequently designated as a Level 6 (the least serious level), and remained ineligible to participate in the Clinton mental health therapy program. (LaValley Decl. ¶¶ 10–12).

Defendant Racette was the Deputy Superintendent for Security at Clinton from December 2006 through November 2010. (Racette Decl. ¶ 4). As Deputy Superintendent for Security, defendant Racette was responsible for all matters of security, and was in charge of all security staff. (Racette Decl. ¶ 5).

Defendant Bosco was the Forensic Program Administrator with the Office of Mental Health from November 2007 through September 2009. (Bosco Decl. ¶ 5). Defendant Bosco was responsible for the oversight and operation of the Mental Health Units at Clinton, Great Meadow, Coxsackie, Sullivan, and Upstate Correctional Facilities. (Bosco Decl. ¶ 6). Defendant Bosco was not responsible for assessing inmates' mental health services levels and did not participate in assessing plaintiff's mental health service level. (Bosco Decl. ¶¶ 7–9).

**\*12** Defendant Waldron is the Mental Health Unit Chief at Clinton and is responsible for the oversight, direct supervision, and coordination of Special Programs. (Waldron Decl. ¶¶ 4–6). Defendant Waldron affirmed that a review of plaintiff's mental health records indicates he was transferred to Clinton on June 20, 2008, and a Treatment Plan Review

dated June 23, 2008, states that plaintiff "denies any active mental health symptoms," that plaintiff was "noncompliant with treatment," and "[r]efuses all callouts." (Waldron Decl. ¶¶ 7–8, Ex. A to Wald. Decl.). plaintiff's frequent refusal of prescribed medication and recommended treatment, and his chronic non-compliance with the directions of the medical staff further undermines his claims of deliberate indifference on the part of the DOCS medical staff. *See, e.g., Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986) (plaintiff's history of declining treatment by prison doctors undermined his claim that they were deliberately indifferent in failing to treat his medical issues).

Plaintiff was evaluated by psychiatrist Dr. Jean Berggren on July 3, 2008, who assigned plaintiff a mental health service level of 3.[13] (Wald. Decl. ¶ 9, Ex. B to Wald. Decl.). Defendant Waldron affirmed that as a level 3 patient, plaintiff was not eligible to participate in the group therapy program at Clinton at that time. (Waldron Decl. ¶ 14). Defendant Waldron also noted that between plaintiff's arrival at Clinton in June 2008 and November 2008, he was seen on at least 80 occasions by mental health staff, and plaintiff was upgraded to Service Level 6[14] on November 13, 2008. (Waldron Decl. ¶¶ 15–17, Ex. D to Waldron Decl.). Defendant Waldron affirmed that changing plaintiff's Mental Health Service Level from a 3 to a 6 was "appropriate and was based upon a thorough assessment of his mental health, his lack of need for medication, and his refusal to accept mental health services." (Waldron Decl. ¶ 18). Plaintiff filed a grievance related to the alleged refusal of group therapy. The CORC found no malfeasance by staff and stated "it is [plaintiff's] extensive disciplinary record and overall poor behavior that is preventing him from participating in the Group Therapy Program." (Ex. A to Pl.'s Resp. Opposing to Defs.' Mot. for Summ. J. 18).[15]

It is clear from the above that plaintiff began, and continued receiving, mental health treatment at Clinton. The named defendants had nothing to do with his transfer to Clinton. No issue of fact exists as to whether mental health staff were monitoring plaintiff, as he repeatedly, often daily, was observed by staff. (*See* Ex. C to Waldron Decl.). At best, plaintiff disagrees with the evaluations given by medical staff and refused any suggested treatment. (*See* Pl.'s Dep. 39, 42). As mentioned above, plaintiff does not have a constitutional right to the treatment of his choice. Plaintiff correctly acknowledges that his mental health treatment "must be left up to the doctors and the mental health workers." (Pl.'s Dep. 48). Plaintiff names supervisory officials in his claim

for deliberate indifference based solely on their supervisory role, which cannot support a claim of deliberate indifference. Because plaintiff cannot establish anything more than a disagreement with prescribed care, he cannot establish deliberate indifference. Accordingly, defendants should be granted summary judgment as to plaintiff's claims based on a denial of mental health treatment.

**b. Defendants Fitzgerald and Farnan**

 **\*13** Plaintiff takes issue with defendant nurse Fitzgerald examining plaintiff on August 24, 2008, "at the back of my cell while standing behind a cell shield pexiglass [sic]," because it "gives unclear vision" and plaintiff "never received treatment for [his] bruises and [swelling]." (First Am. Compl. ¶ 26; Pl.'s Dep. 56; Pl.'s Resp. Opposing Defs.' Mot. for Summ. J. 6). Plaintiff also complains that defendant Nurse Farnan did not give plaintiff anything for his bruises, swelling, or "excruciating" pain on August 25, 2008. (First Am. Compl. ¶ 27; Pl.'s Dep. 56; Pl.'s Resp. Opposing Defs.' Mot. for Summ. J. 6–7).

Defendant Fitzgerald affirmed that on August 24, 2008, he viewed plaintiff after plaintiff threw feces and urine on staff. (Fitzgerald Decl. ¶ 4). Because plaintiff was compliant with being restrained and removed from his cell, there was no use of force, and defendant Fitzgerald viewed plaintiff through the cell door of the holding area in the SHU. (Fitzgerald Decl. ¶ 6–7). Plaintiff alleges that he experienced bruises and a scratch that lasted one to two weeks. (Pl.'s Dep. 70). Defendant Fitzgerald viewed no apparent injury and plaintiff denied having sustained any injury, so defendant Fitzgerald concluded that no further physical examination was necessary or required. (Fitzgerald Decl. ¶ 7,9). The Ambulatory Health Record Progress Note states that plaintiff obeyed commands and denied any injury. (Ex. A to Fitzgerald Decl.) Defendant Fitzgerald noted that plaintiff was "talking to himself, laughing, snickering and then grimacing," and defendant Fitzgerald requested that plaintiff be sent to the mental health unit for observation and evaluation. (Fitzgerald Decl. ¶ 8; Ex. A to Fitzgerald Decl.).

Defendant nurse Farnan affirmed that she was called to the decontamination shower unit in the mental health cell area on August 25, 2008, to provide a medical health assessment of plaintiff after he had been involved in a cell extraction that involved the use of chemical agents. (Farnan Decl. ¶ 4).

Defendant Farnan saw plaintiff immediately following the decontamination shower to remove the chemical agents used

in the extraction. (Farnan Dec. ¶ 5). Plaintiff was wearing shorts, and defendant Farnan checked his blood pressure, pulse, and respirations. (*Id; see also* Ex. A to Farnan Decl.). Defendant Farnan did not see any marks, bruising, or swelling, and plaintiff did not state that he had sustained any injury. (Farnan Decl. ¶ 5–6; Ex. A to Farnan Decl.). Plaintiff testified that defendant Farnan asked him questions, but he no longer remembered what those questions were. (Pl.'s Dep. 128). Plaintiff concluded that the examination was "unprofessional" because the exam was only visual, and defendant Farnan did not use special tools for his eyes and ears, similar to previous exams he had received in clinics and the hospital. (Pl.'s Dep. 129–30). Defendant Farnan concluded that no medical treatment was necessary, and plaintiff was escorted to the SHU without further incident. (Farnan Decl. ¶ 8–9).

 **\*14** Defendant Fitzgerald assessed plaintiff visually and stated that plaintiff did not indicate anything was wrong, and defendant Fitzgerald had no reason to think otherwise, because plaintiff had complied with orders issued during the cell extraction. Likewise, defendant Farnan visually examined plaintiff and took his vital signs after chemical agents were used to remove plaintiff from his cell. Plaintiff did not claim that anything was wrong with him, and defendant Farnan did not discover any injuries indicating plaintiff could be in pain or was having any medical issues after the decontamination shower.

No issue of fact exists as to whether plaintiff had a serious medical need on August 24 and 25, 2008. Plaintiff's alleged bruises and scratch, which were too slight to be noticed by defendants Farnan and Fitzgerald, and too minimal for plaintiff to mention when they examined him, do not constitute a serious medical need.

Even if plaintiff had a serious medical need, defendants Fitzgerald and Farnan were unaware of it, and thus were not deliberately indifferent. Plaintiff alleges that he was in serious pain, but failed to so indicate both times when he was being examined. It is clear from defendant Farnan and Fitzgerald's declarations that they examined plaintiff to the extent they deemed necessary in their medical judgment, as supported by their observation of plaintiff and his failure to indicate anything was wrong. Plaintiff may disagree with their method and extent of medical care, but even if it were to rise to the level of malpractice, which this court does *not* hold, defendant Farnan and Fitzgerald's actions would not rise to the level of a constitutional violation. Accordingly, this court

recommends summary judgment as to plaintiff's medical care claims against defendants Fitzgerald and Farnan.

## B. Excessive Force

Plaintiff alleges that various corrections officers and a "distraction" unit used excessive force against him on August 24 and 25, 2008.

### 1. Legal Standards

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*15** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the

injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

### 2. Application

Plaintiff alleges that, after he committed an aggravated assault on August 24, 2008, he was put in full restraints and "assaulted" in the back of his cell by unnamed defendants. (First Am. Compl. ¶¶ 20, 40; *see also* Pl.'s Dep. 56). Plaintiff testified that he was put in restraints without incident, but that the restraints were too tight on his wrists and ankles, and that corrections officers had him lie prone on the floor and pushed on his back, making it difficult for plaintiff to breathe. (Pl.'s Dep. 64, 67). Plaintiff alleges that he suffered bruises and swelling from the tight restraints, but that they healed within two weeks, and he was left with a "scar from the bruises and the scrape-the-scratch." (Pl.'s Dep. 70).

Plaintiff alleges that, after the incident, he was examined by Nurse Fitzgerald, taken from his cell, and sent to an observation cell. The last sentence of the paragraph states that defendants Hogan, Bosco, and Waldron were "responsible." Defendant Hogan is the Commissioner of OMH and defendants Bosco and Waldron are "unit chiefs." (First Am. Compl. ¶ 20). Plaintiff has not identified the individuals who were directly involved in the alleged assault and he has improperly named defendants Hogan, Bosco, and Waldron in connection with this incident based merely on their supervisory positions. Having failed to name anyone who was personally involved in the alleged excessive force, defendants should be granted summary judgment as to plaintiff's claims based on the alleged use of excessive force on August 24, 2008.

Plaintiff claims that on the morning of August 25, 2008, he was sleeping when approximately three unknown corrections officers entered plaintiff's cell and started punching and kicking him while he was on his bed. (Pl.'s Dep. 88–90). Plaintiff tried to block the punches, and after about two or three minutes, the corrections officers left. (Pl.'s Dep. 90). Plaintiff claims that a few minutes later on August 25, 2008, Sergeant Rendle and two other corrections officers entered his cell and repeatedly punched and kicked him. (Pl.'s Dep. 72–80). Plaintiff alleges that without provocation, Sergeant Rendle punched him about five times in the "face area," kicked him twice in the testicles, and punched him three or

four times in the "stomach area." (Pl.'s Dep. 75–77). Plaintiff said that he resisted the assault by punching and kicking the officers, and that after about three minutes, they abruptly left. (Pl.'s Dep. 81–82). Plaintiff testified that the "only evidence" of being assaulted was swelling and bruising on his face. (Pl.'s Dep. 93–94).

**\*16** Later that day, plaintiff testified that Sergeant Rendle told plaintiff to get dressed so he could return to his cell in the SHU. (Pl.'s Dep. 101). Plaintiff said that he and Sergeant Rendle exchanged "disrespectful statements," and he told Sergeant Rendle, "The door is locked, but when I catch you, you know I'm going to hurt you." (Pl.'s Dep. 101–02).

Sergeant Rendle's report states that when he arrived at plaintiff's cell, plaintiff was standing in his cell with something in his right hand. (Ex. A to Pl.'s Resp. Opposing Defs.' Mot. for Summ. J. 36). Sergeant Rendle ordered plaintiff several times to drop what he was holding in his hand, after which plaintiff threw it against the door of the cell and retrieved what appeared to Sergeant Rendle to be feces from the toilet. *Id.* Sergeant Rendle's report indicates that plaintiff continued to refuse to comply, even after chemical agents were used, so the extraction team entered and restrained plaintiff. *Id.*

Plaintiff disputes the reason why an extraction team came to plaintiff's cell on August 25, 2008, and plaintiff claims that he complied with instructions and stood with his back to the door so he could be handcuffed. (Pl.'s Dep. 103–04). Plaintiff claims that Sergeant Rendle started spraying mace at plaintiff without provocation or warning. (Pl.'s Dep. 104–05). Plaintiff claims that when the members of the extraction unit told him to get on the floor, and he complied.

(Pl.'s Dep. 105–07). Plaintiff testified that after he was handcuffed, no more mace was sprayed. (Pl.'s Dep. 117). The chemical agent affected plaintiff's eyes and his breathing, and within a minute he was taken to the decontamination shower, and within seven minutes, the effects from the chemical agent were gone. (Pl.'s Dep. 113, 115).

Plaintiff was placed in restraints and removed from his cell, and an unnamed officer placed plaintiff's arm in an "unprofessional hold." (Pl.'s Dep. 109). Plaintiff alleges that swelling and bruises resulted, but eventually went away. (Pl.'s Dep. 110–11). Defendant Marcil was not present with the extraction team on August 25, 2008, and plaintiff has therefore failed to establish personal involvement as to

defendant Marcil and the alleged excessive use of force on August 25, 2008. (*See* Ex. A to Allan Decl.; Marcil Decl. ¶ 8). The other officers on the extraction team are not defendants in this action. [16]

Plaintiff also claims that defendants Uhler and Allan are responsible for the use of excessive force against him on August 25, 2008. Defendant Uhler was a captain at Clinton in August 2008, and was responsible for reviewing all Unusual Incident and Use of Force Reports to ensure that the force applied was appropriate. He also consulted with the Deputy Superintendent of Security regarding unusual incidents. [17] (Uhler Decl. ¶¶ 4–6). Defendant Uhler affirmed that he was not present when plaintiff was extracted from his cell, but he was notified that plaintiff was refusing to obey orders from staff to exit his cell. (Uhler Decl. ¶ 11). Defendant Uhler consulted with defendant Racette about plaintiff's refusal, and after attempts at negotiation failed, Deputy Superintendent for Security Racette authorized the use of chemical agents to remove plaintiff from his cell. (Uhler Decl. ¶¶ 11–12).

**\*17** Defendant Allan was one of the lieutenants in charge of the Correction Emergency Response Team (CERT) at Clinton in August 2008. (Allan Decl. ¶ 4–5). Defendant Allan affirmed that he was called to plaintiff's cell on August 25, 2008, and he attempted to convince plaintiff to comply with orders to exit his cell so he could be escorted back to the SHU. (Allan Decl. ¶¶ 7–9). Defendant Allan affirmed that plaintiff continued to ignore orders to exit his cell, and defendant Allan then ordered Sergeant Rendle to use force to extract plaintiff from his cell. Sergeant Rendle sprayed two one-second bursts of chemical agent a total of five times at plaintiff. (Allan Decl. ¶ 11). Defendant Allan affirmed that even after the chemical agent was sprayed, plaintiff still would not exit his cell. (Allan Decl. ¶ 12). The extraction team then entered plaintiff's cell and using body holds, placed plaintiff in restraints and escorted him to the decontamination shower. (Allan Decl. ¶ 13). Plaintiff was examined by defendant Nurse Farnan, who found no injuries. (Ex. A to Allan Decl.).

The only defendant plaintiff names who was personally involved with the use of force on August 25 is Lieutenant Allan, who was present and directed Sergeant Rendle to spray chemical agents before the extraction team entered plaintiff's cell. Resolving any inferences in favor of plaintiff, an issue of fact exists as to whether the application of force was warranted. Plaintiff alleges that he was compliant with orders and was up against the door waiting to be escorted back to the SHU when Lieutenant Allan ordered Sergeant Rendle to

spray the chemical agent without provocation. If plaintiff was complying with orders to exit the cell and was not resisting, the use of the chemical agent may constitute a use of excessive force. Accordingly, the court will not recommend granting summary judgment in favor of defendant Allan as to plaintiff's complaint based on the alleged use of excessive force on August 25, 2008. However, defendants should be granted summary judgment as to plaintiff's complaints based on the alleged use of force as to all other named defendants.

### D. Conditions of Confinement

In order to state a valid conditions-of-confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99 (1991) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). To satisfy the objective element, the plaintiff must demonstrate that the conditions under which he or she was confined resulted "in unquestioned and serious deprivations of basic human needs." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (*citing Rhodes,* 452 U.S. at 347). The Eighth Amendment is implicated for example, "when inmates are denied 'essential food, medical care, or sanitation," or when conditions are such that the threat of violence among inmates is increased." *Morgan v. Ward,* 699 F.Supp. 1025, 1054 (N.D.N.Y.1988) (conditions of confinement in Clinton SHU did not violate Eighth Amendment).

**\*18** When correction officials deny a prison inmate the measure of food necessary to maintain health, the Eighth Amendment's prohibition against cruel and unusual punishment is implicated. *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir.1983). "If, on the other hand, meals are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance." *Cruz v. Church,* 9:05–CV–1067, 2008 WL 4891165, at \*12, 2008 U.S. Dist. LEXIS 91022 (N.D.N.Y. Nov. 10, 2008) (citations omitted).

### 1. Denial of Food

Plaintiff alleges that from January 5, 2009, through January 18, 2009, he went "ten days of no food and four days [when plaintiff] was fed one meal a day which [he] refused to eat because they spit in it or put dirt in it." (First Am. Compl. ¶¶ 34, 50). The amended complaint implies that defendants Moseley and Besaw were the corrections officers

who were responsible for serving breakfast and lunch during this time period. Plaintiff claims that, on January 13, 2009, he complained to defendants Artus and LaValley that he was not being fed, and they did nothing. (First Am. Compl. ¶ 34). The amended complaint also mentions defendants Poupore, Tetreault, Finnell, and Boulrice in the same paragraphs where the food deprivations are discussed, but says nothing about how they were involved. (First Am. Compl. ¶¶ 34, 50).

Plaintiff states that he spoke with defendants Moseley and Besaw about his lack of food on January 18, 2009, when he said they "investigated" why the "pink feed-up sheet" indicated plaintiff was on a "restricted diet." (First Am. Compl. ¶ 34). Plaintiff claims defendants Moseley and Besaw told plaintiff that he had been placed on a restricted diet in error, and that was when he was "served lunch and [he] ate regular[ly]." (First Am. Compl. ¶ 34).

The only grievance filed by plaintiff during this time related to food was filed on January 15, 2009, accusing defendant Tetrault of denying plaintiff one meal on January 12, 2009, an isolated incident that would not rise to the level of a constitutional violation, even if true. (Dkt. No 150–4 p. 4; *see Cruz, supra* ). A subsequent investigation revealed that plaintiff had refused morning and afternoon meals on January 12, 2009. (Dkt. No. 150–4 p. 5). Plaintiff appealed the grievance to the Central Office Review Committee, which denied plaintiff's appeal based on the findings of the investigation. (Dkt. No. 150–4 p. 2).

Defendant Moseley affirmed that he was assigned as Third Officer in the SHU in 2009, and when he was on duty in the SHU, he was responsible for delivering food trays to inmates confined in the SHU. (Moseley Decl. ¶¶ 4–5). Defendant Moseley affirmed that he never denied plaintiff food, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals. (Moseley Decl. ¶¶ 6–8).

**\*19** Defendant Besaw affirmed that in January 2009, he was assigned as a Relief Officer at Clinton, and when on duty in the SHU, he sometimes was responsible for delivering food trays to inmates confined in the SHU. (Besaw Decl. ¶¶ 4–5). Defendant Besaw affirmed that he never denied food to plaintiff, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals. (Besaw Decl. ¶¶ 6–8).

Defendant Poupore [18] was assigned as a Corrections Officer in the SHU at Clinton in January 2009, and sometimes was responsible for delivering food trays to inmates confined in the SHU. (Poupore Decl. ¶¶ 4–5). Defendant Poupore affirmed that he never denied plaintiff food, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals. (Poupore Decl. ¶¶ 6–8).

Defendant Tetreault was assigned as a Corrections Officer in the SHU at Clinton in January 2009, and was sometimes responsible for delivering food trays to inmates confined in the SHU when he was on duty. (Tetreault Decl. ¶¶ 2–3). Defendant Tetreault affirmed that he never denied plaintiff food, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals. (Tetreault Decl. ¶¶ 4–6).

Defendant Finnell is a Resource Officer who was sometimes assigned to the SHU at Clinton in January 2009, and was sometimes responsible for delivering food trays to inmates confined in the SHU. (Finnell Decl. ¶¶ 2–3). Defendant Finnell affirmed that he never denied plaintiff food, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals. (Finnell Decl. ¶¶ 4–6).

Defendant Artus was the Superintendent at Clinton from July 2003 through April 2010. (Artus Decl. ¶ 4). Superintendent Artus's responsibilities included making weekly rounds, including to the SHU, and he remembers speaking to plaintiff on occasion. (Artus Decl. ¶¶ 6–7). Superintendent Artus does not recall ever speaking to plaintiff about the claims he makes in this case, but affirmed that he would have delegated any written complaints from plaintiff to a deputy superintendent for resolution. (Artus Decl. ¶¶ 7–9).

Defendant LaValley was the First Deputy Superintendent at Clinton from February 2008 through September 2009. (LaValley Decl. ¶ 4). As First Deputy Superintendent, defendant LaValley ensured inmates received appropriate mental health care and therapy programs at Clinton based on their assessed need, as determined by mental health staff. (LaValley Decl. ¶ 8).

Defendant Marcil is a sergeant at Clinton and is in charge of maintaining security in the SHU. (Marcil Decl. ¶ 4). Defendant Marcil affirmed that plaintiff was under a cell shield order in January 2009, due to his history of throwing urine and feces through his cell door. (Marcil Decl. ¶ 16). The cell shield order directs that a clear shield be placed in front of the inmates cell and a specific procedure is followed to provide the inmate with food through the feed-up door. (Marcil Decl. ¶¶ 12–15). The SHU logbook entries for January 5 through January 18, 2009, record that plaintiff received breakfast and lunch on January 5 and 11, 2009, but refused his dinner meal. (Marcil Decl. ¶¶ 19, 22; Ex. B to Marcil Decl.) Plaintiff refused all meals on January 6, 7, 8, and 9, 2009. [19] (Marcil Decl. ¶ 20; Ex. B to Marcil Decl.). Plaintiff received all meals on January 10, 14, 15, 16, 17, and 18, 2009. (Marcil Decl. ¶ 21; Ex. B. to Marcil Decl.). Plaintiff refused his breakfast meal, refused to comply with the feed-up procedures [20] at lunch (thereby denying his lunch meal), and received his dinner meal on January 12, 2009. (Marcil Decl. ¶ 23; Ex. B to Marcil Decl.). Plaintiff refused his breakfast and dinner meals, but received his lunch meal on January 13, 2009. (Marcil Decl. ¶ 24; Ex. B to Marcil Decl.).

**\*20** Plaintiff's conclusory allegations fail to identify who, if anyone, deprived him of food in January 2009. The declarations and documentary evidence proffered by the defendants indicate that the times plaintiff did not receive food, he refused it, or refused to comply with the feed-up procedure. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Plaintiff provided no factual support for his claim that any defendant spit or put dirt in his food, his purported excuse for refusing certain meals. *See George v. Conway,* No. 05–CV–510A, 2009 WL 1449046, at \*12–13 (W.D.N.Y. May 21, 2009) (plaintiff has failed to submit any evidence to support his claim that his meals were tampered with or to identify those individuals who tampered with it; his unsubstantiated and wholly conclusory allegations are insufficient to defeat defendants' motion for summary judgment). To the extent plaintiff missed meals as a result of his unjustified refusal to accept the food offered to him, he cannot sustain an Eighth Amendment violation. *See, e.g., Tapp v. Proto,* 718 F.Supp.2d 598, 621 (E.D.Pa.2010) (because plaintiff has not shown that his weight loss was the result of an insufficiently nutritious diet as opposed to his frequent refusal to eat meals because he felt they were inadequately warm and lacked variety, his claims cannot survive summary judgment). To the extent that plaintiff was not served meals because of his failure to follow feed-up procedures, or his propensity for throwing feces at corrections officials, he similarly fails to support an Eighth Amendment claim, particularly in the

absence of any evidence of any significant damage to his health. *See, e.g., Freeman v. Berge,* 441 F.3d 543, 545, 547 (7th Cir.2006) (upholding judgment as a matter of law against plaintiff whose persistent failure to abide by prison rules in connection with receiving meals undermined his Eighth Amendment claim; "to an overwhelming degree plaintiff's food deprivation was self-inflicted," and the record contains no evidence that he experienced real suffering, extreme discomfort, or any lasting detrimental health consequences, despite a significant weight loss).

Based on the declarations and documentary evidence cited above, no reasonable fact finder could conclude that any defendant subjected plaintiff to a sufficiently serious deprivation of food from January 5 through January 18, 2009, or that they acted with deliberate indifference. Plaintiff's bare allegations that defendants denied him food, without more, are not sufficient to defeat defendants' factually-supported motion for summary judgment with respect to plaintiff's Eighth Amendment claim. *See Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

## 2. Deprivation of Property and Repair of Pipes

**\*21** Conditions of confinement are not cruel and unusual for Eighth Amendment purposes simply because they are "restrictive and even harsh." *Anderson,* 757 F.2d at 35. Rather, many unpleasant aspects of prison life "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (citation omitted). Thus, an inmate who claimed that he was deprived "of his belt, shoe laces, and personal property for seven days, subjected to 24–hour observation, placed with mentally ill inmates, denied a change of 'Greens,' and otherwise subjected to the regulations governing inmates in the MHU" did not establish an objectively serious deprivation. *Salahuddin v. Dalsheim,* 94 CIV. 8730, 1996 WL 384898, at *14 (S.D.N.Y. Jul. 9, 1996). Significantly, the plaintiff in *Salahuddin* did not have a mental health designation which would have supported his confinement in the mental health unit. *Salahuddin,* 1996 WL 384898, at *3.

Here, plaintiff fails to establish that some of the alleged deprivations were extreme. Plaintiff alleges he lacked writing utensils, paper, grievance forms, envelopes, and was exposed to noisy pipes-these deficiencies do not amount to a denial of the minimal measure of life's necessities. Plaintiff further alleges he was extremely cold,[21] had only a short-sleeved green state shirt, no sheets, blanket, soap, washcloth, pillow, pillowcase, towel, sweatshirt, toothbrush, toothpaste,[22] or toilet paper for six days. (*See* First Am. Compl. ¶ 30). Such conditions may have been unpleasant for plaintiff, but he has failed to establish an issue of fact as to if the conditions were wantonly imposed for the unnecessary infliction of pain or that they posed a threat to his health or safety.

Plaintiff claims that he was deprived of certain items after he attempted to assault staff on January 5, 2009.[23] (First Am. Compl. ¶ 30). The Contraband Receipt related to the January 5, 2009 incident indicates that plaintiff's state-issued pants, shirts, blankets, sheet, mattress, sneakers, net bag, towel, and pillow were all contaminated by plaintiff with feces and urine, and were therefore disposed of. (Ex. A to Racette Decl.; *see also* SHU logbook entry for January 5, 2009, Ex. B. to Marcil Decl.). As Deputy Superintendent for Security at Clinton, defendant Racette reviewed the reports related to the January 5, 2009 incident, but affirmed that he did not personally confiscate any items from plaintiff's cell. (Racette Decl. ¶¶ 4–14).

Plaintiff filed a grievance dated January 10, 2009, based on the alleged confiscation of his property. (Ex. C. to LaValley Decl.). An investigation was conducted, and as the CORC ultimately stated, "[plaintiff] was involved in an unhygienic act of throwing feces on staff on 1/5/09.... CORC also notes from the investigation that all of the [plaintiff's] state and personal property in his cell was contaminated and disposed of. It is further noted that his contaminated state property was replaced with new items." *Id.* The CORC also stated that plaintiff retained his right to make an inmate personal property claim pursuant to Directive 2733. *Id.*

**\*22** While it is highly ironic that a plaintiff who periodically threw feces at corrections officials would complain about a lack of toilet paper, the deprivation of toilet paper for six days, as plaintiff alleges, *could* be a sufficiently serious deprivation to state an Eighth Amendment claim. *See Trammell v. Keane,* 338 F.3d at 165 (collecting cases). However, plaintiff's complaint does not identify who was personally involved in, or responsible for, this alleged deprivation. *See Green v. Bauvi,* 792 F.Supp. 928, 941–42 (S.D.N.Y.1992)

(inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions). Nor does plaintiff provide any factual support for the suggestion that some defendant acted with deliberate indifference, as opposed to negligence, in connection with his supply of toilet paper. *Trammell v. Keane,* 338 F.3d at 165. [24]

In addition, plaintiff's grievance related to the alleged confiscation of property makes no statement about a lack of toilet paper or other materials. (Ex. C to LaValley Decl.). Plaintiff's grievance focuses on his argument that the property was not contaminated and should not have been destroyed. *Id.* The fact that plaintiff does not mention any lack of toilet paper in his grievance, when he was complaining about the deprivation of other items during the same time period further supports a finding that whatever deprivation he suffered, it was not serious enough to include in his grievance, and thus would not rise to the level of an Eighth Amendment violation. [25]

Plaintiff has failed to document an issue of fact as to whether a named defendant deprived him of toilet paper and acted with deliberate indifference. Without any factual support, plaintiff's bare allegation is not sufficient to survive defendants' motion for summary judgment.

Plaintiff filed a grievance related to the broken pipe sound about February 2, 2009. (Artus Decl. ¶ 12). The grievance was investigated, and the pipe was fixed as of March 2, 2009. (Artus Decl. ¶ 12; Ex. A to Artus Decl.). Defendant Artus responded to plaintiff's grievance, stating that the requested repair was completed. (Ex. A to Artus Decl.). Plaintiff appealed to the CORC, asking if there was a "financial difficulty" at Clinton, and the CORC upheld the Superintendent's determination that the repair had been completed, and the "CORC has not been presented with sufficient evidence necessary to substantiate any malfeasance by staff." (Ex. A. to Artus Decl.). Plaintiff has provided no evidence that the alleged broken pipe deprived him of a life necessity, nor that defendant Artus, the sole defendant plaintiff claims was responsible, acted with deliberate indifference. Rather, it appears that Clinton staff responded to plaintiff's grievance by repairing the problem, not by being indifferent to it. Additionally, defendant Artus was not personally involved with the repair of the pipes. Thus, defendants should be granted summary judgment as

to plaintiff's claims based on deprivation of property and the alleged failure to repair broken pipes.

## VII. *Qualified Immunity*

**\*23** Defendants assert that they are entitled to qualified immunity in connection with plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201 (2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 236 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory" in all cases). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, defendants should be granted summary judgment as to all of plaintiff's remaining claims.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' summary judgment motion (Dkt. No. 150) be **DENIED in part as to plaintiff's claims based on the use of excessive force on August 25, 2008, as to defendant Allan,** and it is further

**RECOMMENDED,** that defendants' summary judgment motion (Dkt. No. 150) be **GRANTED in part,** and the complaint **DISMISSED WITH PREJUDICE IN ITS ENTIRETY AS TO ALL OTHER DEFENDANTS AND ALL OTHER CLAIMS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 4107822

Footnotes

1     Although the motion to dismiss was filed prior to the acceptance of the amended complaint by the court, the only amendment to the original complaint was the addition of two named defendants in place of two of the John/Jane Doe defendants. The new defendants and the original defendants who were served with the original complaint after the motion to dismiss was filed, requested that they be allowed to join the pending motion to dismiss. (Dkt.Nos.72, 87). The court granted these requests. (Dkt.Nos.77, 88).

2     Plaintiff spells defendant Farnan's name "Larnan," but defendant Farnan's Declaration indicates that the proper spelling is "Farnan." The court will refer to this defendant as "Farnan."

3     Plaintiff initially stated in his complaint that the assaults occurred in July 2008, but plaintiff clarified in his deposition that the alleged assault and subsequent denial of medical care was in August 2008. (Pl.'s Dep. 56). The court will now refer to the alleged assaults as occurring in August 2008.

4     Plaintiff clarified in his deposition that the Sergeant was Sergeant Rendle, who is not a defendant in this action. (Pl.'s Dep. 72).

5     There is no defendant named Boulrice in the caption of the amended complaint, and the other defendants whose names begin with "B," do not have names that are even similar to Boulrice. This court cannot even speculate as to whom plaintiff might be referring in this part of his amended complaint.

6     Behavioral Health Unit. *See* Pl.'s Dep. 32.

7     Plaintiff claims in his Response to Defendants' Motion to Dismiss that he received one Ramadan meal during the month of Ramadan. (Dkt. No. 73 at 10).

8     Sergeant Rendle is not a defendant in this action.

9     Plaintiff spells defendant LaValley's name "Lavalle," but defendant LaValley's Declaration indicates that the proper spelling is "LaValley." The court will refer to this defendant as "LaValley."

10    Plaintiff does not number the pages in his response, so the court will refer to the page numbers assigned by the CM/ECF system.

11    Plaintiff has named me as a defendant in a case filed in the Northern District of New York. (*Reeder v. Allen, et al.,* Case No. 10–CV–959). Although plaintiff has not moved for my recusal in this case, to the extent that it is necessary to discuss the issue, it is clear that "a judge is not required to recuse him- or herself simply because a litigant before the judge has filed suit or made a complaint against him or her." *See Jenkins v. Sladkus,* No. 04 Civ. 1595, 2004 WL 1238360, 2004 U.S. Dist. LEXIS 10320 at \*4 (S.D .N .Y. June 3, 2004) (citing *United States v. Nagy,* 19 F.Supp.2d 139, 140–41 (S.D.N.Y.1998). Thus, notwithstanding plaintiff's attempt to name me as a defendant in *Reeder v. Allen,* No. 9:10–CV–959, there is no basis for me to recuse myself in this action.

12    Evan if defendant Archambault had taken plaintiff's grievance and failed to mail it, as plaintiff alleges in his Response Opposing Defendants['] Motion [for] Summary Judgment (Dkt No. 154 ¶ 4), this interference with the grievance process would not rise to the level of a constitutional claim. The law is well-settled that inmates do not have a constitutional right to grievance procedures. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Davis v. Buffardi,* No. 0:01–CV–0285, 2005 WL 1174088, at \*3, 2005 U.S. Dist. LEXIS 45487 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted). Furthermore, a violation of the inmate grievance procedures does not give rise to a claim under section 1983. *Cancel v. Goord,* No. 00 CIV.2042, 2001 WL 303713, at \*3, 2001 U.S. Dist. LEXIS 3440 (S.D.N.Y. Mar. 29, 2001).

13    An inmate who is assigned a mental health service level of 3 "[n]eeds/may need shortterm chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders OR suffers from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff." (Ex. B to Wald. Decl.).

14    Mental Health Service Level 6 is described as: "Mental health assessment completed-does not require mental health services." (Ex. C to Waldron Decl.).

15    Plaintiff did not number the pages in his exhibit, so the court will use the page numbers assigned by the Case Management/Electronic Case File (CM/ECF) system.

16    The Use of Force Report dated August 25, 2008, indicates that R. Rendle, M. Chagnon, N. Moore, E. Owen, and T. Saunders assisted on the extraction team, none of whom were named as defendants in this action. (Ex. A to Allan Decl.).

17    On August 26, 2008, defendant Uhler reviewed the Unusual Incident reports and videotape of plaintiff's extraction, and concluded that the force applied was appropriate. (Uhler Decl. ¶¶ 14–15). Defendant Uhler also reviewed the Unusual Incident Report, Sergeant Rendle's report, the videotape of the incident, and testimony from OMH staff, and concluded

that the force was appropriate, plaintiff understood his actions at the time, and plaintiff refused to attend the Tier III hearing to defend himself. (Ex. A to Pl.'s Resp. Opposing Defs.' Mot. for Summ. J. 38).

18 Plaintiff spells defendant Poupore's name "Poupoure," but defendant Poupore's Declaration indicates that the proper spelling is "Poupore." The court will refer to this defendant as "Poupore ."

19 Plaintiff was also under medical observation as of January 9, 2009, and medical staff was monitoring when he was eating, whether or not he was drinking, and if he appeared hydrated or ill. (*See* Progress Notes for January 9, 2009–January 18, 2009, Dkt. No. 151).

20 *See* Clinton Special Housing Unit # 14 Procedure XI(A)(1) (d), Ex. C to Marcil Decl.).

21 *See, e.g., Smith v. Burge,* No. 9:03–CV–0955, 2006 WL 2805242 at *7 (N.D.N.Y. Sept. 28, 2006) (confinement of inmate, for less than one day, in a T-shirt and underwear, in a cell with an open window, exposing him to "cold" or "very cold" temperatures, was not sufficiently prolonged or severe to rise to the level of an Eighth Amendment violation); *Borges v. McGinnis,* 03–CV–6375, 2007 WL 1232227, at *4–6, 2007 U.S. Dist. LEXIS 30865 (W.D.N.Y. Apr. 26, 2007) (keeping inmate, clothed only in paper gown and slippers, with a thin mattress and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, did not meet the objective element of an Eighth Amendment violation); *Grant v. Riley,* 89 Civ. 0359, 1993 WL 485600 at *4, 1993 U.S. Dist. LEXIS 16605 (S.D.N.Y. Nov. 24, 1993) (confining inmate for three days, in an unheated room with a cold wind blowing through a broken window, and denying him a coat, bedding or blankets for over nine hours, failed to allege treatment that offends concepts of dignity, civilized standards, humanity, and decency, as required to state an Eighth Amendment cause of action).

22 *See, e.g., Fernandez v. Armstrong,* No. 3:02CV2252, 2005 WL 733664, at *5, 2005 U.S. Dist. LEXIS 4958 (D.Conn. Mar. 30, 2005) (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights (citations omitted)); *Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (holding that "[d]eprivation of ... toiletries [other than toilet paper] for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.' " (quoting *Farmer,* 511 U.S. at 837); *Chavis v. Kienert,* No. 9:03–CV–0039, 2005 WL 2452150, at *21, 2005 U.S. Dist. LEXIS 41920 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries for a two-month period did not rise to the level of deliberate indifference to the prisoner's health or safety)).

23 To the extent plaintiff is alleging a due process claim (as opposed to an 8th Amendment conditions of confinement claim) for the alleged deprivation of property, it is well-settled that where post-deprivation remedies are available, intentional deprivation of property by a state employee does not violate the Due Process Clause. *See Hudson v. Palmer,* 468 U.S. 517, 533 (1984). New York provides an adequate post-deprivation remedy through a Court of Claims action. (*Davis v. New York,* 311 Fed. App'x 397, 400 (2009) (citing *Jackson v. Burke,* 256 F.3d 98, 96 (2d Cir.2001); *Love v. Coughlin,* 714 F.2d 207, 208–09 (2d Cir.1983).

24 "It appears that the deprivation of toilet paper was inadvertent and that, at worst, Trammell was left with one roll of toilet paper to last approximately nine days and that the defendants were negligent in replenishing Trammell's supply. Negligence does not, however, satisfy the scienter requirement necessary to support a claim for 'cruel and unusual punishment.' *See Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988) (inadvertent failure to replenish inmate's toilet paper supply for several days does not evidence mental state required to demonstrate Eighth Amendment violation)." *Id.*

25 Plaintiff's failure to include the deprivation of toilet paper in his grievance also supports defendants' argument that he failed to exhaust administrative remedies as to that issue.

---

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4106740
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raszell REEDER, Plaintiff,

v.

Michael HOGAN; Brian Fischer; Richard Roy;
Dale Artus; Thomas Lavalle; Steven Racette;
Maureen Bosco; Kelly Bonner; Dave Lucia;
Donald Uhler; Kevin Hicks; Tara Brousseau;
Joanne Waldron; Gregory Savage; William
Allen; Unknown Archambault; Jerry Ludwig;
Norman Bezio; Unknown Mareil; Unknown
Tetreault; Unknown Poupore; Unknown
Martin; Unknown Bouyea; Unknown Maccomb;
Unknown Besaw; Unknown Finnel; R Trudeau;
Unknown Moseley; Unknown Stuart; John
Doe; Jane Doe; Unknown Howard, Defendants.

No. 9:09–CV–520 (NAM/
ATB). | Sept. 19, 2012.

**Attorneys and Law Firms**

Raszell Reeder, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of NY, Adrienne J. Kerwin, Esq., Assistant New York State
Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, District Judge.

**\*1** Defendants move (Dkt. No. 150) for summary judgment
dismissing this *pro se* action brought by plaintiff, an
inmate in the custody of New York Department of
Corrections and Community Services, pursuant to 42 U.S.C.
§ 1983. Upon referral pursuant to 28 U.S.C. § 636(b)(1)
(B) and Local Rule 72.3(c), United States Magistrate Judge
Andrew T. Baxter issued an excellent and thorough Report
and Recommendation (Dkt. No. 156) recommending that
summary judgment be granted dismissing all claims against
all defendants except for plaintiff's claim against defendant
Allan for the use of excessive force during a cell extraction on
August 25, 2008, as to which he found questions of fact. Both

parties submit objections (Dkt.Nos.157, 158). Pursuant to 28
U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts
of a report and recommendation to which a party specifically
objects.

As Magistrate Judge Baxter notes, the operative pleadings
are the first amended complaint (Dkt. No. 84), without the
claims that were previously dismissed by this Court (Dkt. No.
122), read together with plaintiff's second amended complaint
(Dkt. No. 129). As such, four categories of claims remain:
free exercise of religion; denial of proper medical care;
excessive force; and conditions of confinement. Upon *de
novo* review, *see* 28 U.S.C. § 636(b)(1)(C), the Court accepts
and adopts the Report and Recommendation in its entirety
insofar as it recommends summary judgment dismissing all
claims against all defendants except the excessive force claim
against Allan.

As for the excessive force claim against Allan stemming from
the August 25, 2008 cell extraction, Magistrate Judge Baxter
found questions of fact based on material discrepancies
between plaintiff's version of events and that of Sergeant
Rendle and defendant Allan. Defendants made their objection
to the Report and Recommendation in the form of a letter
motion (Dkt. No. 158) requesting this Court to consider
a video tape (Dkt. No. 159) of the cell extraction, which,
according to defendants, conclusively supports defendants'
version of events and contradicts plaintiff's, thus warranting
summary judgment dismissing the claim against Allan. *See,
e.g., Caldwell v. Gettmann,* 2012 WL 1119869, \*1, \*6
(N.D.N .Y. Mar. 2, 2012), *adopted* 2012 WL 1119771
(N.D.N.Y.Apr.3, 2012); *Arnold v. Westchester Co.,* 2012
WL 336129, \*6 (S.D.N.Y. Feb. 3, 2012), *adopted* 2012 WL
841484 (S.D.N.Y. Mar. 13, 2012); *see also Scott v. Harris,*
550 U.S. 372, 378–81 (2007); *Cameron v. City of New York,*
598 F.3d 50, 60 (2d Cir.2010). Defendants urge the Court to
exercise its discretion to consider the video tape although it
was not placed before Magistrate Judge Baxter in support of
the summary judgment motion. *See Hynes v. Squillance,* 143
F.3d 653, 656 (2d Cir.1998) (stating that a court has discretion
to consider evidence first offered in support of objections to
a Report and Recommendation). Defendants have provided a
copy of the video tape to plaintiff.

**\*2** The Court declines to consider the video tape on this
motion, because plaintiff has not had an opportunity to
address it. In the interests of justice and preserving judicial
resources, however, the Court gives defendant Allan leave
to file another summary judgment motion, supported by the

video tape, the evidence submitted on the instant motion, and anything else he wishes the Court to consider. Such a motion shall be made within 30 days of the date of the Memorandum–Decision and Order herein. The Court will then issue a briefing schedule giving plaintiff a reasonable opportunity to file opposing papers.

It is therefore

ORDERED that the Report and Recommendation (Dkt. No. 156) is adopted and accepted; and it is further

ORDERED that defendants' motion (Dkt. No. 150) for summary judgment is granted and all claims against all defendants are dismissed, except that summary judgment dismissing plaintiff's claim against defendant Allan for use of excessive force during the cell extraction on August 25, 2007

is denied without prejudice to another summary judgment motion by Allan in accordance with this Memorandum–Decision and Order; and it is further

ORDERED that defendants' letter motion (Dkt. No. 158) is denied in accordance with this Memorandum–Decision and Order; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4106740

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works. 2

2012 WL 1899004
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael JONES, Plaintiff,

v.

Brian FISCHER, David Rock, et al., Defendants.

No. 9:10–CV–1331 (GLS/ATB).  |  May 1, 2012.

**Attorneys and Law Firms**

Michael Jones, pro se.

Krista A. Rock, Asst. Attorney General for Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). [1]

In this amended civil rights complaint, plaintiff alleges that defendants have violated his rights to proper medical care, due process, and his right to be free from cruel and unusual punishment. (Dkt. No. 5). Plaintiff also alleges that defendants violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* (Dkt. No. 5). Presently before the court is the defendants' motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 37). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.42, 43). For the following reasons, this court will recommend granting the defendants' motion in part, and denying it in part.

### DISCUSSION

**I. *Facts and Procedural History***

**A. Procedural History**
The original complaint in this action named only defendants from the Albany Offices of the Department of Corrections and Community Supervision ("DOCCS"), and from Upstate

Correctional Facility ("Upstate"). [2] (Dkt. No. 1). The original complaint alleged only claims relating to plaintiff's medical condition relative to his double-cell lower bunk assignment and his problems with uncomfortable seating in the visiting room. (Dkt. No. 1). In plaintiff's amended complaint, he added several defendants from Clinton Correctional Facility Annex ("Clinton"), claiming violations of his Eighth Amendment rights based on his removal from a "low sodium" diet, his due process rights relative to a disciplinary hearing, and claims of "retaliation." [3] (Dkt. No. 5).

On February 3, 2011, Senior U.S. District Judge McAvoy ordered that plaintiff's motion for *in forma pauperis* (IFP) status be granted, but dismissed the following claims and defendants without prejudice: J. Carver [4] and C.O. Lincon; plaintiff's conspiracy claims; and plaintiff's claims that he was denied adequate warmth or food at Upstate. (Dkt. No. 6).

On May 16, 2011, defendants made a motion to revoke plaintiff's IFP status pursuant to 28 U.S.C. § 1915(g) based upon plaintiff's accumulation of "three strikes." (Dkt. No. 25). On December 1, 2011, after briefing by both sides, in this and in a related action, [5] plaintiff paid the filing fee in this action, rendering the defendants' "three strikes" motion moot. Defendants filed this motion to dismiss on December 19, 2011. (Dkt. No 37).

**B. Facts**

**1. Special Diet (Clinton)**
The court will summarize the facts in plaintiff's remaining claims. Plaintiff claims that on June 14, 2010, while he was incarcerated at Clinton, defendant Leon told plaintiff that he was removing plaintiff's name from the "special diet meal list." (Amended Complaint (AC) at 6, ¶ (h)). [6] Plaintiff alleges that when he asked why he was being removed from this list, defendant Leon stated that plaintiff knew why, and it was because " ' I was you eating toast.' " (*Id.*) Plaintiff claims that his "special diet" was low sodium, based upon plaintiff's high blood pressure. As a result of his removal from the diet, plaintiff states that he experienced headaches and dizziness. (*Id.* at 6, ¶ (i)) When he went to the facility clinic, he was allegedly told that due to his elevated blood pressure, he would have to be monitored to determine whether he should be placed on medication. (*Id.*) Plaintiff filed a grievance against defendant Leon. [7] (*Id.* at 6(j)).

**2. Retaliation and Due Process (Clinton)**

**\*2** Plaintiff claims that on June 29, 2010, he was sitting in the hall, waiting to be interviewed by the grievance committee, when the "corridor Officer" asked plaintiff what his grievance was about. (*Id.*) Plaintiff states that when he explained the nature of his grievance, the "corridor Officer" said that plaintiff would lose his grievance because defendant Leon was well-liked, "and filing grievance complaint's [sic] in Clinton Annex [ ] would cause plaintiff a lot of problems." (*Id.*)

Plaintiff claims that one or two weeks after this encounter with the "corridor Officer," plaintiff was on his way to a visit with his wife, when the "hall Officer" asked if plaintiff had a permit for his wedding band. (*Id.* at 7, ¶ (k)). Plaintiff states that the "hall Officer" gave plaintiff a hard time about the wedding band and sent plaintiff back to his dorm to take his wedding band off and go to his visit without the ring.[8] The officer then told plaintiff that this "was only the beginning" because plaintiff liked to write grievances at Clinton Annex. (*Id.* at 7, ¶ (m)) Plaintiff states that he wrote a grievance, complaining about the "hall Officer," and plaintiff explained to the investigating Sergeant that the "hall Officer's" action was a result of the grievance that he wrote against defendant Leon. The "Sergeant" who was investigating the grievance allegedly told plaintiff that "that was how things work in Clinton Annex." (*Id* . at 7, ¶ (n)).

The next few paragraphs of the amended complaint discuss an incident with former defendant Lincon on July 8, 2010, involving plaintiff and his wife. (*Id.* at 8, ¶ (o)). Plaintiff claims that when his wife complained about a long delay in the "processing area" before she could visit with plaintiff, defendant Lincon told her she would have to endure another long delay because it was "his count time." (*Id.*) Although plaintiff's wife asked to speak with a supervisor, defendant Lincon became belligerent and told her that she should "take it up with Govern [sic] Patterson because he was the person cutting all the jobs." (*Id.*) Plaintiff claims that he and his wife complained about defendant Lincon's conduct, and were told that complaints against staff were not looked upon favorably. (*Id.* at 8, ¶ (q)).

Plaintiff alleges that, as he was exiting the bathroom on July 23, 2010, he was escorted to SHU. (*Id.* at 8, ¶ (r)). On July 26, 2010, plaintiff was escorted to an interview room inside the SHU, where he was questioned by defendant Chase about "all" the grievances and complaints that plaintiff filed while

he was at Clinton Annex. (*Id.* at 9, ¶ (s)). Plaintiff states that he told defendant Chase that he was being harassed, and asked defendant Chase why plaintiff was "being held in SHU." (*Id.*) Defendant Chase allegedly told plaintiff that he placed plaintiff in SHU, and he could do whatever he wanted at Clinton Annex. Plaintiff states that he was thereafter issued a misbehavior report, charging him with threats, rioting, false statements, and impersonation. (*Id.*)

**\*3** Plaintiff alleges that the disciplinary hearing on the above charges was held on July 29, 2010, and defendant Eggleston was the hearing officer. Plaintiff claims that he told defendant Eggleston that the charges were false, and that the "threatening letter was an attempt by someone to have inmate Alexander removed [from] the ILC Committee because of a very controversial issue that he placed on the ILC agenda."[9] (*Id.* at 9, ¶ (t)). Plaintiff states that he tried to explain that the incident "in the threatening letter happen[ed] while [plaintiff] was on the Family Reunion Visit with his wife." (*Id.*)

Plaintiff alleges that when defendant Chase arrived to testify at plaintiff's disciplinary hearing, he had an ex parte discussion with defendant Eggleston for "approximately seven minute[s]," during which time, plaintiff was told to stand outside the hearing room. (*Id.* at 9, ¶ (u)). Plaintiff then recounts defendant Chase's testimony at the disciplinary hearing. (*Id.* at 10, ¶ (v)). Plaintiff claims that defendant Chase testified that plaintiff wrote the threatening letter, and that in making this determination, reviewed handwriting samples of eight other inmate porters. Plaintiff claims that this testimony was insufficient because defendant Chase was not trained in handwriting analysis and could not prove "beyond a reasonable doubt" that plaintiff wrote the letter. (*Id.*)

Plaintiff asked defendant Eggleston for a copy of the handwriting samples that defendant Chase reviewed and also asked defendant Eggleston to review the samples himself so that she could make her own independent determination as to whether those other inmates should be excluded as the author of the "threatening letter." (*Id.* at 10, ¶ (w)). Defendant Whalen testified that she was not a handwriting expert either, but "in her view," some of the characters in the threatening letter appeared to match plaintiff's handwriting. She was the individual who reported the incident to defendant Chase. (*Id.* at 10. ¶ (x)).

Plaintiff states that defendant Eggleston found plaintiff guilty even though inmate Alexander testified on plaintiff's behalf that Alexander was a member of the ILC, and that he was

being "set up" because of a controversial issue that he had placed on the agenda of the ILC, involving dorm officers' illegal gambling and other conduct on duty. (*Id.* at 11, ¶ (y)). Plaintiff claims that defendant Eggleston sentenced plaintiff to a total of 90 days SHU, loss of telephone and commissary privileges, and "loss of good time." [10] (*Id.* at 9, ¶ (z)).

Plaintiff alleges that while he was still in SHU, on July 27, 2010, defendant Whalen issued plaintiff a misbehavior report, charging him with refusing a direct order, a telephone program violation, and "Exchanging pins." (*Id.* at 11, ¶ (a–1)) The hearing for these charges was conducted by defendant Meskunas. (*Id.* at 11, ¶ (b–1)). Plaintiff alleges that during the hearing, he testified that he was handcuffed and taken to SHU on July 23, 2010, and all of his property was left in his "curb." [11] (*Id.*) Plaintiff claims that someone must have taken his property and used his telephone number while he was in SHU. (*Id.*) Plaintiff claims that defendant Meskunas refused to call plaintiff's witness, inmate Anthony Mosely, who allegedly would have testified about the telephone. (*Id.* at 12, ¶ (c–1)). Plaintiff states that defendant Meskunas found plaintiff guilty of telephone program violations and of exchanging "pins," but not guilty of refusing a direct order. Plaintiff states he was sentenced to two months loss of telephone and commissary privileges. (*Id.* at 12, ¶ (d–1)). Plaintiff claims that defendant Maskunas was biased and did not call plaintiff's witnesses. Plaintiff states that defendant Prack affirmed both disciplinary determinations on appeal. (*Id.* at 12, ¶ (e–1)).

### 3. Medical Care and ADA Claims (Upstate)

**\*4** Plaintiff states that he was transferred to the Upstate SHU on August 24, 2010, and that upon his arrival, he was placed in a double cell and assigned to the bottom bunk. (AC at 12, ¶¶ (7–a, 7–b)). Plaintiff told the intake nurse that he could not be assigned to a bottom bunk because of his prior back surgery. (*Id.* at 13, ¶ (c)). Plaintiff states that he told the nurse that the surgery resulted in a limitation on his range of motion, and it would cause him extreme pain if he had to climb in and out of a bottom bunk. (*Id.* at 12, ¶ (e)). The intake nurse told plaintiff that she would speak to the Sergeant. Plaintiff repeated his concerns to the Sergeant, who after checking with a computer printout from "Movement and Classification," told plaintiff that "it was okay for plaintiff to be housed in a double bunk cell and if he had a problem with that, to take it up with inmate grievance or Superintendent Rock." (*Id.* at 13, ¶ (f)). Plaintiff states that he wrote a grievance regarding this issue, but that defendant Rabideau reviewed plaintiff's chart and found that

plaintiff was cleared to be assigned to a double bunk bottom bunk, denying plaintiff's request to be assigned to a single cell. (AC at 14, ¶ (i)).

Plaintiff also alleges that on August 29, 2010, he went to a visit with his wife, but he had to sit on a small round stool, causing him back pain and requiring him to lean forward to speak with his wife. (*Id.* at 12, ¶ (h)). Plaintiff states that on September 13 and 27, he complained to defendant Rock when Superintendent Rock was making his rounds of the facility, but the Superintendent simply smiled and walked away. (*Id.* at 14, ¶ (i)). On November 1, 2010, plaintiff claims that he asked defendant Rock why plaintiff's property was not packed because he was scheduled to be released on November 2, 2010. (*Id.* at 14, ¶ (j)). Plaintiff claims that defendant Rock told plaintiff to speak with the Sergeant, and that the Sergeant told plaintiff that he could be "held" for up to 30 days past his release date. (*Id.*) Plaintiff states that he did not leave Upstate until November 4, 2010, and was thus, held two days past his release date. (*Id.* at 14, ¶ (k)).

### II. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

**\*5** In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents

attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

## III. *Eleventh Amendment*

The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted).

Plaintiff states that he is suing defendants in their individual and official capacities. (AC at 15, ¶ 8(b)). To the extent that plaintiff is attempting to sue defendants for damages in their official capacities or to the extent that his complaint can be interpreted as raising such official capacity claims, he is barred by the Eleventh Amendment from doing so. All such claims may be dismissed with prejudice.

## IV. *Medical Care/ADA Claims*

### A. Legal Standards

### 1. Constitutional Standard

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47).

**\*6** The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . (citing *Helling v. McKinney,* 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

**\*7** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

## 2. ADA Claims

The ADA is applicable to inmates in state correctional facilities. *See Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005) (both the ADA and the Rehabilitation Act are applicable to inmates). Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005).

In order to establish a claim under the ADA, the plaintiff must first show that he has a disability. *Farid v. Bouey,* 554 F.Supp.2d 301, 326 (N.D.N.Y.2008). Under the Title II of the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities. *Id.* (citing *inter alia Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 147 (2d Cir.2002); *Doe v. Goord,* No. 04–CV–570, 2004 WL 2829876 at \*17, 2004 U.S. Dist. LEXIS 24808 (S.D.N.Y. Dec. 10, 2004); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B)). Plaintiff must identify the activity that he claims is impaired and establish that it constitutes a "major life activity." *Weixel,* 287 F.3d at 147.

Major life activities include, among others, caring for oneself; performing manual tasks; seeing, hearing; speaking; breathing; learning; reading; communicating; and working. 42 U.S.C. § 12101(2)(A). Major life activities also include the operation of a major bodily function such as the immune system; digestive system; neurological system; respiratory; bladder; brain; endocrine; reproductive and circulatory systems. *Id.* § 12101(2)(B). A substantial limitation is one that prevents or severely restricts the individual from doing activities that are of "central importance most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

## B. Application

### 1. Special Diet [12]

**\*8** Plaintiff claims that on June 29, 2010, while he was at Clinton, defendant Leon took plaintiff off a "special diet" list. The list apparently included a restriction on sodium. Plaintiff's cryptic statement about what defendant Leon said to plaintiff before he took plaintiff off the list is clearly a typographical error. It appears that plaintiff was taken off the list because defendant Leon saw plaintiff eating toast. [13] Plaintiff states that, as a result of being removed from the low sodium diet, he experienced headaches and dizziness. (AC at 6, ¶ (i)). Plaintiff states that he went to the facility clinic and

was told that his blood pressure was high and needed to be monitored for medication. Although the complaint makes no further statements regarding the diet issue, plaintiff's response to the motion to dismiss is much more specific, and he has included a substantial number of exhibits in support of the amended complaint. [14]

In the amended complaint, plaintiff states that he filed a grievance, complaining about being removed from the special diet list. (AC at 6, ¶ (j)). In his response the motion to dismiss, plaintiff attaches the grievance document, which indicates that it was filed June 17, 2010, three days after the incident with defendant Leon. (Dkt. No. 42–1, Ex. P). A letter dated June 20, 2010, written by plaintiff, complaining about the incident is attached to the grievance form. (Dkt. No. 42–1 at 41–42, Ex. P). Plaintiff has also submitted the "Therapeutic Diet Request Form," [15] dated June 1, 2010, and signed by two health care providers. (Dkt. No. 42–1, Ex. X). On July 15, 2010, plaintiff's grievance requesting reinstatement on the therapeutic diet list was granted by M. Patnode, Deputy Superintendent of Programs (DSP). (Dkt. No. 42–1, Ex. Z). Thus, it appears that plaintiff could have been denied his therapeutic diet for approximately one month, from June 15, 2010 to July 15, 2010.

The intentional failure to provide an inmate with a medically prescribed diet for a prolonged period of time can state an Eighth Amendment claim. *Davidson v. Desai,* 817 F.Supp.2d 166, 189 (W.D.N.Y.2011) (citing *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002) (holding that plaintiff stated an Eighth Amendment claim when he alleged that prison officials deprived him of a nutritionally adequate diet for 14 days and knew that it was likely to inflict pain and suffering; *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (constitution requires serving inmates nutritionally adequate food prepared and served under conditions that do not present imminent danger to the inmates' health and well-being)).

In *Collazo v. Pagano,* 656 F.3d 131, 135 (2d Cir.2011), the Second Circuit granted summary judgment on a claim that Inmate Collazo's special dietary status had been improperly revoked, but only after finding no question of material fact indicating that the defendant had the requisite state of mind when he twice revoked Collazo's dietary status. The court also found that "once Pagano became aware that Collazo's 'violations' [of mess hall rules] were the result of an innocent misunderstanding, the special diet was restored." *Id.*

**\*9** *Davidson v. Desai,* was also decided on a motion for summary judgment, and the court considered medical records, which illustrated why plaintiff was prescribed the diet, and the court discussed the circumstances surrounding whether or not it was properly provided to the plaintiff). Although the court ultimately granted summary judgment in favor of the defendants, the court reviewed the medical records as well whether plaintiff suffered any adverse health impact from the discontinuance of his medically prescribed diet. 817 F.Supp.2d at 190. In this case, while it may be that plaintiff will be unable to prevail on this issue, he has stated a claim for relief at this early stage, and the court will not recommend granting a motion to dismiss on the plaintiff's medical care claim. [16] *See also Benn v. Nassau County,* No. 10–CV–1963, 2010 WL 2976540, at *6 (E.D.N.Y. July 22, 2010) (refusing to grant a motion to dismiss when the court was uncertain as to the facts surrounding denial of medical diet and other medical care issues).

## 2. Double Cell/Bottom Bunk

### (a) Eighth Amendment Claims

Plaintiff alleges that he was transferred to Upstate on August 24, 2010, and upon his arrival, he learned that he would be housed in a double cell, with a bottom bunk assignment. (AC at 12). Plaintiff states that he had back surgery [17] and has fused vertebrae. (AC at 13). Plaintiff states that he told "the intake nurse" at Upstate that if plaintiff had to sleep in a bottom bunk, it would "cause sharp extreme back pain to climb in and out...." (*Id.*) Plaintiff alleges that he was later told that "Movement and Classification said" that plaintiff was cleared to be housed in a double bunk cell, "and if he had a problem with that, to take it up with inmate grievance or Superintendent Rock." (*Id.*)

Plaintiff alleges that he wrote a grievance about this issue on August 25, 2010 and actually spoke to defendant Rock about the bottom bunk "on or about the weeks of September 13, and 27, 2010" while Superintendent Rock was "making his rounds." (*Id.*) Plaintiff claims that defendant Rock merely looked at plaintiff, "smiled and walked away." (*Id.*) In his response to the motion to dismiss, plaintiff alleges that defendant Rock acknowledged plaintiff's complaints, but did not rectify the problem, stating that Upstate did not have any single cells to accommodate plaintiff's disability. Plaintiff also alleges that defendant Rabideau, a nurse, reviewed his chart and determined that plaintiff was "cleared" to be assigned to a double bunk cell. (AC at 14).

**(i) Nurse Rabideau**

The only named defendant that plaintiff alleges was personally involved in the denial of a single sell was defendant Rabideau. The other defendants who plaintiff discusses in this section of the amended complaint are supervisory officials, who would not necessarily be involved in a medical decision. With respect to defendant Rabideau, the amended complaint is quite clear in stating that, after plaintiff filed his grievance, Nurse Rabideau reviewed plaintiff's medical file and made a decision that he was "cleared" for the double bunk assignment. [18] (AC at 14). Even if she were incorrect, was negligent in making her determination, or the appropriate information was not in plaintiff's file, defendant Rabideau would not be liable for a constitutional violation because negligence is not actionable under section 1983. *Daniels v. Williams,* 474 U.S. at 332. A nurse's failure to properly review the medical records does not rise to the level of a constitutional violation. *See Holmes v. Fell,* 856 F.Supp. 181, 183 (S.D.N.Y.1994). Plaintiff's disagreement with Nurse Rabideau's decision does not rise to the level of an Eighth Amendment claim. [19]

**(ii) Superintendent Rock**

**\*10** Defendant Rock is the Superintendent of Upstate, and his only involvement appears to have been speaking to plaintiff while defendant Rock was making his rounds of the plaintiff's housing unit. (AC at 14, ¶ i). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing

subordinates who caused the unlawful condition or event. *Id.* See also *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006). Mere notice of alleged wrongdoing is insufficient to establish a supervisor's or administrator'[s] personal involvement. *Gibson v. Comm'r of Mental Health,* No. 04 Civ. 4350, 2008 WL 4276208, at \*8, 2008 U.S. Dist. LEXIS 70080, at \*27 (S.D.N.Y. Sept. 17, 2008). While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... '[p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.' " *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (quoting *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002).

In this case, plaintiff alleges that because he spoke to defendant Rock about the bunk assignment while he was making rounds, Rock became personally involved in the alleged violation when he ignored plaintiff's request. Just as the failure to respond to a letter of protest is insufficient to constitute personal involvement, this conduct by defendant Rock is insufficient to assert that he was personally involved in any deliberate indifference claim regarding plaintiff's bunk assignment, particularly because this issue involved medical decisions beyond the purview of non-medical personnel.

**\*11** Plaintiff also alleges that defendant Rock was personally involved because he responded to plaintiff's grievances. Plaintiff submits a memorandum from defendant Rock, returning plaintiff's grievances, and telling him that he needed to follow proper grievance procedures. (Dkt. No. 42–1 at 34). The memorandum from defendant Rock, telling plaintiff he needed to take his grievance [20] through the proper channels is not sufficient to establish personal involvement. Although defendant Rock "received" plaintiff's grievance, he did not "act" on plaintiff's grievance. Returning plaintiff's grievances so that he could challenge the bottom bunk issue properly does not constitute personal involvement and may be dismissed as against defendant Rock. *See e.g., Liner v. Goord,* 310 F.Supp.2d 550, 555 (W.D.N.Y.2004) ("Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the

supervisor has insufficient personal involvement to sustain a § 1983 cause of action.")

### (iii) Theresa Knapp–David and Brian Fischer

Theresa Knapp–David was the director of Movement and Classification, and Brian Fischer is the Commissioner of DOCCS. In the amended complaint, plaintiff names defendant Knapp–David because plaintiff claims that he was told "the intake Sergeant ha[d] a computer printout stating that Movement and Classification said that it was okay for plaintiff to be housed in a double bunk cell and if he had a problem with that, to take it up with inmate grievance or Superintendent Rock." (AC at 13, ¶ f). There is no indication that defendant Knapp–David, who is the director of "Classification and Movement"[21] was personally involved in the decision to place plaintiff in a double-bunked cell or that she had any involvement in issuing the "computer printout." In his response to the motion to dismiss, plaintiff states that, as the person in charge of classification and movement, defendant Knapp–David was responsible for plaintiff's assignment through her "delegated policy-making [authority]." (Dkt. No. 42 at 9). This statement by plaintiff is not a proper allegation of personal involvement, instead, it is an attempt at alleging liability under *respondeat superior.* Plaintiff cites no "policy" instituted by defendant Knapp–David that would have caused plaintiff to be assigned to a double-bunked cell.[22]

The same is true for defendant Fischer. There is no indication that he was aware of, or caused plaintiff's housing assignment. It is implausible to allege that the Commissioner of DOCCS would be responsible for one inmate's housing assignment, without any more information. To allow personal involvement to be stated in such a way would result in defendant Fischer being personally involved in every alleged violation because he is the "policy-maker" for the department. Thus, plaintiff's eighth amendment claim may be dismissed as against defendants Knapp–David and Fischer.

### (b) ADA Claims

**\*12** Plaintiff alleges that defendants have violated Title II of the ADA by assigning him to a bottom bunk at Upstate and by failing to have appropriate seating in the visiting room at Upstate, causing plaintiff pain while visiting with his wife. Title II forbids discrimination against persons with disabilities in public services, programs and activities.[23] *Tennessee v. Lane,* 541 U.S. 509, 516–17, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); 42 U.S.C. § 12132. While the defendants must be sued in their individual capacities for purposes of section 1983, defendants may ***not*** be sued in their "individual" capacities for violations of the ADA. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). Any suit for statutory relief would have to be against the defendants in their "official" capacities. *Givens v. City of New York,* No. 11 Civ. 2568, 2012 WL 75027, at \*3–4 (S.D.N.Y. Jan.10, 2010) (citing *inter alia Spiegel v. Schulmann,* 604 F.3d 72, 79 (2d Cir.2010); *Parada v. Banco Indus. de Venezuela, C.A.,* No. 10 Civ. 0883, 2011 WL 519295, at \*3–4 (S.D.N.Y. Feb. 15, 2011); *Corr. v. MTA Long Island Bus,* 27 F.Supp.2d 359, 370 (E.D.N.Y.), *aff'd,* 199 F.3d 1321 (2d Cir.1999) (unpublished opinion). *See also Fox v. State Univ. of New York,* 497 F.Supp.2d 446, 449 (E.D.N.Y.2007) (no individual liability under either Title I or Title II of the ADA); *Plumey v. New York State,* 389 F.Supp.2d 491, 499 (S.D.N.Y.2005); *Cerrato v. Durham,* 941 F.Supp. 388, 395 (S.D.N.Y.1996). If plaintiff in this case has stated an ADA claim, it must be asserted only against the defendants in their official capacities.[24]

In *Tennessee v. Lane,* the Court held that State defendants are immune from damage claims under Title II if the State's conduct does not independently violate the Fourteenth Amendment, and in *United States v. Georgia,* 546 U.S. 151, 158–59, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), the court extended the reasoning in *Tennessee v. Lane* to encompass claims by inmates against the state under Title II. In this case, because there is no independent Fourteenth Amendment violation with respect to either the cell assignment or the visiting room situation, the State defendants are immune from suit.

Claims for declaratory and injunctive relief against State defendants in their official capacities are not specifically barred by the Eleventh Amendment. *Andino v. Fischer,* 698 F.Supp.2d 362, 380 (S.D.N.Y.2010) (citing *inter alia Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009)). However, when the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated, the claim is moot and may be dismissed because the court lacks subject matter jurisdiction. *Id.* (citing *Fox v. Bd. of Trs. of State Univ. of N.Y.,* 42 F.3d 135, 140 (2d Cir.1994). Plaintiff's transfer out of the facility will generally moot any claims for declaratory and injunctive relief against officials from that facility. *Id.* (citing *Verley v. Wright,* No. 02 Civ. 1182, 2007 WL 2822199, at \*9 (S.D.N.Y. Sept. 27, 2009)).

**\*13** In this case, plaintiff is no longer incarcerated at Upstate, and absent a reasonable expectation that the conduct will be repeated, plaintiff's claim for declaratory and injunctive relief would be moot. However, plaintiff argues that he has been double-bunked at various facilities, and that there is a reasonable expectation that he will again be housed in a double cell. In order to demonstrate this, he has submitted a declaration, authored by a DOCCS employee, filed in opposition to a motion for a preliminary injunction in another of plaintiff's actions in this District. (Dkt. No. 42–1, Ex. F). The declaration, dated July 29, 2010, states that plaintiff was housed in a double cell at Clinton for approximately four days between May and June of 2010, but had been transferred to a single cell at Clinton. (*Id.*) Plaintiff states in this case that on August 24, 2010, when he was transferred from Clinton to Upstate, he was again housed in a double cell, showing that the double-cell assignment can be imposed at various facilities within a short period of time.

From the amended complaint and from plaintiff's response to the motion to dismiss, it appears that plaintiff may be occasionally housed in a double-cell for a short period of time until he is transferred to a different cell assignment. Thus, for purposes of injunctive relief under the ADA, it is reasonable to assume, based on plaintiff's allegations, that plaintiff could be subjected to the same double celling conditions in the future. However, even assuming that plaintiff's transfer to a different facility does not render moot the claim for injunctive relief because plaintiff is often assigned temporarily to a double cell, the court finds that plaintiff has not stated an ADA claim with respect to his housing assignment.

The ADA affords disabled persons legal rights regarding access to programs and activities enjoyed by all, but does not provide a state inmate with a "general federal cause of action" for challenging his medical treatment. *See Carrion v. Wilkinson,* 309 F.Supp.2d 1007, 1016 (N.D.Ohio 2004) (quoting *Galvin v. Cook,* CV–00–29, 2000 WL 1520231, at \*6 (D.Ore. Oct. 3, 2000)). In this case, plaintiff alleges that he was improperly assigned to a bottom bunk. Although he claims that it caused him great pain to get up from his bed, he does not claim that he was denied access to any activity or program, or suffered discrimination because of his back problem.[25] The ADA is not the vehicle for his claims, and any ADA claim regarding his housing assignment may be dismissed for failure to state a claim.

Plaintiff also complains about the discomfort he experienced during visits with his wife at Upstate because he could not sit comfortably for six hours in the chairs, due to his back impairment. Visitation while in prison is considered a privilege and not a right. *See Mateo v. Heath,* No. 11 Civ. 636, 2012 WL 1075836, at \*3 (S.D.N.Y. March 29, 2012) (citations omitted). Plaintiff in this case does not claim that he could not attend his visits, merely that he had difficulty sitting for six hours. Plaintiff has not stated a claim that he was denied access to a program or activity because of his disability. Thus, any ADA claims relating to plaintiff's visitation may be dismissed.

## V. *Retaliation (Clinton)*

### A. Legal Standards

**\*14** In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennet v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

There is no question that filing grievances qualifies as a "constitutionally protected" activity. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

### B. Application

#### 1. Verbal Harassment

Plaintiff appears to allege that "defendants" retaliated against him because he filed a grievance against defendant Leon. Plaintiff claims that the "corridor Officer" told him that plaintiff was going to lose his grievance because "defendant Leon was well-liked," and that filing grievances at Clinton "would cause a lot of problems." (AC at 6, ¶ (j)). Plaintiff then claims that one or two weeks after the grievance hearing, a "hall Officer" gave plaintiff a difficult time about having a

permit for his wedding band as plaintiff was on his way to visit with his wife. (AC at 7, ¶¶ (k)-(l)). Although plaintiff states that he tried to explain that his "permit" was on "file" in the package room, and that he never had to take it off before, the officer allegedly sent plaintiff back to his cell to take off the ring, telling plaintiff that "this was only the beginning" because he liked to write grievances.

The court first notes that neither the "Corridor" officer, nor the "Hall" officer are named, and neither are defendants in this action. The fact that plaintiff was inconvenienced by having to go back to his cell and take off his wedding ring is certainly not conduct that would deter a reasonable inmate from making complaints. Plaintiff claims that he wrote a grievance about the hall officer's conduct, and told the grievance officer that he *believed* that the officer's conduct was retaliatory. The grievance sergeant told plaintiff "that was how things work in Clinton Annex." [26] (AC at 7, ¶ (n)).

Although there are other allegations of harassment by defendant Lincon (who has been dismissed from this action) and delays in visiting privileges, none of this conduct would be sufficient to rise to the level of actionable retaliation. (AC at 8, ¶¶ (o)-(q)). Even if plaintiff had been *denied* his visit on one occasion, [27] it would not rise to the level of "adverse action" for purposes of the retaliation analysis. *Mateo v. Heath,* 2012 WL 1075836, at *4. In *Mateo,* the district court also held that plaintiff had failed to come forward with the "detailed fact pleading" required to support his claim that the denial of visitation was causally connected to any filed grievance. (*Id.*) The same is true in this case. There are no allegations indicating either that this conduct is adverse action, or that two unnamed officers would have known about plaintiff's grievance against defendant Leon.

**2. False Misbehavior Reports**

 **\*15** A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if the defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff was entitled to, and did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any action taken by a defendant in retaliation for the exercise of a constitutional

right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

Plaintiff claims that he was the subject of two false misbehavior reports, and that he was not afforded due process at the resulting disciplinary hearings. Although it is unclear from the amended complaint, in his response to the motion to dismiss, plaintiff makes it quite clear that he is also claiming that the allegedly false disciplinary reports were in retaliation for his grievances. (Dkt. No. 42–1 at 12–13, ¶¶ (1)-(3)). It also appears from plaintiff's exhibits that one of the disciplinary hearings was ultimately reversed, while the other one survived plaintiff's challenges. [28] (Dkt. No. 42–1, Exs.H). Plaintiff claims that his due process rights were violated at both hearings. At this stage of the case, and based in part on the fact that one of the hearings was reversed, the court will not recommend granting a motion to dismiss on the retaliation claim, relating to the disciplinary charges only. [29]

**VII. *Due Process***

**A. Legal Standards**
To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996).

In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d

Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*16** However, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—*e.g.,* 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31

(W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

## B. Application

In this case, defendants cite the amended complaint, in which plaintiff alleged that he was sentenced to SHU for 90 days, and argue that 90 days is insufficient to establish a liberty interest. A review of the amended complaint shows that plaintiff also alleged a loss of good time as the result of one of the disciplinary hearings. (AD at 11, ¶ (z)). In his response to the motion, plaintiff adds that he was held longer than 90 days, and argues that a liberty interest was created. Plaintiff has submitted the hearing officer's decision, dated August 5, 2010. (Dkt. No. 42–1, Pl.'s Ex. C1). It is clear from the document that plaintiff was sentenced to 90 days SHU, and the hearing officer also recommended loss of two months good time. (*Id.*) The loss of good time creates a liberty interest because the length of plaintiff's incarceration is implicated. [30] *Wolff v. McDonnell,* 418 U.S. 556–57 (1974). Thus, plaintiff did have a protected liberty interest, and the court may not grant defendants' motion to dismiss on that basis. [31]

**\*17 WHEREFORE,** based on the findings above it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 37) be **GRANTED,** and the complaint dismissed in its entirety without prejudice as to **DEFENDANTS FISCHER, KNAPP–DAVID, ROCK, and RABIDEAU,** and it is

**RECOMMENDED,** that defendants motion to dismiss (Dkt. No. 37) be **DENIED** as to **DEFENDANT LEON,** only with respect to the medical diet claim, and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 37) be **DENIED** as to defendants **EGGLESTON, MASKUNAS, PRACK, WHALEN, and CHASE,** only with respect to plaintiff's Due Process and First Amendment claims, relating to plaintiff's allegations of retaliatory false misbehavior reports and due process violations at the disciplinary hearings.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be

filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1899004

## Footnotes

1   The case was reassigned from other judges to Chief Judge Sharpe and me by order dated November 29, 2011. (Dkt. No. 35).

2   The original complaint named: Brian Fischer, Commissioner of DOCCS (Albany); J. Carver, Classification and Movement (Albany); David Rock, Superintendent of Upstate; and K Rabideau, Nurse at Upstate. (Dkt. No. 1).

3   In addition to defendants Fischer, Rock, and Rabideau, plaintiff added the following defendants: Theresa David, the Director of Classification and Movement (Albany); L. Whalen, Corrections Counselor (Clinton); Lt. Chase (Clinton); J. Eggeston, Hearing Officer (Clinton); S. Meskunas, Hearing Officer (Clinton); A. Prack, Director of the Special Housing Unit (SHU) (Clinton); C. Leon, Food Service Administrator (Clinton), and C.O. Lincon, Corrections Officer (Clinton). (Dkt. No. 5).

4   Plaintiff omitted defendant Carver, from the DOCCS Movement and Classification Department, from his amended complaint. Instead, in his amended complaint, plaintiff names Theresa Knapp–David, the Director of Movement and Classification.

5   *Jones v. Smith, et al.,* No. 9:09–CV–1058. In 9:09–CV–1058, defendants made the identical motion to revoke plaintiff's IFP status. (Dkt. No. 75, 78, 79). On December 6, 2011, I recommended that the "three strikes" motion be granted and that plaintiff be required to pay the filing fee before that case could proceed. (Dkt. No. 83). Chief Judge Sharpe adopted the Report–Recommendation on January 23, 2012, and ordered dismissal of the action within forty-five days if plaintiff did not pay the filing fee. (Dkt. No. 85). Plaintiff did not pay the fee in that case, but filed a notice of appeal. (Dkt. No. 86).

6   Plaintiff has numbered the pages of his amended complaint at the bottom. He has also identified paragraphs on each page by letter. However, plaintiff begins each cause of action with a new set of letters, beginning with ¶ (a). Thus, to properly cite to the amended complaint, the court will first cite the bottom page of the document and then cite to the lettered paragraph in which the cited facts are stated.

7   Although plaintiff does not specifically state that he filed a grievance, the next paragraph refers to the "grievance" he filed. (AC at 6, ¶ (jj)).

8   Plaintiff claims that he explained to the officer that the permit was on "file" in the package room, but the officer told plaintiff that he had to return to his cell and take off the ring. (AC at 7, ¶ (i)).

9   "ILC" stands for Inmate Liaison Committee.

10  Plaintiff also complains that he was not given appropriate credit for his pre-hearing confinement in SHU on these charges. (AC at 11).

11  Plaintiff may be referring to his "cube," which is another word for his cell.

12  Any claim that plaintiff was denied his special diet relates only to a constitutional claim because plaintiff does not allege that his diet restrictions constitute a limitation on a "major life activity," nor does he allege that he was deprived of access to any services, programs, or activity "by reason of" his dietary requirement or that the need for a low sodium diet is a "disability" under the statute. *See Farid v. Demars,* No. 9:06–CV–1545, 2009 WL 455450 (N.D.N.Y. Feb.23, 2009) (dismissing inmate's ADA claim that he was not allowed to obtain special low sugar foods for his diabetic condition).

13  "I was you eating toast" does not make sense. A review of the documents submitted with plaintiff's response shows that plaintiff meant to say that defendant Leon told plaintiff that he would be taken off the special diet list because Leon *saw* plaintiff eating toast.

14  A motion to dismiss is addressed to the face of the complaint, including any attachments and information incorporated by reference. This court has considered plaintiff's current submission and exhibits as clarification of his claims. *Accord Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering plaintiff's response to motion to dismiss); *Mest v. Naguib,* No. 08–CV–416A(F), 2010 WL 1644189, at *3 (W.D.N.Y. March 30, 2010) (considering plaintiff's response to the motion to dismiss as amending the complaint by alleging additional clarifying facts) (Report–Recommendation), *adopted,* 2010 WL 1644180 (W.D.N.Y. April 22, 2010); *Fox v. City of New York,* No. 03 Civ. 2268, 2004 WL 856299, at *1 (S.D.N.Y.

April 20, 2004) (considering plaintiff's response papers and any other documents that are referenced in his papers on the motion to dismiss); *Johnson v. Wright,* 234 F.Supp.2d 352, 356 (S.D.N.Y.2002) (considering plaintiff's response briefs on motion to dismiss).

15   The form indicates that the diet requested for plaintiff was "Controlled A," consisting of "enhanced fiber, low fat/cholesterol/ sodium." (Dkt. No. 42–1, Ex. X). Plaintiff has also included the facility rules regarding therapeutic diets. (Dkt. No. 42–1, Ex. Y).

16   The court does note, however, that the therapeutic diet claim is alleged only against defendant Leon. There are no other defendants who were personally involved in the alleged deprivation. DSP Patnode granted plaintiff's grievance and is not a defendant. There are no further allegations against any of the existing defendants about this claim. As discussed below, personal involvement is a prerequisite to the assessment of damages in a section 1983 case. Thus, if plaintiff intended to include other defendants in this claim, it would be subject to dismissal as against all defendants except defendant Leon.

17   Attached as Exhibit F1 to plaintiff's opposition papers is the Discharge Summary, dated October 4, 2006, from plaintiff's hospitalization for back surgery, which was performed on September 20, 2006. (Dkt. No. 42–1, Ex. F1).

18   From the language of the complaint, it appears that Nurse Rabideau investigated the grievance that plaintiff says he filed on August 25, 2010. (AC at 14, ¶ g). Plaintiff states that after her investigation she "denied plaintiff's request to be house [sic] in a single cell." (*Id.*)

19   The court will discuss the potential ADA claim in a separate subsection.

20   It is unclear to which grievances defendant Rock was referring, because plaintiff filed various grievances during the relevant time period. Defendant Rock's memorandum was dated October 22, 2010.

21   In his response to the defendants' motion to dismiss, plaintiff includes an exhibit, consisting of a newspaper article, showing that Theresa Knapp–David was the director of Classification and Movement. (Dkt. No. 42–1, Ex. I).

22   In his response to the motion to dismiss, plaintiff also states that he was told that Upstate "does not have any single cells to accommodate plaintiff's [medical] need." (Dkt. No. 42 at 9).

23   In general, the ADA forbids discrimination in three major areas. Title I covers employment discrimination; Title II covers public services, programs, and activities; and Title III covers public accommodations. *Tennessee v. Lane,* 541 U.S. at 516–17. In *Board of Trustees v. Garrett,* 531 U.S. 356, 374, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the Court held that Title I of the ADA does not abrogate the State's Eleventh Amendment immunity. In *Garrett,* Court distinguished between Title I claims and Title II claims.

24   For purposes of the ADA, only one defendant in his official capacity would be sufficient, because the ultimate party responsible for an ADA claim is the State of New York.

25   In an effort to come within the purview of the ADA, plaintiff claims he was "denied the benefit of a single cell." (AC at 17, ¶ (e)). However, there is no "benefit" to a single cell. Neither plaintiff, nor any other inmate has the right to a single cell, and plaintiff is not being denied a single cell because of his disability. *See Jarecke v. Hensley,* No.2009 WL 2030394, at *8 (D.Conn. July 9, 2009) (citing *inter alia Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (holding that double celling inmates did not rise to the level of a constitutional violation). Other inmates do not get to choose what cells they occupy. Additionally, it has been held that New York has not created a liberty interest in single cell housing. *Bolton v. Goord,* 992 F.Supp. 604, 630 (S.D.N.Y.1998). Thus, plaintiff cannot state an ADA claim by alleging that he is being denied a "benefit" that is being given to others without plaintiff's disability.

26   The Sergeant could have been referring to the necessity for carrying the wedding ring permit. However, plaintiff has interpreted this statement as an admission of "retaliation."

27   Plaintiff makes no such claim.

28   In the amended complaint, plaintiff claims that "both misbehavior reports were appeal[ed] to defendant Prack, who affirmed all the charges even though established case law supports plaintiff's arguments." (AC at 12, ¶ (a–1)). However, this allegation is inconsistent with plaintiff's Ex. H, which is the review of the August 5, 2010 (plaintiff says August 2, 2010) hearing. Plaintiff's Exhibit H shows defendant Prack *administratively reversing* the August 5, 2010 Superintendent's Hearing on July 6, 2011. (Dkt. No. 42–1 at 21, Pl.'s Ex. H). Also attached to Exhibit H is a decision by the Appellate Division, Third Department, dated July 27, 2011, dismissing as moot plaintiff's Article 78 proceeding, which challenged a disciplinary hearing, because the hearing had been administratively reversed. (*Id.* at Ex. H, Dkt. No. 42–1 at 23–24). It also appears that the other disciplinary hearing may have survived plaintiff's challenge because plaintiff filed a grievance, alleging that he was held in SHU past his release date. (*See* Dkt. No. 42–1 at 36, 38, Pl.'s Exs. N (grievance), O (response to grievance)).

29   This court makes no assessment of the ultimate merits of the plaintiff's retaliation claim.

30    In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that a liberty interest is implicated in SHU confinement where the confinement imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Courts look to the "actual" punishment imposed in making that determination. *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998). The court also notes that there is no issue in this case that the action is premature under *Heck v. Humphrey,* In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a section 1983 action, seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486–87. *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) extended the rationale in *Heck* to section 1983 challenges to prison disciplinary proceedings in which a decision in plaintiff's favor would necessarily reverse the administrative decision revoking a plaintiff's good-time credits, thereby affecting the length of the plaintiff's confinement. 520 U.S. at 644. In this case, *Heck* and *Balisok* do not preclude plaintiff's due process claim because it appears that the disciplinary hearing in which plaintiff lost good time was reversed on appeal, making the case ripe for section 1983 review.

31    The hearing officers are defendants Eggleston and Maskunas. Those are the only named defendants personally responsible for defendants' due process claims. It is unclear what happened after the second disciplinary hearing, although it appears that plaintiff lost only privileges as the result of the second hearing. Unlike the first disciplinary hearing conducted by defendant Eggleston, plaintiff does not include any of the documents associated with the second hearing that was conducted by defendant Maskunas. The second hearing was apparently not reversed, but plaintiff suffered no loss of good time and appears to have only suffered a loss of privileges. Without further information, the court cannot determine whether a liberty interest was implicated with respect to the second hearing; however, the court will not recommend dismissing either claim at this time.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

**FN7.** *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

**FN8.** Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

**FN9.** Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

**FN10.** The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See* *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

a. Witnesses

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 7410227 (N.D.N.Y.)
**(Cite as: 2014 WL 7410227 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
David ROCK, Superintendent of Upstate Corr.
Fac.; Brian Fischer, Commissioner of Doccs; An-
thony Carozzoni, Counsel Elmira Corr. Fac.; Trudy
Lynn–Boyea, Counselor, Upstate Corr. Fac.; John
Carvill, Classification Analyst, Doccs; Douglas
Botford, Director of Classification and Movement;
Theresa Knapp–David, Classification and Move-
ment; Norm Bezio, Former Deputy Superintendent
of Security, Upstate Corr. Fac.; and Lucien Leclaire
Jr., Former Deputy Commissioner of Doccs, De-
fendants.

No. 9:14–CV–815 (DNH/ATB).
Signed Dec. 31, 2014.

Johnathan Johnson, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, David J. Sleight, Esq., Ass't
Attorney General, of Counsel, Albany, NY, for De-
fendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Johnathan Johnson brought
this civil rights action pursuant to 42 U.S.C. § 1983
. On December 3, 2014, the Honorable Andrew T.
Baxter, United States Magistrate Judge, advised by
Report–Recommendation that defendants' motion to
dismiss be granted and the complaint be dismissed
in its entirety as to all defendants with prejudice.
He further recommended that defendants' motion
for sanctions and plaintiff's motion for sanctions be
denied. Plaintiff timely filed objections to the Re-
port–Recommendation. Defendants responded to
plaintiff's objections and seek reconsideration of
one portion of the Report–Recommendation.

Based upon a de novo review of the portions of
the Report–Recommendation to which the parties
objected, the Report–Recommendation is accepted
and adopted in all respects. *See* 28 U.S.C. §
636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED
and the complaint is DISMISSED in its entirety as
to all defendants with PREJUDICE;

2. Defendants' motion for sanctions and
plaintiff's motion for sanctions are DENIED; and

3. The Clerk is directed to enter Judgment ac-
cordingly, serve a copy of this Decision and Order
upon plaintiff in accordance with the Local Rules
and close the file.

IT IS SO ORDERED.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate
Judge.

This matter has been referred to me for Report
and Recommendation pursuant to 28 U.S.C. §
636(b) and Local Rules N.D.N.Y. 72.3(c). On July
7, 2014, defendants removed this action from the
New York State Supreme Court, Franklin County.
(Dkt. No. 1). In this civil rights complaint, plaintiff
alleges that he was the subject of a "retaliatory
transfer" from Elmira Correctional Facility
("Elmira") to Upstate Correctional Facility
("Upstate") on November 16, 2006, and that after
he arrived at Upstate, some of the defendants failed
to protect him from attacks by unknown gang mem-
bers in violation of his right to be free from cruel
and unusual punishment under the Eighth Amend-
ment. (Compl.) (Dkt. No. 2). Plaintiff seeks a sub-
stantial amount of monetary damages.

Presently before the court is defendants' motion

to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 2). Plaintiff has responded in opposition to the motion and has moved to remand this case to New York State Supreme Court. (Dkt.Nos.4, 5). Plaintiff's motion to remand contains a request for "sanctions" against defendants for the "impropriety of removal" pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1447. (Dkt. No. 5 at 1–2). Defendants have responded in opposition to the motion to remand. (Dkt. No. 6). Defendants have also requested that the court consider sanctions against plaintiff based upon his vexations litigation. (Dkt. No. 2–1 at 2). For the following reasons, this court will deny plaintiff's motion to remand and recommend that the defendants' motion to dismiss be granted, but will not recommend that sanctions be assessed at this time, either against plaintiff or against defendants.

### I. *Facts and Procedural Background*

**\*2** Plaintiff alleges that in "2000," he filed an Article 78 [FN1] proceeding in Franklin County Court: *Matter of Johnson v. Lucien LeClaire*, Index. No.2007–0204—RJI No. 16–1–2007–0078. [FN2] Plaintiff seeks to claim that his Article 78 petition raised claims of "gang member[ ] enemies at Upstate ... in June 2000." (Compl.¶ 4). Plaintiff states that on "or about" June 23, 2000, plaintiff was transferred from Upstate to a one-person cell at Southport Correctional Facility ("Southport") for "unsuitable behavior." (Compl.¶ 5). Plaintiff states that he was confined at Southport for six years until he was transferred to Elmira in January 2006. (Compl.¶ 6).

> FN1. Plaintiff is referring to Article 78 of the New York State Civil Practice Law & Rules. N.Y. Civ. Prac. L. & R. Art. 78, § 7000 et seq. The issues that may be raised in an Article 78 proceeding are listed in section 7803. It is not completely clear from the complaint what claims plaintiff raised in that proceeding.

> FN2. It is odd that an action filed in 2000 would have received a 2007 Index Number

and RJI number, but this discrepancy does not affect this court's decision.

Plaintiff claims that on November 13, 2006, he and the guards who were escorting him to the shower were "thrown on" by an inmate on the gallery in the Special Housing Unit ("SHU"). (Compl.¶ 7). The inmate in question was subsequently moved to a different cell location so that he and plaintiff would not be taken to the shower at the same time. Plaintiff asked Superintendent John Burge [FN3] to "preserve[ ] all [the] evidence," which included a video tape of the "incident" for "future court actions." (Compl.¶¶ 8–9). Plaintiff claims that on November 15, 2006, Superintendent Burge came through the SHU area and informed the plaintiff that he "was getting rid of him" because of his intent to file a lawsuit stemming from the November 13, 2006 incident. (Compl.¶ 10). Plaintiff alleges that this "retaliatory transfer" occurred the next day (November 16, 2006).

> FN3. The court notes that Superintendent Burge is not a defendant in this action.

Plaintiff claims that upon his arrival at Upstate, he "informed" defendants Brian Fischer, Theresa Lynn–Boyea, Norm Bezio, Lucien LeClaire, "and other officials" that plaintiff had enemies/gang members at Upstate. (Compl.¶ 12). It is unclear from the complaint, but it appears that plaintiff alleges that the transfer from Elmira was requested by defendants Anthony Carozzoni (a counselor at Elmira) and Superintendent Burge. (Compl.¶ 13). Plaintiff states that defendant John Carvill (Classification Analyst for the Department of Corrections and Community Supervision ("DOCCS")) caused the transfer from Elmira to Upstate, even though plaintiff had been transferred out of Upstate in 2000. (*Id.*)

Plaintiff alleges that on April 25, 2007, he wrote to defendants Fischer, Knapp–David, and Le-Claire informing them of the numerous "inmate gang members at Upstate to no avail to date." (Compl.¶ 14). Plaintiff claims that on November

16, 2006, he also told defendant Bezio (Deputy Superintendent for Security at Upstate) about the enemy gang members, but to "no avail to date." (Compl.¶ 15).

Plaintiff claims that on an unspecified date in December of 2007, he was "attacked" by an "unknown gang member" on the Upstate/Downstate Correctional Bus coming from Federal custody back to Upstate. (Compl.¶ 16). Plaintiff claims that he and his family were attacked by "gang members" in May of 2008 in the Upstate visiting room. (Compl.¶ 17). Plaintiff states that on January 7, 2011, he was attacked by a "gang member" in the holding pen area at Upstate. (Compl.¶ 18). The fourth alleged attack occurred on August 27, 2012 on the Upstate "draft bus" and subsequently, in the draft room area. (Compl.¶ 19). Plaintiff claims that unnamed guards conspired to "cover up" this attack. (*Id.*) The fifth attack occurred on October 3, 2012, when feces was thrown on plaintiff during recreation in "Eight Building." (Compl.¶ 20).

**\*3** Plaintiff alleges that on October 24, 2012, plaintiff was being escorted back from court proceedings, and the "prison guard" who was assigned to the console, opened the door for "inmate gang members" to attack the plaintiff. (Compl.¶ 21). However, plaintiff states that the gang member "attempted to come at plaintiff[ ]." (*Id.*) Although the complaint lists a "Seven[th] Attack" in December of 2012, plaintiff does not describe any attack during that time period. (Compl.¶ 22). He claims that "gang members" are putting notes on meal trays, stating that plaintiff raped a child. Plaintiff claims that this conduct put his life in danger and claims that no actions have been taken to protect his safety at Upstate.[FN4] (*Id.*) Plaintiff claims that he has been confined at Upstate together with inmates who are on his "separatee" list, and that in 2008, he was housed in "Eleven Building" wherein a "listed enemy" was also housed, "under the supervision of David Rock, Trudy Lynn–Boyea, Brian Fischer, John Cavill, Theresa Knapp–David, Lucien LeClaire, and Douglas Botford.[FN5] (Compl.¶ 23).

Plaintiff also claims that defendant Carozzoni "conspired" with defendants Carvil and Superintendent Burge to have plaintiff transferred to Upstate "where he is surrounded by gang members to date." (Compl.¶ 24).

> FN4. Plaintiff does not allege any incidents or injuries resulting from this alleged conduct by unnamed "gang members."

> FN5. Defendant Botford is the Director of Classification and Movement. This is the first and only time that he is mentioned in the complaint.

Plaintiff states that he brings this action pursuant to section 1983, raising claims of "deliberate indifference, cruelty [sic] and unusual punishment and retaliatory acts for court's access." (Compl.¶ 25).

## II. *Motion to Remand*

### A. Legal Standards

### 1. Removal

"Any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441; *see Lincoln Property Co. v. Roche,* 546 U.S. 81, 83, 126 S.Ct. 606, 163 L.Ed.2d 415 (2005) (explaining that section 1441 "authorizes the removal of civil actions from state court to federal court when the action initiated in state court is one that could have been brought, originally, in a federal district court). However, " '[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability.' " *Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 213 (2d Cir.2013) (quoting *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

269, 274 (2d Cir.1994)).[FN6]

> [FN6]. There are exceptions to removal jurisdiction. Under 28 U.S.C. § 1445, certain civil actions against railroads or common carriers, civil actions arising under the workers' compensation laws of a state, and any civil action arising under section 40302 of the Violence Against Women Act, may not be removed to any district court of the United States. Plaintiff does not claim that this case is in any category of nonremovable actions under section 1445.

The procedural requirements for removal to federal court are as follows:

> The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

**\*4** 28 U.S.C. § 1446(b)(1). The thirty-day window for removal contained in section 1446(b)(1), while not jurisdictional, is "rigorously enforce[d]" by courts absent a finding of waiver or estoppel. *Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1046 (2d Cir.1991), *superseded on other grounds by rule as stated in Contino v. United States,* 535 F.3d 124, 127 (2d Cir.2008).

The subject matter jurisdiction of the federal district courts is limited and is set forth generally in 28 U.S.C. §§ 1331 and 1332. Under these statutes, federal jurisdiction is available only when a federal question is presented or when the parties are of diverse citizenship, and the amount in question exceeds $75,000. In this case, defendants' removal was pursuant to Section 1331, which sets forth federal-question jurisdiction, and states:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331. "Generally, '[t]he presence or absence of federal-question jurisdiction is governed by the well-pleaded complaint rule, which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.' " *NYU Hosp. Ctr. Tisch v. Local 348 Health & Welfare Fund,* No. 04 Civ. 6937, 2005 WL 53261, at \*1 (S.D.N.Y. Jan.6, 2005) (quoting *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)) (internal quotation marks omitted).

**2. Remand**

After an action is removed from state court to federal court, remand may be granted on one of two grounds: (1) a defect in removal procedure or (2) a lack of subject matter jurisdiction. 28 U.S.C. § 1447. A motion to remand "on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal ...." 28 U.S.C. § 1447(c).

**B. Application**

**1. Removal**

Plaintiff filed this action on April 16, 2013 in the New York State Supreme Court, Franklin County. (Def.s' Ex. A) (Dkt. No. 1). The complaint was ultimately served on defendants on June 5, 2014. (Def.s' Ex. H). On July 7, 2014, defendants filed a Notice of Removal in this court pursuant to 28 U.S.C. § 1441(a) and 1446. (Dkt. No. 1) (Notice of Removal). All defendants except defendant Carozzoni joined in the petition for removal. On a motion to remand, the defendant bears the burden of demonstrating the propriety of removal. *Cal. Pub. Employees' Ret. Sys. v. Worldcom, Inc.,* 368 F.3d 86, 100 (2d Cir.2004) (citation omitted).

First, the defendants' notice of removal was timely filed on July 7, 2014. Defendants state that they were served with the complaint on June 5, 2014. (Dkt. No. 1 ¶ 14). Plaintiff's motion to remand also states that he served the defendants on June 5, 2014. (Dkt. No. 5 ¶ (m)). Thirty days from Thursday, June 5, 2014 would have been Saturday, July 5, 2014. However, pursuant to Fed.R.Civ.P. 6(a)(1)(C), when computing time for a period stated in "days or a longer unit," if the last day of the period is a Saturday, Sunday, or legal holiday, "the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." *Id.* Because July 5, 2014 was a Saturday, defendants had until Monday July 7, 2014 to file their notice of removal.

**\*5** Second, in their notice of removal, defendants assert that the district court has original jurisdiction over the federal constitutional claims in plaintiff's complaint pursuant to Section 1331. (Dkt. No. 1 ¶ 3). On its face, plaintiff's complaint asserts claims arising under the Constitution of the United States. (*See* Compl. ¶ 25 (alleging that defendants violated plaintiff's federal constitutional rights and bringing this action pursuant to 42 U.S.C. § 1983)). It would appear that removal jurisdiction exists. Nevertheless, plaintiff contends that removal jurisdiction is unavailable.

## 2. Remand

In his motion to remand, plaintiff asserts that because both state court and federal court have jurisdiction over his federal constitutional claims brought under Section 1983, his claims should have remained in state court. (Dkt. No. 5 ¶ (g)). Plaintiff cites *Haywood v. Drown,* which states that "[i]n our federal system of government, state as well as federal courts have jurisdiction over suits brought pursuant to 42 U.S.C. § 1983." *Haywood,* 556 U.S. 729, 731, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). Although plaintiff is correct that both state and federal courts may entertain suits brought pursuant to Section 1983, this concurrent jurisdiction does not preclude removal. Indeed, it is the existence of con-

current jurisdiction which allows a defendant to remove an action from state court to federal court. *See, e.g., Dorsey v. City of Detroit,* 858 F.2d 338, 341 (6th Cir.1988) ("The weight of judicial authority supports the conclusion that 'a Congressional grant of concurrent jurisdiction in a statute does not imply that removal is prohibited.' ") (citing cases); *Pace v. Hunt,* 847 F.Supp. 508, 509–10 (S.D.Miss.1994) ( "[T]he removal statute would be eviscerated if actions such [as those arising under Section 1983] were remanded simply because such courts have concurrent jurisdiction.").

Plaintiff also argues that this court does not have "original jurisdiction" over this action because plaintiff is subject to the "three-strikes" rule pursuant to 28 U.S.C. § 1915(g), and he could not have filed his action in this court.[FN7] First, plaintiff is incorrect about the three-strikes rule. The rule does not prevent plaintiff from filing an action in federal court. Rather, it prevents plaintiff from filing an action "in forma pauperis." If plaintiff paid the filing fee, he would be able to file his action, whether he had three-strikes or not.[FN8]

> FN7. The three-strikes provision was adopted as part of the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1995). The principal purpose of the statute was to deter frivolous prisoner litigation. *See Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997).

> FN8. Additionally, as plaintiff is well-aware, the three-strikes rule contains an exception when the plaintiff claims he is in "imminent danger." *See Chavis v. Chappius,* 618 F.3d 162, 169–70 (2d Cir.2010).

The three-strikes rule is not "jurisdictional" and would not deprive the court of "original jurisdiction" over the action itself because the action is based upon a federal statute and the United States Constitution. *See Lisenby v. Lear,* 674 F.3d 259, 262–63 (4th Cir.2012) (nothing in the PLRA or the removal statutes defeats the court's jurisdiction over

a section 1983 action, and the requirement that a three-strikes plaintiff pay the filing fee is procedural, not jurisdictional). Thus, the fact that plaintiff would have been barred by the three-strikes rule from filing an action without the prepayment of fees is not a basis for remand.

**\*6** Plaintiff cites *Bartelli v. Beard,* No. 3:CV–08–l 143, 2008 WL 4363645 (M.D.Pa. Sept.24, 2008), which held that the three-strikes rule applied to a case removed from state court, notwithstanding the payment of the filing fee by the defendants. *Id.* at \*5. The court then stated that it was recommending "that the present case of Plaintiff be dismissed, pursuant to the three strike rule, without prejudice to allowing him to re-file his action if he pays the full filing fee. In the alternative, we will recommend that this case be remanded to state court." *Id.* The court in *Bartelli* stated that the plaintiff should not be allowed to "circumvent" section 1915(g) by filing his state court action in forma pauperis. *Id.* at \*6. Over the defendants' objections, the district court appeared to disregard the Magistrate Judge's recommendation that the case be dismissed without prejudice to plaintiff re-filing and paying the fee, and instead, ordered the alternative relief of remand to state court, without any analysis of the authority to remand. 2008 WL 4363645 at \*1–2. In doing so, the court relied upon on *Farnsworth v. Washington State Department of Corrections,* No. C07–206, 2007 WL 1101497 (W.D.Wash. Apr. 9, 2007), in which the court applied section 1915(g) to a case that was removed by the defendants, but ordered dismissal of the action rather than remand to state court.

Plaintiff also cites a Third Circuit case which was a challenge to section 1915(g) itself, but where the court found that the application of section 1915(g) was not unconstitutional and that "the appellant prisoner overlooked the fact that prisoners may seek relief in state court, where limitations on filing *in forma pauperis* may not be as strict." *Bartelli,* 2008 WL 4363645, at \*2 (citing *Abdul Akbar v. McKelvie,* 239 F.3d 307 (3d Cir.2001)).

This court does not agree with the analysis in the cases cited by plaintiff. These cases ignore the fact that the plaintiff did not choose to bring the action in federal court, and the defendants paid the filing fee. Neither court discussed the removal statute or the whether the federal court had the authority to remand the action. This court finds *Lisenby, supra* and *Dotson v. Shelby County,* No. 13–2766, 2014 WL 3530820 (W.D.Tenn. July 15, 2014) more persuasive. In *Dotson,* the three-strikes plaintiff filed his civil rights action in state court, and defendants removed the case to federal court. *Id.* at \*1–2. In analyzing the propriety of removal, the court stated that it considered whether plaintiff's status as a three-strikes filer precluded him from litigating in federal court, but found that because "28 U.S.C. § 1915(g) does not alter the Court's subject-matter jurisdiction, a district court cannot remand a properly removed action to state court on the ground that the prisoner is a three-strike filer." *Id.* at 3 (citing *Lloyd v. Benton,* 686 F.3d 1225, 1227–28 (11th Cir.2012); *Lisenby v. Lear,* 674 F.3d 259, 262–63 (4th Cir.2012); *Hartley v. Comerford,* No. 3:13–CV–488, 2014 WL 241759, at \*5–6 (N.D.Fla. Jan. 22, 2014) (denying prisoner's motion to remand case on ground that he is a three-strike filer); *Lanier v. Holiday,* No. 05–2203, 2005 WL 1513106, at \*2 (W.D.Tenn. June 16, 2005) ("Because the complaint asserts claims pursuant to 42 U.S.C. § 1983, over which the federal courts have original jurisdiction, the defendants have an absolute right to remove it from state court.")

**\*7** The court in *Dotson* also cited cases in which the plaintiff was allowed to proceed after removal notwithstanding his three-strike status. *Id.* (citing *Gay v. Chandra,* 682 F.3d 590, 596 (7th Cir.2012) ("The PLRA's three-strikes obstacle does not apply in state courts, where Gay filed this suit."); *Howard v. Braddy,* No. 5:12–CV–404, 2013 WL 5461680, at \*4 (M.D.Ga. Sept. 30, 2013) (denying motion to dismiss under § 1915(g) because "[t]he clear language of the statute applies only to actions in forma pauperis .... The Court will not construe 28 U.S.C. § 1915(g) to apply to non-in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7410227 (N.D.N.Y.)
**(Cite as: 2014 WL 7410227 (N.D.N.Y.))**

forma pauperis cases....") (Report–Rec., adopted by district court); *Gray v. Cardoza,* No. CIV S–05–2611, 2006 U.S. Dist. LEXIS 43710, at *5 (E.D. Cal. June 27, 2006) (because the filing fee was paid by counsel for defendant, plaintiff was not barred by 28 U.S.C. § 1915(g) from proceeding in federal court) (Report–Rec), *adopted,* 2006 U.S. Dist. LEXIS 71167 (E.D.Cal. Sept. 29, 2006); *see also Jae v. Stickman,* No. 12–1332, 2012 WL 5830633 (W.D.Pa. Nov.16, 2012) (declining to sua sponte dismiss removed case filed by three-strike filer without addressing § 1915(g) provided a basis for dismissal)).

Plaintiff also alleges that removal was improper because defendant Carozzoni did not consent to removal. As defense counsel points out, only defendants who have been served must consent to the removal. *Varela v. Flintlock,* 148 F.Supp.2d 297, 300–301 (S.D.N.Y.2001). Plaintiff claims that he served defendant Carozzoni on June 5, 2014, at the same time that he served the other defendants, pursuant to the state court judge's order allowing for "alternative service." (Def.s' Ex. G to Notice of Removal). However, the state court's order directed that the defendants be served at their place of employment. (*Id.*) Defense counsel states in his affidavit that defendant Carozzoni's employment with DOCCS ended on April 4, 2014. (Dkt. No. 6 at 8–9 & Whitaker Decl. ¶ 2). [FN9] Thus, defendant Carozzoni was not properly served on June 5, 2014, nor does it appear that he was served subsequent thereto, and therefore, defendant Carozzoni was not required to consent to the removal.

> FN9. Terry Whitaker is the Deputy Superintendent of Administration at Elmira. (Whitaker Decl. ¶ 1).

Plaintiff has cited no other viable basis for remand. Thus, this court must deny plaintiff's motion to remand and consider defendants' motion to dismiss.

### III. *Motion to Dismiss*

To survive dismissal for failure to state a claim,

the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant ' "fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

**\*8** When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.,* 328 F.3d 50, 57 (2d Cir.2003) (citing *inter alia County Vanlines, Inc. v. Experian*

*Info. Solutions, Inc.,* 205 F.R.D. 148, 154 (S.D.N.Y.2002) (taking judicial notice of NLRB decisions)). *See also Combier Kapel v. Biegelson,* 242 F. App'x 714, 715 (2d Cir.2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.,* 151 F. App'x 46, 48 (2d Cir.2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC,* No. 3:12–CV–1066, 2013 WL 3299708, at *6 (D.Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## IV. *Statute of Limitations*

### A. Legal Standards

Federal courts borrow the state law personal injury statute of limitations period for purposes of filing section 1983 actions. *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In New York State, the relevant limitations period is three years. *Owens v. Okure,* 488 U.S. 235, 250–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). *See* N.Y. Civ. Prac. L & R. § 214(5). Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action. Federal law, governs the question of when a section 1983 claim accrues. *Covington v. City of New York,* 171 F.3d 117, 121 (2d. Cir.1999) (citing *Morse v. University of Vermont,* 973 F.2d 122, 125 (2d. Cir.1992)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980) (internal quotation marks omitted)). Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.1997).

### B. Application

**\*9** Plaintiff argues that the alleged "retaliatory transfer" took place on November 16, **2006.** Plaintiff filed this action in New York State Supreme Court on April 16, **2013.** (Dkt. No. 1–1 at 3). The plaintiff signed his state court complaint on April 12, 2013. Even assuming that the date of signing is the date of filing, the statute of limitations has run on his "retaliatory transfer" claim. In fact, the statute of limitations has run on any claim that accrued prior to April 12, 2010. This includes any claim based on conduct occurring in 2007 and 2008. (Compl.¶¶ 16, 17).

There is absolutely no basis for any kind of tolling in this case, equitable or otherwise. Plaintiff is a very frequent litigator, who is well-aware of his rights and the basis for any claims. Mr. Johnson is a plaintiff in approximately 42 civil rights cases in this court alone, including cases filed in 2010, 2011, and 2012. Thus, there is no basis for alleging that he has somehow been prevented from filing lawsuits, except by his own frivolous filings. Thus, this court recommends dismissing any claim accruing prior to 2010 based upon the statute of limitations. (Compl.¶¶ 7–17). This includes any claim for retaliatory transfer in 2006 against defendants Carozzoni and Carvill and any failure to protect claims that accrued prior to 2010 as against any of the defendants.

## V. *Res Judicata*

### A. Legal Standards

Res judicata includes two concepts: claim preclusion and issue preclusion, also known as collateral estoppel. *Rivera v. City of New York,* —— F. App'x ——, 2014 WL 5463320, at *2 (2d Cir. Oct.29, 2014). Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. The doctrine bars subsequent litigation if the earlier decision was (1) a final judgment on the merits, (2) the previous action involved the plaintiff or those in privity with him, and (3) the claims asserted in the subsequent action were, or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

could have been raised in the prior action. *Id.* (quoting *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000)). *See also Ajamian v. Nimeh,* No. 1:14–CV–320, 2014 WL 6078425, at *2 (N.D.N.Y. Nov. 13, 2014) (citing *EDP Med. Computer Sys., Inc. v. United States,* 480 F.3d 621, 624 (2d Cir.2007) (internal citations and quotation omitted)). Under claim preclusion, even if the plaintiff's claims are based upon different legal theories, they are barred in the subsequent action, provided they arise from the same transaction or occurrence. *Id.* (citing *LTec Elecs. Corp. v. Cougar Elec. Org., Inc.,* 198 F.3d 85, 88 (2d Cir.1999) (per curiam)).

The doctrine of collateral estoppel provides that once a court has actually and necessarily decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue on a different cause of action involving a party to the first case. *Rivera v. United States,* No. 3:10–CV–1970, 2012 WL 3043110, at *2 n. 5 (D.Conn.2012) (discussing collateral estoppel) (citations omitted). Collateral estoppel is applicable if (1) the issues in both proceedings are identical; (2) the issue of law or fact was "actually litigated and actually decided" in the prior proceeding; (3) the party against whom preclusion is sought had a full and fair opportunity for litigation in the prior proceeding; and (4) the previously litigated issues were necessary to support a valid and final judgment on the merits. *Ali v. Mukasey,* 529 F.3d 478, 489 (2d Cir.2008) (citing *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986)); *Wade v. City of Kingston,* No. 1:13–CV–623, 2014 WL 4897244, at *4 (N.D.N.Y. Sept. 30, 2014) (citing *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987) (citation omitted)). *See also NML Capital, Ltd. v. Banco Central de la Republica Argentina,* 652 F.3d 172, 184–85 (2d Cir.2011) (discussing factors considered for collateral estoppel). Whether a previous federal court judgment has preclusive effect in a subsequent action is a question of federal common law. *NML Capital, Ltd.,* 652 F.3d at 184 (citing *Taylor v. Sturgell,* 553 U.S. 880, 891, 128 S.Ct.

2161, 171 L.Ed.2d 155 (2008)).

**B. Application**

**\*10** In this case, one of plaintiff's claims is that he was attacked on January 7, 2011. (Compl.¶ 18). Plaintiff does not explain the connection between any of the defendants and this alleged attack, other than his conclusory allegations that he informed defendants in 2006 and 2007 that he had enemies at Upstate. The previous alleged attack occurred in 2008. (Compl.¶ 17). In any event, plaintiff raised this claim in one of his many previous federal court actions.[FN10] *Johnson v. Lynn Boyea,* 9:11–CV–386. (*See* Compl. in 11–CV–386, Dkt. No. 1 at ¶ 1). In 11–CV–386, plaintiff claimed that "On January 7, 2011, at Upstate Correctional Facility Eleven Building lower holding pens at approximately 9:00 a.m. plaintiff was attack[ed] by a gang member [Blood] enemy." *Id.* Plaintiff claimed that defendant Corrections Counselor Trudy Lynn–Caron (now Trudy Lynn–Boyea) was "previously informed of plaintiff's enemies gang members in 2008 and 2011 and has refused to transfer plaintiff from this facility to date." (*Id.* at ¶ 5).

> [FN10.] In 11–CV–386 plaintiff also stated that he has informed defendants Fischer, LeClaire, and David upon his arrival at Upstate that he was "surrounded" by gang members in 2006, 2007, and 2008. (Compl. in 11–CV–386 ¶ 2). This paragraph states that he was "threatened" by these gang members, but there was no indication of any "assaults" between 2008 and 2011. Defendants Fischer, LeClaire, and Knapp–David were dismissed from the action based on a lack of personal involvement. (Dkt. No. 15 at 5–6 (Rep't Rec.); Dkt. No. 17 (Order Approving Rep't Rec.) In this case, even if claims regarding the previous assaults were not barred by the statute of limitations, they would be barred by res judicata because plaintiff clearly could have raised these claims in his previ-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ous federal court action against the same defendants.

On June 17, 2013, Magistrate Judge David Homer recommended granting defendant Lynn–Caron's motion for summary judgment and dismissing plaintiff's action in its entirety. (Dkt. No. 96 in 11–CV–386). The evidence considered in the motion for summary judgment included a video tape of the incident. (*Id.* at 2–3 & n. 4). Magistrate Judge Homer found that plaintiff had failed to allege the requisite "physical injury" to sustain a claim under the Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e(e). (*Id.* at 9–10). The court also considered plaintiff's "failure to protect" claim under the Eighth Amendment and found that it failed under both the objective and the subjective prong of Eighth Amendment analysis. (*Id.* at 11–13). Judge Homer also found that there was no allegation that either of the inmates had prior physical contact with plaintiff, that defendant Lynn–Caron knew that the inmate was an enemy of plaintiff's, or that the two inmates were going to be placed in the same holding pen. (*Id.* at 12–13). The issue of the 2011 "assault" was fully litigated and decided against plaintiff. Plaintiff had every opportunity to make his claim in 11–CV–386, and he is barred by res judicata and collateral estoppel from bring any claim regarding the 2011 assault against any of the defendants.

## VI. *Personal Involvement*

### A. Legal Standard

In order to recover damages in a civil rights action, plaintiff must allege a defendant's direct or personal involvement in the alleged constitutional deprivations. *Farrell v. Burke,* 449 F.3d 470, 474 (2d Cir.2006). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (*citing, inter alia, Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN11] Personal involvement requires that the individual who is, or becomes aware of, the violation, have the ability to take action to correct the problem. *See Conklin v. City of Suffolk,* 859 F.Supp.2d at 441–42 (personal involvement requires knowledge *and* the ability to take action).

> FN11. Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon,* are still viable after *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *See, e.g., Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y.2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y.2011)). See also *Young v. Choinski,* 15 F.Supp.3d 172, No. 3:10–CV–606, 2014 WL 962237, at *10–12 (D.Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited

the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

**B. Application**

**\*11** In this case, plaintiff has named defendants Rock, Fischer, Bezio, LeClaire, Knapp–David, Carvill, and Botsford. Plaintiff claims that these defendants were told in 2006 that plaintiff had enemies at Upstate. (Compl.¶ 12). Plaintiff claims that he wrote a letter to defendants Fischer and Knapp–David in April of 2007, but "to no avail to date." (Compl.¶ 14). As stated above, any claims based on conduct prior to 2010 are barred by the statute of limitations. In addition, defendants Fischer, LeClaire, Knapp–David, Carvill, and Botsford are supervisory defendants who have offices in Albany and do not work at Upstate. To the extent that plaintiff alleges that he wrote letters to these defendants, but that his letters were ignored, such allegations are insufficient to establish personal involvement. *See Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement).

Plaintiff claims that he was attacked on August 27, 2012. (Compl.¶ 19). On October 3, 2012, plaintiff claims that someone threw feces at him during recreation. (Compl.¶ 20). On October 24, 2012, plaintiff claims that a sergeant, assigned to the console, opened the cell door for an inmate who "attempted to come at plaintiff." (Compl.¶ 21). The complaint does not allege anyone's responsibility for these three incidents. Plaintiff only alleges that the incidents occurred. Although plaintiff titles his next claim "Seven Attack," he only states that in December of 2012, plaintiff informed defendants Fischer and Rock that gang members were "putting plaintiff's life in jeopardy" by placing notes in "numerous meal trays," accusing plaintiff of raping a little girl. (Compl.¶ 22). Plaintiff does not allege that he was harmed or attacked as a result. Plaintiff alleges only that defendants have not taken any action to protect him. (*Id.*)

There is absolutely no connection between the supervisory defendants and any of the incidents described by plaintiff. The fact that plaintiff may have written to defendant Fischer and some of the other Albany defendants in 2006 or 2007 does not show that they were personally involved in conduct that occurred in 2012. Plaintiff's conclusory allegations are insufficient to allege the requisite personal involvement. Thus, the complaint may be dismissed as to defendants Fischer, LeClaire, Knapp–David, Carvill, and Botsford. The complaint may also be dismissed as against defendants Rock and Bezio. Even though both of these defendants work at Upstate, there is no indication that either of them were aware of any danger with respect to the recent incidents.

**VII.** *Failure to Protect*

**A. Legal Standards**

An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain. ' " *Hendricks v. Coughlin,* 942 F.2d 109, 112 (2d Cir.1991) (citation omitted). An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of other inmates states a claim under section 1983. *Id.* at 113.

**\*12** In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, **_and_** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The plaintiff must show that prison officials **_actually knew of and disregarded_** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

## B. Application

There is absolutely no indication that the defendants were aware of a serious risk of harm to plaintiff. Plaintiff has alleged no injuries as the result of any of the "attacks." This is particularly true in the more recent incidents. Plaintiff alleges only that he was "attacked" on August 27, 2012, that on October 3, 2012, feces was thrown at him during recreation, and that on October 24, 2012, an inmate "attempted" to come at plaintiff. Plaintiff does not even allege that there was an incident in December of 2012, merely that he informed defendants Fischer and Rock that inmates were placing false accusations in notes which were placed on other inmates' food trays. Plaintiff's failure to protect claims must fail.

## VII. *Opportunity to Amend*

In addition to the requirement that pro se complaints must be "liberally construed," the court should generally not dismiss without granting leave to amend at least once. *Contreras v. Perimenis,* No. 13–3337, 2014 WL 1409495, at *1 (citing *Cuoco v. Moritsugu,* 222 F.3 99, 112 (2d Cir.2000)). The court may deny leave to amend when the amendment would be futile. *Id.* (citing *Pan gburn v. Culbertson,* 200 F.3d 65, 70–71 (2d Cir.1999)).

## B. Application

This case is clearly a situation in which plaintiff should not be afforded the opportunity to amend. As stated above, many of plaintiff's claims are barred by the statute of limitations, and one is barred by res judicata. Plaintiff has brought many similar cases in this district alone. Plaintiff has three-strikes in this court and granting him the opportunity to amend would not be appropriate under the circumstances.

## IX. *Sanctions*

## A. Legal Standards

The court has the authority to sanction parties and attorneys for frivolous and vexatious conduct before the court. *See Mahoney v. Yamaha Motor*

*Corp. U.S.A.,* 290 F.R.D. 363, 367 (E.D.N.Y.2013) (outlining the various bases for awarding sanctions) (citations omitted). One of the vehicles by which the court may impose sanctions is through its "inherent power," born of the "practical necessity" for a court to be able to manage its own affairs so as to achieve the orderly and expeditious disposition of cases *Id.* (citing *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 71, 78 (2d Cir.2000)). Similar to sanctions under 28 U.S.C. § 1927, applicable to attorneys, the inherent power to sanction requires that the party requesting sanctions present " 'clear evidence that the challenged actions are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes.' " *Id.* (quoting *Oliveri v. Thompson,* 803 F.2d 1265, 1272 (2d Cir.1986)). " 'A claim lacks a colorable basis when it is utterly devoid of legal or factual basis.' " *Id.* (quoting *Reichmann v. Neumann,* 553 F.Supp.2d 307, 320 (S.D.N.Y.2008)). However, the court must find both lack of merit and improper purpose, neither alone with suffice. *Id.* (citations omitted).

## B. Application

**\*13** Defendants move for sanctions against plaintiff, and plaintiff requests sanctions in connection with the removal. Because this court has found that defendants' removal was proper, plaintiff's request for sanctions must be denied as moot. Defendants support their request for sanctions on the argument that plaintiff filed his case in New York State court in order to avoid the three-strikes rule in federal court. However, it was the defendants' choice to remove the action to federal court. There is concurrent jurisdiction over section 1983 actions in state court, and although this plaintiff may merit sanctions for many of his cases, because this court is recommending dismissal with prejudice, it is sufficient sanction for the plaintiff. The court is well-aware that plaintiff has multiple actions that defendants have been removed to federal court, and this court is not precluding a later finding that plaintiff has been vexatious in his behavior. But the court does not do so at this point.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7410227 (N.D.N.Y.)
**(Cite as: 2014 WL 7410227 (N.D.N.Y.))**

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that plaintiff's motion to remand to state court (Dkt. No. 5) is **DENIED,** and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 2), be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS WITH PREJUDICE,** and it is

**RECOMMENDED,** that defendants' motion for sanctions (Dkt. No. 2) and plaintiff's motion for sanctions (Dkt. No. 5) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **fourteen (14) days** within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), & 6(e).

Filed Dec. 3, 2014.

N.D.N.Y.,2014.
Johnson v. Rock
Slip Copy, 2014 WL 7410227 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.